**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SVOTHI INC.,

                    Plaintiff,

          v.

DARK ALLEY MEDIA, LLC and
ROBERT FELT,

                    Defendants.

Civil Action No. 25 CV 00333

**DECLARATION OF ROBERT FELT IN SUPPORT OF ORDER TO SHOW CAUSE**

COMES NOW, Robert Felt, under 28 U.S.C. § 1746, and hereby declares under penalty of perjury that the following is true and correct:

1.      I am the owner of a fifty percent interest in and the managing member of Dark Alley Media, LLC ("DAM"), a New York-based media company specializing in the production and distribution of adult content. I have served as the President of DAM from its foundation and shepherded it from an undercapitalized start up funded on credit card debt, into a profitable studio with international recognition and a library of over 300 titles. I was present for and knowledgeable of nearly every part of the growth and development of DAM, including DAM's creation of, and first use of the brand "Raw Fuck Club," ("RFC")

2.      I have utilized the professional name Owen Hawk since 2001, when I began my career as a performer in the adult industry. My performer career has been one of historical note, and my resume of achievements in this industry is one that few others can match. I have built a reputation as a performer, producer, and

entrepreneur, won coveted awards such as Performer of the Year, Starred in a comedic film alongside RuPaul, and produced 2 independent feature films, one of which debuted at the Toronto International Film Festival. In 2020 I was inducted into our industry's Hall of Fame.

3.      The following facts and attached exhibits recount and support my creation of the common-law trademark in various marks used by DAM, their first and continued use in commerce, as well as the history of the RFC website from its initial registration through the present. I am also providing along with this affidavit documentation and evidence supporting my statements.

4.      DAM began filming in late 2004 and incorporated as an LLC in May of 2005.

5.      Between 2004 and August 2007 DAM was focused on the release of DVD titles branded "Dark Alley Media" and featuring only the DAM mark, which appears as a small green street sign.

**Creation and Use of JV Marks by Dark Alley Media Since 2007**

**6.**      In 2006 DAM opened its own distribution arm, a decision that proved critical as it saved the company from going under and allowed DAM to grow into the future. We signed a few labels, acquired a library of titles from a company whose owner was retiring, and brainstormed on producing a second line of films that would complement our main, DAM branded ones. After month of deliberating on this, I came up with the brand RFC and on August 2, 2007 I registered the corresponding domain rawfuckclub.com. **EXHIBIT 1** attached hereto is a true and correct copy of **the Domain Registration.**

7.     Follow the domain registration, on August 20, 2007, DAM began filming the first scenes that would become the DVD "RFC-001: Raw Fuck Club." Internal production documents, including model release forms, signed and dated, confirm this. **EXHIBIT 2** attached hereto is a true and correct copy of **Production Documents**.

**8.**     RFC-001 would not be sold until 2008; however, DAM began immediately utilizing RFC on packaging for the movie "Raw in Paris" which we had acquired earlier in 2008. Attached is a screenshot of darkalley.com. This page shows an image of the video and the mark RFC in the upper right area and is proof of use of the mark in interstate commerce, by anyone, anywhere in the world and 3 years prior to the date that Plaintiff/ Svothi, Inc. ("Counterclaim Defendant") claims use in the Complaint. **EXHIBIT 3** attached hereto is a true and correct copy of **a screenshot of darkalley.com dated 8/26/07.**

**9.**     Additional evidence of our first use of the marks prior to 2009 are the attached portions of sales reports from AEBN, a leading provide Video-on-demand, (VOD) digital streaming. These reports show the release of titles designated as Raw Fuck Club studios, beginning in April of 2008. By January 2010, when Counterclaim Defendant claims its first use, DAM had already commercialized 8 titles featuring the RFC branding and mark on the AEBN network. **EXHIBIT 4** attached hereto is a true and correct copy of **AEBN sales reports.**

**10.**     DAM has consistently used the mark from August 2007 through today, releasing a total of 165 DVD titles in those years. **EXHIBIT 5** attached hereto is a

true and correct copy of **RFC DVD Releases.**

11.     Additionally, DAM possess 2 additional DVDs that are ready for release, but have been held back due to this dispute.

**History of JV Marks and Website and Relationship with Damian Todaro, The Owner of Svothi, Inc. and VideoApp.**

12.     My relationship with Damian Todaro began in the mid-2000s and was initially built on mutual trust and collaboration.

