# EXHIBIT 11

*Svothi, Inc. v. Dark Alley Media, LLC, et. al.* No. 25 CV 00333 | Declaration of Robert Felt



# Joint Venture Agreement

This joint venture agreement commencing on January 1, 2019, between

VideoApp Inc, 228 Park Avenue, Unit 40543, New York, NY 10003, a Nevis corporation, hereinafter referred to as "PPVNetworks" and;

Dark Alley Media, LLC, 4005 NE 6th Ave, Oakland Park, FL 33334, a New York corporation, hereinafter referred to as "DAM;"

WHEREAS PPVNetworks brings technology, a robust and proprietary channels-based video delivery platform, operations (content management, customer service, billing, accounting, affiliate management), industry experience, industry connections;

WHEREAS DAM brings adult video production, 2257 management, industry experience, performer connections;

WHEREAS PPVNetworks and DAM wish to memorialize their joint venture operating an adult video website using the brand built by PPVNetworks and DAM together over the past 10 years and to confirm that the Domains, including but not limited to RAWFUCKCLUB.COM and the brand, Raw Fuck Club" and "RFC" are owned by the JV;

NOW THEREFORE PPVNetworks and DAM hereby declare this joint venture ("the JV") with the purpose of the operation of the adult video website under the Domains and the brands "RFC" and "Raw Fuck Club.".

## 1. DEFINITIONS

1.1 "Affiliate" means a company, or person, who promotes Sites and gets compensated either by revenue-share or pay-per-signup, a flat fee per conversion. Affiliate payouts are determined and negotiated by PPVNetworks with the goal of maximizing long-term Profit of the Sites;

1.2 "Agreement" means this agreement and any future amendments added in writing;



2

1.3 "Brands" and "RFC Brands" means the brands, trademarks and copyrights associated with the names "RFC", "Raw Fuck Club," "RFC Channels" and all versions of the logos associated with these names;

1.4 "Chargeback" means a free assessed by a merchant bank for transactions that are fraudulent or disputed by customers;

1.5 "Confidential Information" means any proprietary data or information acquired by the parties about the other party;

1.6 "Scenes" or "Content" mean the original video content created for Sites by DAM which includes metadata (descriptions, titles, list of performers, etc.) on a continuous basis. Scenes are 15 to 30 minutes in length, featuring two or more performers, and anal sex.

1.7 "Conversion" is a new member as determined by member joining with a uniquely new username;

1.8 "Domain Names" or "Domains" are the internet addresses of the Sites and are listed in Appendix B;

1.9 "Expenses" means shared advertising fees (to be agreed upon as they arise), merchant processing fees, independent producer revenue sharing and affiliate payouts;

1.10 "Force Majeure" means (a) acts of God; (b) flood, fire, earthquake, or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (d) government order or law; (e) actions, embargoes, or blockades in effect on or after the date of this Agreement; (f) action by any governmental authority; (g) national or regional emergency; (h) strikes, labor stoppages or slowdowns, or other industrial disturbances; (i) shortage of adequate power or transportation facilities; and (j) other similar events beyond the reasonable control of the party impacted by the Force Majeure Event;

1.11 "Key Members" are individuals considered to be essential to the performance of this joint venture. List in Appendix A;

1.12 "License" described in Section 3;

1.13 "Profits" means Gross Revenues (receipts) less Expenses;

1.14 "Sites" are membership websites operated by PPVNetworks using proprietary technology owned by PPVNetworks, using Domain Names owned by the joint venture, to monetize Content produced by DAM and other producers.

## 2. INTELLECTUAL PROPERTY

The parties acknowledge and agree the JV is the owner of the Domains, listed in Appendix B, and Brands throughout the world. Any goodwill derived from the use bt and licensee of the Domains and the Brands shall inure to the benefit of the JV. If any license acquires any rights in the Domains and the Brands, by operation of law, or otherwise, such rights shall be deemed and are hereby irrevocably assigned to the JV without further action by any of the parties;

2.2 The JV has the right to monetize and promote Content licensed by DAM, as RFC original content, as listed in Appendix D and described in Section 3;

2.3 The JV has the right to use proprietary channels-based video delivery platform developed by PPVNetworks, customized and branded for RFC as Sites;

2.4 Both parties agree that they shall not, during the Term or thereafter, directly or indirectly:

   I. do, omit to do, or permit to be done, any act which will or may dilute the Domains and the Brands or tarnish or bring into disrepute the reputation of or goodwill associated with the Domains and the Brands, or the other party, or which will or may invalidate or jeopardize any registration or registrability of the Domains and the Brands; or

   II. apply for, or obtain, or assist any person in applying for or obtaining any registration or any trademark, service mark, trader name or other [indicia] confusingly similar to the Domains and the Brands in any country.