**13.**     For 2 years (2008 -2010) our companies shared an office lease on the 5th floor of 939 8th Avenue. The friendship, existing working relationship, and complimentary specialties of our companies made for a natural partnership, and by 2010 RFC we developed rawfuckclub.com into a membership site. The launch of the site included a redesign of the mark, adding biohazard graphic for distinctiveness and to align with the established brand's identity. **EXHIBIT 6** attached hereto is a true and correct copy of **History Of The JV Marks.**

14.     The redesign of the RFC mark first appears on the 9th DVD release in the RFC line and because DVD was still our primary form of distribution, we splashed the domain all over the front cover of the DVD  to help with marketing efforts.

15.     I do not remember, and do not believe that a written contract existed for this site, but we treated it as a joint venture with a 50/50 profit split after deductions for credit card processing fees and shared expenses for marketing.

16.     In 2010 DAM outgrew the shared office space and DAM offices moved to

40th Street. The years 2010 - 2015 would be the peak years of the DAM. Overcoming immense odds, DAM had established itself via retail and wholesale DVDs, an exclusive contract with AEBN, became a market leader in Video On Demand, and with our membership site, was not only growing, but had become a launching pad for performers who would go on to industry stardom.

17.    During this time Mr. Todaro and I maintained our friendship.

18.    In 2015 DAM moved its DVD distribution arm to Fort Lauderdale, FL to lower warehouse costs in response to the industry-wide decline in revenue from DVD sales. In 2017 the industry began a massive shift as it experienced a major disruptive event—the launch of a website called onlyfans.com. OnlyFans changed the market and the rules of the game by letting performers create accounts where they could post their own videos and sell recurring memberships directly to customers through twitter and other social media. For studios, like mine, this caused panic and readjustment.

19.    Conversations Damian and I had on Skype, which I recently reviewed in preparation for this affidavit, show that both Damian and I expressed significant concern due to sagging membership sales and concerns about the future viability the single-studio membership model. We exchanged many ideas but did not come up with anything we liked.

20.    Considering the new industry trends, I began to conceptualize how they could be used to our advantage. In my experience managing distribution I knew of the importance of secondary and even tertiary distribution. While many people

were trying to be "the next only fans" no one was positioning for a role in secondary distribution.

**21.**    On Nov 8th, 2017, I made the initial pitch for what would be the next evolution of the site, a redesigned, scalable distribution platform that allowed for the integration of performer produced "fan" content via a YouTube-like "channels" system. We would refer to this as RFC Channels. **<u>EXHIBIT 7</u>** attached hereto is a true and correct copy of **Skype messages showing the origin of RFC Channels**.

**22.**    Over the next 13 months Damian, together with myself and others at DAM, developed and eventually launched the new platform. Messages confirm that Todaro acknowledges my role and "deep involvement since day 1". **<u>EXHIBIT 8</u>** attached hereto is a true and correct copy of **Confirmation of Robert's Deep involvement.**

**23.**    As my design of the 4th version of the RFC mark appearing in Skype Messages via texts between me ("F4G") and Todaro ("Damian"). **<u>EXHIBIT 9</u>** attached hereto is a true and correct copy of **First instance of 4th mark**.

**24.**    The matter of trademarks and domain ownership was part of these ongoing conversations, and the record shows that I consistently maintained DAM's ownership of the brands and domain, the need to keep the RFC brand strong and independent, and that Damian consistently agreed with me and expressed that he had no intent to claim the trademarks and in Exhibit 10 (which texts read from bottom to top). Damian admits he does not believe that he should have ownership

of the name RFC or brand. **EXHIBIT 10** attached hereto is a true and correct copy of **Statements on brands and trademarks.**

25.    Notably missing from these extensive conversations is any mention of any other party, including Svothi, Inc., which to the best of my knowledge and belief, is wholly owned by Damian Todaro.

**The Joint Venture Agreement Between VideoApp, Inc. (VideoApp) and DAM**

26.    Over 13 months of talk between me and Todaro regarding a written agreement resulted in a signed Joint Venture Agreement ("JVA") effective January 1, 2019. **EXHIBIT 11** attached hereto is a true and correct copy of **The Joint Venture Agreement.**

27.    The JVA was made between DAM and VideoApp, Inc. ("VideoApp") (which is identified as PPVNetworks in the agreement), and indicates that the website rawfuckclub.com was part of collaborative efforts that began in 2010. The final language regarding intellectual property reflects the importance both parties made in creating the brands value, and states the domains and brands are owned by the JV regardless of which party actual possesses the domain.