2.5 To protect the intellectual property of the JV, both parties should respectively apply for or obtain registrations of the Brands with USPTO within the appropriate applicable International Classification of Classes of Goods and Services.

2.6 Trademarks may be registered by either party, for purposes of protecting the rights of the joint venture;

2.7 PPVNetworks should obtain registrations for Brands including but not necessarily limited to the following ID's per USPTO Nice database:

   038-434



Video broadcasting and transmission services via the Internet, featuring films and movies

038-384
Video broadcasting services over the Internet or other communications network featuring the uploaded, posted and tagged videos of others

2.8 DAM should obtain registrations for Brands including but not necessarily limited to the following ID's per USPTO Nice database:

041-897
Film and video production

2.9 Although the Domains shall be registered and managed by PPVNetworks during the Term hereof, the Domains (in addition to the Brands) shall be solely owned by the JV;

2.10 PPVNetworks acknowledges and is familiar with the high standards, quality, style and image of DAM, and PPVNetworks shall, at all times, conduct its business and use the Domains and Brands in a manner consistent with these standards, quality, style and image;

2.11 PPVNetworks shall comply with the specifications, standards and directions relating to the Domains and Brands, including their design, manufacture, promotion, distribution and sale;

2.12 In exercising its rights under this Agreement, PPVNetworks shall comply with and shall ensure that the products solds or otherwise supplied by PPVNetworks comply with all applicable laws. PPVNetworks shall promptly provide DAM with copies of all communications, relating to Domains and Brands, with any governmental, regulatory or industry authority;

2.13    PPVNetworks shall immediately notify DAM in writing giving reasonable detail if any of the following matters come to its attention:

   I. any actual, suspected or threatened infringement of the Domains and Brands;
   II. any actual, suspected or threatened claim that the Domains and Brands is invalid;
   III. any actual, suspected or threatened opposition to the Domains and Brands;
   IV. any actual, suspected or threatened claim that use of the Domains and Brands infringes the rights of any third party;
   V. any person applies for, or is granted, a registered trademark by reason of which that person may be, or has been, granted rights which conflict with any of the rights granted to PPVNetworks under this Agreement; or



VI. any other actual, suspected or threatened claim to which the Domains and Brands may be subject.

2.14 The JV allows DAM use of RFC Brands for commercialization of merchandise, such as clothing and sex toys;

2.15 The joint venture allows DAM use of RFC Brands for commercialization of physical DVDs and online adult streaming services listed in Appendix C, using Content created for Sites, repackaged into DVD with Dark Alley and RFC co-branding;

2.16 No rights are granted now, or upon termination of the contract, for either party to utilize the RFC Brands outside of those defined herein.

## 3. GRANT OF LICENSE

3.1 JV hereby grants to PPVNetworks, subject to the terms and conditions of this Agreement, a license to use the Domains and Brands on or in connection with the promotion, advertising, distribution Domains and Brands, including the right to use, integrate and incorporate in Sites and the rights for any affiliates of PPVNetworks to so promote;

3.2 The JV allows PPVNetworks to commercialize Content on its network of VOD and channels-based sites;

3.3 Grant of license is worldwide;

3.4 Notwithstanding termination of this Agreement, the License shall remain in effect indefinitely;

3.5 Grant of license is exclusive except as stated in 3.8 and 3.9 below;

3.6 Notwithstanding anything to the contrary in this Agreement, the parties hereto hereby grant permission to DAM to fully commercially exploit, without incurring of or payment of any royalty or licensing fee to the JV or PPVNetworks, all RFC branded content outside of the JV, in all available digital and printed forms, so long as it is packaged and presented in the format of a DVD;

3.7 Notwithstanding anything to the contrary in this Agreement, the parties hereby grant permission to DAM to fully commercially exploit, without incurring of or payment of any royalty or licensing fee to the JV or PPVNetworks, all RFC branded content that is more



than 1 year old (defined as 1 year from date of content's premiere on Sites) in all forms, DVD and scene, in all possible formats and through all possible distribution channels.