28.    Termination provisions were written to cover different possible scenarios. If one party felt the other was in breach, they were required to send written notice to the to the other via overnight delivery explaining the breach and giving a window to cure of either 30 days for financial breach or 45 days for non-financial breach. In all termination scenarios, DAM's rights to the brands and domain persist.

29.     For example, in paragraph 12.4 applicable if the JV Agreement is terminated due to the breach of VideoApp, the agreement has VideoApp completely losing its rights to use the brands or the websites (emphasis added):

> 12.4 Upon termination of this agreement by PPVNetworks due to Breach, as described in 12.1,
>
> a. PPVNetworks *shall provide DAM with digital assets, including but not limited to metadata, source video and encoded stream files, and customer database tables*;
>
> b. *DAM gains all rights to RFC Brands, Content and Domain names* for monetization of Content.

Even if the JV Agreement is terminated due to the breach of DAM, the JVA under paragraph 12.3 merely grants to VideoApp the right to "utilize" the domains and marks, and indicates that DAM is entitled to receive continued compensation via royalties for its content on the site, that is, DAM retains its rights to the marks and Brands but must share them with VideoApp (emphasis added):

> 12.3 Upon termination of this agreement by DAM due to Breach, as described in 12.1,
>
> a.     PPVNetworks, at its discretion, *may continue to utilize the RFC Brands, Content and Domains,* for continued operation of Sites
>
> b.     PPVNetworks may produce, or outsource production of, new RFC-branded Content to used on Sites;
>
> c.     In lieu of pre-termination Consideration that was granted by this Agreement, after termination PPVNetworks shall pay to the shareholders of DAM**,** as determined at time of breach, and pro-rated based on their percent of ownership of DAM, a revenue share for the continued commercialization of Content originally produced and supplied by DAM. This revenue share shall be consistent with the payment schedule

used for all Independent Producers on Sites, or alternately as
agreed to in writing by Key Members.

30.    As per 12.3 c., quoted above, compensation survives the life of DAM itself,
in that it instructs royalties to be paid to the shareholders based on the ownership
at the time of DAM's breach (if such occurs). Furthermore, there is no language
requiring DAM to choose to commercialize or not commercialize DAM's content on
the site(s). It was my understanding that 12.3c c. requires PPV Networks to
continue to commercialize DAM content and make payments to the shareholders
as specified.

**Counterclaim Defendant's Role And Alter Ego Relationship with VideoApp, Inc.
(VideoApp)**

31.    Counterclaim Defendant, Svothi, Inc. and VideoApp, Inc. share the same
business address, ownership by Damian Todaro, and attorney, Wesley Mullen, Esq.
This overlap in corporate structure and representation demonstrates a lack of
separation between the two entities, suggesting that they operate as a single
economic unit.

32.    Counterclaim Defendant issued payments to DAM under the JVA, despite not
being a signatory to the agreement. These payments were made pursuant to profit
shares due to DAM from the proceeds of the exploitation of DAM's videos on the
websites operated under the JVA.

33.    Counterclaim Defendant and VideoApp, Inc. operate under the same d/b/a,
"PPVNetworks" and operates at 228 Park Avenue South, Unit 40543, New York, NY
10003. **EXHIBIT 12** attached hereto is a true and correct copy of **screenshots of**

the rawfuckclub.com website.

34.    Counterclaim Defendant and VideoApp, Inc. utilize similar websites, also with addresses, 228 Park Avenue South, Unit 40543, New York, NY 10003, that evidence the same control and function. **EXHIBIT 13** attached hereto is a true and correct copy of **screenshots of Videoapp.net, Svothi.com, and PPVNetworks.com websites.**

35.    Counterclaim Defendant's involvement in the joint venture, including (a) issuing payments to DAM and, (b) in this action asserting ownership of the JV Marks (as defined below), demonstrates its lack of independence from VideoApp, Inc.

36.    Counterclaim Defendant and VideoApp, Inc. have failed to maintain separate corporate identities, commingling their operations and resources to the detriment of DAM.

37.    Counterclaim Defendant's actions, including its attempt to circumvent the arbitration process and assert independent ownership of the JV Marks, further demonstrate its bad faith and alter ego relationship with VideoApp, Inc.

**Operation of the Joint Venture Websites**

38.    Initial implementation of the channels was bumpy as many performers did not understand the revenue model as it was unique to the industry and more complex than the models employed on OnlyFans and similar sites. However, over the following years, RFC Channels grew into a success. DAM not only met all of the production requirements, but went above and beyond our duties, performing customer services roles, recruiting new producers, and

demonstrated consistent commitment to the growth of the Channels platform.