## 4. CONSIDERATION

4.1 In consideration for being a partner of joint venture discussed herein, and granting a License for use of originally produced Content to be used under the RFC Brands, Profits from Sites shall be split evenly, or 50/50 to PPVNetworks and DAM;

4.2 In consideration for granting the License, PPVNetworks shall pay DAM its published Independent Producer revenue sharing for referrals, streaming and downloads, for Content that appears in Channels or VOD on the PPVNetworks network of sites;

4.3 PPVNetworks shall provide DAM with real-time reports to check, and audit, revenues;

4.4 Disbursements will be paid monthly via ACH. Payments are made on or about the 10th of each month for the prior month's transactions;

4.5 Chargeback fee of $25 per occurrence plus prorated share of returned transaction.

## 5. DAM OBLIGATIONS

5.1 DAM shall supply and deliver to PPVNetworks Content as described in Appendix D;

5.2 DAM must continue to provide originally produced videos, including post-produced "ready to encode" video files of comparable format, length, genre, number of performers, appearance of performers, video quality (high-definition 16:9 video minimally compressed digital source), quality of sex acts (scenes must all contain anal and a cum shot from a majority of performers, and at least half of the minimum required scenes produced must include 3 or more performers);

5.3 Content shall be entirely original, directed and filmed by DAM, and not infringe upon any third party rights, title or interest. DAM indemnifies PPVNetworks from any damages suffered by it as relating to Content;

5.4 DAM shall design and deliver, using software provided by PPVNetworks, newsletters at a minimum of once per week;



5.5 DAM shall provide PPVNetworks with a legal address of Custodian of Records. DAM shall maintain records, for immediate delivery upon request, of model releases and proof of age for each performer in compliance with, and organized electronically and physically as specified by, USC 2257;

## 6. PPVNETWORKS OBLIGATIONS

6.1 PPVNetworks will operate a channels-based membership site at one or more of the aforementioned Domains. PPVNetworks will handle all aspects of Site operations, with the exception of original content production, including but not limited to hosting; software development and updates; cloud infrastructure architecture; registrar and domain management, management and protection; customer service; technical support; independent producer management; marketing operations using newsletters and twitter; cascaded payment processing; DoS/DDoS threat mitigation;

6.2 PPVNetworks will release content, including all associated marketing, on a regular basis. PPVNetworks manages the approval and scheduling of all content, however, RFC content is prioritized and released based on mutually agreed upon rules;

6.3 PPVNetworks will maintain its sites at or above industry standards for adult membership websites as it pertains to new web technologies, anti-piracy, support for new devices, industry trends, and guidelines set forth by market leaders (ie. Google, Twitter, Apple, etc.)
6.4 PPVNetworks will provide 24/7/365 operation of Sites;

6.5 PPVNetworks will provide a proprietary channels-based platform that allows for independent producers to create and manage channels of video content from which they can generate revenues conversions and production revenues;

6.6 PPVNetworks will employ digital fingerprinting technology to protect content from piracy and non-authorized distribution. Efficacy of these efforts is not guaranteed;

6.7 PPVNetworks has relationships with most tube providers and will issue DMCA takedowns for content that it finds is being exhibiting Content without permission. Efficacy of these efforts is not guaranteed;

6.8 PPVNetworks will process disbursements to DAM, studios, independent producers and affiliates in a timely manner.

6.9 PPVNetworks shall use its best efforts to promote the Domains and Brands, and;



I. provide such advertising and publicity as may reasonably be expected to bring Domains and Brands to the attention of as many purchasers and potential purchasers as possible; and

II. ensure its advertising, marketing and promotion of the Domains and Brands in no way reduces or diminishes the reputation, image and prestige of the Domains and Brands or of the products sold under or by reference to the Domains and Brands (including, without limitation, the Content);

## 7. CONFIDENTIAL INFORMATION

7.1 Each party agrees that from time to time it may be exposed to confidential information of the other party. Both parties will take appropriate steps to protect this confidential information, and neither party will disclose this confidential information to any third party or use any confidential information without prior written consent;

7.2 Except as set out in Section 6.3 below, "Confidential Information" means all non-public, confidential or proprietary information disclosed before, on or after the Effective Date, by either Party (a "Disclosing Party") to the other Party (a "Recipient") or its affiliates, or to any of such Recipient's or its affiliates' employees, officers, directors, partners, shareholders, agents, attorneys, accountants or advisors (collectively, "Representatives"), whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential," including, without limitation:

 i all information concerning the Disclosing Party's and its affiliates', and their customers', suppliers' and other third parties' past, present and future business affairs including, without limitation, finances, customer information, supplier information, products, services, organizational structure and internal practices, forecasts, sales and other financial results, records and budgets, and business, marketing, development, sales and other commercial strategies;

 ii the Disclosing Party's unpatented inventions, ideas, methods and discoveries, trade secrets, know-how, unpublished patent applications and other confidential intellectual property;

 iii all designs, specifications, documentation, components, source code, object code, images, icons, audiovisual components and objects, schematics, drawings, protocols, processes, and other visual depictions, in whole or in part, of any of the foregoing;

 iv any third-party confidential information included with, or incorporated in,



any information provided by the Disclosing Party to the Recipient or its Representatives; and

    v    all notes, analyses, compilations, reports, forecasts, studies, samples, data, statistics, summaries, interpretations and other materials (the "Notes") prepared by or for the Recipient or its Representatives that contain, are based on, or otherwise reflect or are derived from, in whole or in part, any of the foregoing;