39.     The majority of the most valuable channels came from DAM's deliberate recruitment of popular performers by first offering them paid studio work, and then introducing them to the RFC Channels program after we had established a business relationship and trust. VideoApp could not have built up RFC channels without DAM, and it relied on DAM for connection to the performers, as well as the good will that DAM created through its deliberate efforts and dedication to the success of the platform.

40.     DAM worked through the COVID epidemic, risking our own lives to assure consistency of productions. Our work was noted for excellence across the industry through multiple award nominations, including winning a highly prized AVN award, the second one in the company's 20-year history. **EXHIBIT 14** attached hereto is a true and correct copy of the **AVN Award 2020.**

41.     By 2023, RFC Channels was not only the flagship offering of VideoApp, but it was also where VideoApp placed all its future hopes, as evidenced by this post on affiliate board where they ask all their affiliates to stop sending traffic to any site on their network other than RFC. **EXHIBIT 15** attached hereto is a true and correct copy of **an Affiliate Board Post.**

42.      VideoApp had tried implementing their channel's software on other sites but were not able to achieve success. Only RFC was able to gain significant traction and pose the best future potential.

43.    The success of the RFC did not come from any code or webpage technology implemented by VideoApp, which was utilized on other sites to no avail, but instead came as a direct result of efforts that DAM, myself, and others put in from the point of conception through implementation. Without these efforts of DAM, VideoApp and Damian Todaro would not be where they are today, nor positioned well for their future.

44.    My personal efforts, together with the "clout" that I brought due to my performance success and popularity, have been central to the success of the site and the value of the brands since their inception 17 years ago. My personal connection to RFC runs deep. I take immense pride in calling myself an owner and it was a source of self-worth and a recognition that I had beaten the odds against success. I had started out as a 24-year-old go-go boy dancing on tables in the East Village, and from there had built something that provided not only for myself and my future, but for others and their futures. I had built something larger than myself, and something I believed could endure; and I have spent half my life dedicated to the success on this project, and I count on it for my and DAM's future.

45.    Since the termination and VideoApp's refusal to turn over the brands and the marks and the websites, which was a betrayal not just of promises and assurances, but of the bonds of friendship and decades of good will and established trust, I feel robbed—not just of the value of all that hard work and dedication that got me here, but of my future, my hopes, and my sense of self.

46.    My business is on life support, my professional reputation maligned, and

the loss of my income has made every day a constant stress from economic duress. I make choices now about whether I will pay bills for legal fees or my rent. These are impossible decisions, and the consequences of this calculation are immeasurable.

**The Federal Lawsuit By Svothi Inc.**

47.     So, you can imagine how I feel about having to answer to Svothi's complaint, which is astoundingly dishonest, omits significant material evidence and paints me, the person with the deepest ties to RFC, as violating the rights of a corporate entity with no convincing claim to own these marks.

48.     DAM has first use, DAM has the domain registration, and DAM has continuous use of the brand and marks from 2007 to the present.

49.     The owenhawk.com website has a banner clearly displayed on the landing page of the site that the site was a "dummy site" and was not conducting any sales. **EXHIBIT 16** attached hereto is a true and correct copy of **the Banner on owenhawk.com**.

50.     Any harm that this use causes the Counterclaim Defendant is speculative, but if Counterclaim Defendant were to be granted the injunction it seeks, DAM will be significantly harmed as the majority DAM's assets are branded and known as RFC and it would assure DAM's inability to generate revenue through the entire court proceedings including the underlying arbitration pending before JAMS in New York City.

51.     The claim that the association of RFC with Owen Hawk creates market confusion is without merit. My professional identity as Owen Hawk is inseparable from these brands. The association of me and these brands is part of the cultural consciousness. A google search of "RFC" + "Owen Hawk" produces over 31,000 results! **<u>EXHIBIT 17</u>** attached hereto is a true and correct copy of **"RFC Owen Hawk" Google Search Results**.

52.     However, while Counterclaim Defendant speciously claims to have spent "millions of dollars" to make sure that customers and others associate the JV Marks exclusively with them, the same Google search of "Svothi" + "RFC", other than their name as PPVNetworks on the site, produces <u>one result</u> which is a link to its complaint in this action. **<u>EXHIBIT 18</u>** attached hereto is a true and correct copy of **"RFC Svothi" Google Search Results**.