**6.4 Exclusions from Confidential Information.** Except as required by applicable federal, state or local law or regulation, the term "Confidential Information" as used in this Agreement shall not include information that:

    i    at the time of disclosure is, or thereafter becomes, generally available to and known by the public other than as a result of, directly or indirectly, any violation of this Agreement by the Recipient or any of its Representatives;

    ii    at the time of disclosure is, or thereafter becomes, available to the Recipient on a non-confidential basis from a third-party source, provided that such third party is not and was not prohibited from disclosing such Confidential Information to the Recipient by a legal, fiduciary or contractual obligation to the Disclosing Party;

    iii    was known by or in the possession of the Recipient or its Representatives, as established by documentary evidence, before being disclosed by or on behalf of the Disclosing Party under this Agreement; or

    iv    was or is independently developed by the Recipient, as established by documentary evidence, without reference to or use of, in whole or in part, any of the Disclosing Party's Confidential Information.

6.5 The Recipient shall:

    v    protect and safeguard the confidentiality of all such Confidential Information with at least the same degree of care as the Recipient would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care;

    vi    not use the Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than the Purpose or any related transactions between the Parties, or otherwise in any manner to the Disclosing Party's detriment, including without limitation, to reverse engineer, disassemble, decompile or design around the Disclosing Party's proprietary services, products and/or confidential intellectual property;



vii    not disclose any such Confidential Information to any person or entity, except to the Recipient's Representatives who: (a) need to know the Confidential Information to assist the Recipient, or act on its behalf, in relation to the Purpose or to exercise its rights under the Agreement; (b) are informed by the Recipient of the confidential nature of the Confidential Information; and (c) are subject to confidentiality duties or obligations to the Recipient that are no less restrictive than the terms and conditions of this Agreement; and

viii    be responsible for any breach of this Agreement caused by any of its Representatives.

6.6 Parties will not reveal to any third party any particulars or details of this Agreement;

6.7 Except as specified in this Agreement, each Party hereby retains its entire right, title and interest, including all intellectual property rights, in and to all of its Confidential Information Except as specified in this Agreement, disclosure of such Confidential Information hereunder shall not be construed as an assignment, grant, option, license or other transfer of any such right, title or interest whatsoever to the Recipient or any of its Representatives;

6.8 Each party's obligation with respect to confidential information shall continue for 2 years from the date of termination of this Agreement.

## 8. REPRESENTATIONS AND WARRANTIES

8.1 Both parties represent and warrant to each other that it has been duly incorporated and is validly existing as a corporation under the laws of its government jurisdiction; it has the right to enter into this Agreement and perform its obligations;

8.2 DAM represents and warrants that it is the sole owner of Content; its intellectual property rights are not contested; Content complies with all application laws, regulations, treaties and restrictions of the United States, including USC 2257; no performers under the age of 21 appear in Content; no forced sex appears in Content; no beastiality appears in Content.



11

## 9. GENERAL PROVISIONS

9.1 Neither party shall be considered to be in default pursuant to this Agreement while the fulfilment of its obligations is prevented due to Force Majeure

9.2 In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction), and the balance of this Agreement shall be interpreted as if such provisions were so excluded and shall be enforceable in accordance with its terms;

9.3 All notices, solicitations of consent or approval, and other communications hereunder shall be in writing and shall be sent by certified or registered mail, return receipt requested, or by hand delivery or overnight courier with return receipt, addressed as set forth above;

9.4 No failure or delay by any party hereto in exercising any of its rights under this Agreement shall operate as a waiver thereof or of any other right, nor shall any single or partial exercise of any such right preclude any other or further exercise thereof, or of any other right. Each waiver or consent under any provision of this Agreement shall be effective only if in writing and in the specific instance and for the specific purpose for which it was given;

9.5 No provision of this Agreement may be amended or modified except by an instrument in writing executed by both of the parties hereto. Any such written amendment or modification will be binding upon the parties and the JV;

9.6 Parties shall not assign the rights or obligations created pursuant to the terms of this Agreement without the express written consent to such effect of the other party;

9.7 Any and all disputes arising from or relating to this Agreement shall be submitted to full and final resolution by binding arbitration, to be conducted in New York, New York. Arbitrator will be mutually selected by Key Members from both parties, and a lawyer with 10+ years' experience with entertainment law. Judgment on the arbitration award may be entered in any court of competent jurisdiction;

9.8 Parties shall not assign the rights or obligations created pursuant to the terms of this Agreement without the express written consent to such effect of the other party;

9.9 This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement;

9.10 If either party breaches its obligations under this Agreement, the non-breaching party shall give the breaching party written notice of such breach, and the opportunity to cure such breach for a period of thirty (30) business days after delivery of the notice of breach with respect to a monetary breach, or forty-five (45) business days after delivery of the notice of breach with respect to a non-monetary breach.