**Purported Termination of the Joint Venture Agreement By VideoApp**

53.     On October 25th, 2024, VideoApp sent a letter that attempted to terminate the JVA without providing the required forty-five days' notice via overnight delivery, citing breaches they failed to substantiate. **<u>EXHIBIT 19</u>** attached hereto is a true and correct copy of **PPVN's Wesley Mullen Termination Letter**.

54.     The letter was rife with misstatements and language intended to manipulate and fool me. It pointed to 2 sentence fragments from an email exchange titled "working on ideas" and attempted to claim that such emails constituted official notice of breach.

55.    I am providing the court with the emails so it can see for itself that what they have tried to use to establish notice of breach contains neither of the words "notice" or "breach", though it does contain a statement by Damian Todaro regarding the area he "struggles the most" with is "maintaining IDs and consent" for performers.  **EXHIBIT 20** attached hereto is a true and correct copy of **VideoApp' emails**.

56.    The court should note that the primary reason VideoApp has claimed DAM was in breach was in regard to maintaining ID's and consent.

57.    The purported termination was unfair, unnecessary, and unsubstantiated and has left me in a state of emotional and economic duress. Since that time VideoApp has refused to pay DAM's revenue due from July 1, 2024, since August, citing rising costs and increased work, and nothing to do with DAM's performance. As a result, I have gone without income for 5 months, and I am under severe economic duress.

58.    Such constituted VideoApp breach of the JV Agreement which was duly noticed and resulting in termination of the agreement under Section 12.4. But rather than turn over the brands, marks and websites, instead Damian has instituted this spurious federal case on behalf of Svothi, Inc. in an effort to make an end-run around the terms of the JVA. The court should not allow this.

59.    The effects on DAM have been disastrous. DAM has put everything into the Joint Venture, confident in the established trust of a long-standing relationship and the contractual provisions of the JVA which assured its rights. Had those

clauses about notice, the assurances around rights, and other protections signed in the agreement not been included, DAM would not have invested so much time and effort into building of the platform.

60.    Now DAM finds itself unable to move forward given the uncertainty created by from the dispute over termination, as well as from Counterclaim Defendant's claim and the threatened injunction prayed for in the Complaint. This uncertainty forces DAM into a state of inaction, unable to commercialize the majority of the content it owns due to fact the entire library over the last 7 years bears marks that Counterclaim Defendant claims it owns and seeks to enjoin.

61.    To the contrary, all of these facts support DAM's motion for immediate injunctive relief against Counterclaim Defendant and its principals and affiliates in the form of a temporary restraining order and a preliminary injunction.

**Counterclaim Defendant's Infringement and Unfair Competition If Unchecked Will Continue To Cause Irreparable Harm**

62.    Because VideoApp had failed to pay DAM under the JVA since August 2024, DAM's counsel notified VideoApp of such breach (as well as others) and its obligation to cure via his letter of November 1, 2025 (attached as Exhibit 1 to the Declaration of Ravi Ivan Sharma filed herewith).

63.    Following VideoApp's failure to cure the notified breaches, DAM, via counsel, notified VideoApp of the termination of the JVA and demanded VideoApp comply with the terms of the JVA section 12.4. including to cease and desist from the use of

the marks belonging to DAM. attached as Exhibit 3 to the Declaration of Ravi Ivan
Sharma filed herewith)

64.    Such marks are consist of two of the identical marks alleged in the
Complaint, word mark "RFC" and image mark "RFC"  (together the "JV RFC
Abbreviation Letter Marks"), as well as the word marks "Raw Fuck Club", "RFC
Channels" (the "JV Word Marks") as well as the URLs "rawfuckclub.com, and
rfcchannels.com (the "JV URL Marks", which together with the JV Abbreviation
Letter Marks, and the JV Word Marks, the " JV Marks")

65.    However, since termination of the joint venture agreement due to VideoApp's
breach of the joint venture agreement, VideoApp, by and through Counterclaim
Defendant, has used and continues to use DAM's JV Marks.

66.     Counterclaim Defendant has used and continues to use DAM's JV Marks to
sell competing goods to many of the same consumers served by DAM.

67.    Unless Counterclaim Defendant and VideoApp are enjoined from using the
JV Marks, such use will continue to cause consumer confusion and will cause
irreparable harm to Counterclaim Plaintiff.

68.    Counterclaim Defendant and VideoApp, Inc. have continued to use the JV
Marks without authorization, causing significant harm to DAM's business and
reputation.

69.    Plaintiff's actions, including its claims of ownership over the JV Marks and
interference with DAM's business relationships, have caused financial losses and
reputational damage to DAM.