## 10. EFFECTIVE DATE

10.1 This Agreement shall commence effective as of the date indicated at the beginning.

## 11. TERM

11.1 The term of this Agreement shall commence on the date hereof and shall be perpetual, subject to the provisions of this Agreement.

## 12. TERMINATION

12.1 This Agreement shall Terminate due to Breach in any of the following circumstances:

a. if a party fails to fulfill any of its obligations hereunder and does not remedy the default as per 9.10;

b. if either party (a) becomes insolvent or admits its inability to pay its debts generally as they become due; (b) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which is not fully stayed within [seven] business days or is not dismissed or vacated within 60 days after filing; (c) is dissolved or liquidated or takes any corporate action for such purpose; (d) makes a general assignment for the benefit of creditors; or (e) has a receiver, trustee, custodian or similar agent

13

appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business;

c. in the unlikely event such as death, permanent incapacitation, incarceration for 30 days or more, or any life event that causes a Key Member to be unable to perform his duties or maintain decision-making authority;

d. in the event of significant organizational changes that limit the decision-making power of a Key Member within the organization, such as a buyout, merger or large transfer of shares.

12.2 This Agreement shall Terminate by Mutuality in any of the following circumstances:

a. upon the written consent of both parties;

b. In the event site revenues fall to below profitability for either, or both, of the parties forcing inability to meet Obligations as described in Sections 4 and 5. The specific metrics for this trigger need to be discussed further.

12.3 Upon termination of this agreement by DAM due to Breach, as described in 12.1,

a. PPVNetworks, at its discretion, may continue to utilize the RFC Brands, Content and Domains, for continued operation of Sites;

b. PPVNetworks may produce, or outsource production of, new RFC-branded Content to used on Sites;

c. In lieu of pre-termination Consideration that was granted by this Agreement, after termination PPVNetworks shall pay to the shareholders of DAM, as determined at time of breach, and pro-rated based on their percent of ownership of DAM, a revenue share for the continued commercialization of Content originally produced and supplied by DAM. This revenue share shall be consistent with the payment schedule used for all Independent Producers on Sites, or alternately as agreed to in writing by Key Members.

12.4 Upon termination of this agreement by PPVNetworks due to Breach, as described in 12.1,

a. PPVNetworks shall provide DAM with digital assets, including but not limited to metadata, source video and encoded stream files, and customer database tables;



14

b. DAM gains all rights to RFC Brands, Content and Domain names for monetization of Content.

12.5 Upon Termination by Mutuality, the parties agree to shut down the Sites and discontinue use of RFC Brands, Domains and Content. The parties must mutually agree in writing to a path forward for monetization of RFC Brands, Domains and Content.

## 13. BUSINESS CONTINUITY

13.1 PPVNetworks will provide DAM with all the necessary development and admin contacts, and other staff necessary for DAM to continue operations;

13.2 DAM will provide PPVNetworks contacts to all current and recent production and post-production staff, and a contact database for performers and applicants. DAM will provide PPVNetworks with a cloud storage system of 2257 records;

13.3 A designated agent will be assigned by both parties to deliver this business continuity information and data in the event of death, permanent incapacitation, incarceration of a Key Member, or either party becomes insolvent or bankrupt.

**SIGNATURE PAGE TO FOLLOW**

15

_____     3/25/19
Damian Todaro                        Date
President
PPVNetworks

_____     3/25/19
Robert Felt                          Date
President
Dark Alley Media, LLC


**APPENDIX ATTACHED**



## APPENDIX A

List of Key Members:

Damian Todaro
Robert Felt

## APPENDIX B

List of Domain Names:

RAWFUCKCLUB.COM
RFCCHANNELS.COM
RFCMEN.COM

## APPENDIX C

List of Online Streaming Services:

AEBN
Naked Sword

## APPENDIX D

Listing of Content licensed by DAM to joint venture:

- Entire library of existing Scenes, produced under the following lines: Raw Fuck Club, Dark Alley, Dark Alley XT, Fisting Underground and Darkroom
- 2 new originally produced Scenes per month