70.    Plaintiff's conduct constitutes trademark infringement, unfair competition, and a violation of DAM's rights under the JVA.

**The Equities Favor Enjoining Counterclaim Defendant From Use And Providing the Relief Sought In this Motion**

71.    The court should note the extreme imbalance in equities between DAM and VideoApp, who has been taking 100% of the profits since August 2024.

72.    The timing of this purported termination and present federal action—after RFC Channels had become self-sustaining through independent creators suggests a calculated effort to exclude DAM from the platform DAM, through my personal efforts, helped create and build.

73.    The allegations of the Complaint are contradicted by years of documented communications in which Damian affirmed DAM's ownership of the JV Marks and domains. It also disregards the JVA's terms, which limit VideoApp (and therefore Counterclaim Defendant's) claims even in the event of a breach.

74.    The reality is that all of VideoApp' websites other than RFC have decayed and affiliates, left unsupported, were instructed to abandon them and instead send all traffic to RFC, which upon information and belief has become the majority if not the entirety of VideoApp' business. This provides motive for VideoApp and Counterclaim Defendant to seek to take the RFC brands all to themselves via the spurious attempt to cancel the JVA and this lawsuit that seeks to avoid the JVA mandated arbitration.

75.    In conclusion, DAM and I have been the central force behind the creation, development, and success of RFC. My and DAM's efforts have created the marks and the brands, and also majority of the value of such thorugh both digital and hardcopy distribution sustained over 17 years. The suggestion that Counterclaim Defendant has a greater claim to the marks is not only unsupported by any facts or written documents but simply implausible.

76.    DAM's use in commerce of the marks pre-date that claimed by Counterclaim Defendant.

77.    DAM's rights have been repeatedly confirmed by the owner of Counterclaim Defendant which directly contradict its claims.

78.    The Counterclaim Defendant's bad faith here is evident in its omission of the JVA in the complaint and attempts to evade arbitration.

79.    This suit attempts to intimidate DAM and me and waste resources while creating confusion regarding the corporate structure of Counterclaim Defendant's business.

**DAM's Financial Inability to Post a Bond**

80.    Since August 2024, VideoApp has failed to pay DAM its share of revenue as required under the JVA between DAM and VideoApp.

81.    Specifically, VideoApp has withheld payments totaling at least $67,289.62 as of November 1, 2024, and an additional $146,959 in unpaid royalties and other

amounts due as of December 4, 2024. These amounts represent DAM's rightful share of profits generated under the JVA.

82.    The financial strain caused by VideoApp's non-payment has left DAM without sufficient funds to meet its operational expenses, let alone post a bond in connection with this litigation.

83.    DAM's inability to post a bond is directly attributable to VideoApp' breach of its payment obligations under the JVA, which has deprived DAM of the financial resources necessary to defend its rights and pursue its claims in this matter.

**Counterclaim Defendant's Lack of Standing and Inability to Demonstrate Harm**

84.    Counterclaim Defendant is not a party to the JVA between DAM and VideoApp. The JVA governs the ownership and use of the JV Marks and explicitly identifies DAM and VideoApp as the sole parties to the agreement.

85.    Plaintiff has not provided any evidence or documentation demonstrating that it has any legal or contractual rights to the JV Marks.

86.    The JV Marks were created, developed, and used in commerce by DAM beginning in August 2007, well before the execution of the JVA. The JVA further specifies that the JV Marks are the property of the joint venture and revert to DAM upon termination due to breach by VideoApp.

87.    Counterclaim Defendant's claims of ownership over the JV Marks are baseless and directly contradict the terms of the JVA.

88.     Because Counterclaim Defendant has no legal or contractual rights to the JV Marks, it cannot demonstrate that it will suffer any harm if it is enjoined from utilizing the marks.

89.     In contrast, DAM has suffered and will continue to suffer irreparable harm to its business, reputation, and ability to monetize its intellectual property if Counterclaim Defendant is allowed to continue its unauthorized use of the JV Marks.

**CONCLUSION**

90.     I respectfully request that the court consider these facts when evaluating the merits of the applications in this matter and order appropriate action to ensure fairness, accountability, and proper use of the legal process, including but not limited to, enjoining Counterclaim Defendant from any use of the marks and for all the other relief requested in the Counterclaim and our motion for injunctive relief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, NY
February 5, 2025


*Robert Felt*
Robert Felt (Feb 5, 2025 09:37 EST)
_____

Robert Felt