**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SVOTHI INC.,

                              Plaintiff,

            v.

DARK ALLEY MEDIA, LLC and
ROBERT FELT,

                              Defendant
            s.

Civil Action No. 25 CV 00333

**REPLY DECLARATION OF**
**ROBERT FELT IN SUPPORT**
**OF ORDER TO SHOW CAUSE**

COMES NOW, Robert Felt, under 28 U.S.C. § 1746, and hereby declares under

penalty of perjury that the following is true and correct:

**INTRODUCTION**

1.  I am the managing member of defendant Dark Alley Media, LLC ("DAM") amd

    I present this Reply Affidavit to present testimony and  evidence addressing

    issues raised by the Plaintiff in its opposition to DAM's request for a

    preliminary injunction and also to present newly discovered evidence I located

    since the filing of my first Declaration In Support of Order To Show Cause.

2.  It has been difficult diving through nearly two decades of communications

    between the parties and myself. I apologize for not being able to locate these

    earlier, but they are directly related to the claims in the case, especially the

    claim by Plaintiff that it is not the alter ego of either Video App, Inc.

    ("VideoApp") or its owner Damian Todaro ("Todaro").

3.  I must also begin by noting that Plaintiff has failed, both its complaint, and in

its subsequent papers in opposition to this motion, to offer evidence sufficient to establish a valid, enforceable trademark under the Lanham Act - a prerequisite for bringing charges of Trademark Infringement. I want to make my view on this very clear, their case against me and my company should be dismissed.

4.  Plaintiff claims that its mere use of various marks (the "RFC Marks" defined in the Complaint) on the rawF**kclub.com (the "Site") it claims it has owned and operated since 2010 gives it all the rights to all the RFC Marks.  However, as evidence presented below shows, prior to 2023 Plaintiff never owned or operated the Site except, if at all, under the joint control of Todaro .

5. It is undisputed that Todaro is the sole owner and CEO of Plaintiff  and Video App, and apparently 3 or more other companies he operates together as one under the dba PPVNetworks.

6. In addition, even when Plaintiff's name first appeared on the Site in its Terms of Service, such terms indicated that much of the content that appeared on the Website, i.e. the DAM produced Raw F**k Club ("RFC") videos, were *licensed by VideoApp.* Such is consistent with the terms of the Joint Venture Agreement ("the JV Agreement") between VideoApp and DAM  because VideoApp's role in the Joint Venture ("JV") was explicitly the operation of the Site (and others) while DAM's role was to provide the RFC branded content it had been producing since 2007.

7. Plaintiff's admission that the content either is owned by the independent producers or is licensed by VideoApp is not consistent, however, with Plaintiff's

assertion ever had any rights to the RFC Marks, except, perhaps, at best, as a licensee from the JV via VideoApp.

**FIRST AND CONTINUED USE OF RAW F*** CLUB**

8. Plaintiff has offered at least five exhibits of my social media posts, compared to its offer of zero exhibits to establish its first use or other rights to the RFC Marks.

9. While in my prior Declaration in Support of this motion I included what I believed are sufficient examples of DAM's First Use of Raw F**k Club ("RFC") prior to 2010, although Plaintiff failed to challenge the validity of my examples, I think it worthwhile to offer more examples in support of our Counterclaims.

10. DAM's use of Raw F**k Club prior to 2010 was extensive across all channels of distribution, including retail DVD sales, wholesale DVD sales, and digital distribution through both Video-On-Demand (VOD) and digital downloads. Our well documented, multi-platform distribution of Raw F**k Club branded content, together with our 2007 registration of rawF**kclub.com, all occurring prior 2010 give us priority of use over Plaintiff who has shown no proof except for the declaration of plaintiff's employee bookkeeper, Cynthia Corso, who admits she can have no personal knowledge of anything prior to start of employment about 10 years ago. I did not notice that she indicated what about her duties provided her with any of the information she stated in her declaration.

11. **EXHIBIT 1** attached hereto is a true and correct copy of a 2009 XBIZ industry

press release referencing Dark Alley Media and its *"subsidiary line[] Raw F\*\*\* Club"*.

12. **EXHIBIT 2** attached hereto is a true and correct copy of  Fleshbot Reviews of RFC branded films from 2009.

13.  **EXHIBIT 3** attached hereto is a true and correct copy of Adult DVD Talk entry for Load Factory showing release date 02-06-09

14. DAM's use of RFC as a brand mark on our products began in 2007 and continues through today across multiple platforms, including digital and hard goods, online retail sales, and wholesale.

15. As the listed owner of the domain from 2007 to 2018, our involvement in rawF\*\*kclub.com membership sales is irrefutable.

16. **EXHIBIT 4** attached hereto is a true and correct copy of Examples of Continuous use, including screenshots of "darkalleydvd.com", "XBIZ press releases", and "articles on JRLCharts".

17. **EXHIBIT 5** attached hereto is a true and correct copy International Adult Film Database, entry for Distributors: Dark Alley Media showing releases 2005 - 2025

18.  Historical WHO IS records name Robert Felt as the domain holder from 2007 to 2018. Subsequent WHO IS records are redacted for privacy, however I have never signed or agreed to any transfer of ownership of the domain other than to the Joint Venture. As Plaintiff was not party to the JV, and termination provisions in the JV only allowed for VideoAPP to "utilize" the domain, Plaintiff's possession of the domain would be evidence of conversion or a

fraudulent conveyance from VideoApp.

19. **EXHIBIT 6** attached hereto is a true and correct copy of expanded WHOIS registration information.

20. Regardless of how it the Court rules on our request for to enjoin Counterclaim Defendant, I ask the court for a declaratory judgment affirming myself and/or DAM owner of the domain and to issue a court order requiring the transfer of the Domain back to my custodial care, even if it allows SVOTHI or another entity to continue to utilization of the rawF**kclub.com Domain.

21. Up until at least 2017, the "About Us" section of rawF**kclub.com stated that rawF**kclub.com "is an edgy new membership site by the always outrageous Directors at Dark Alley Media," demonstrating our ownership and financial stake the website

22. **EXHIBIT 7** attached hereto is a true and correct copy of RFC Site "About Us" page from 2012.

23. **EXHIBIT 8** attached hereto is a true and correct copy of RFC Site "About Us" page from 2017.

24. During the same period, and through 2018, DAM was the *only* provider of content to the Site, as evidenced in the copyright notice at the bottom of the About Us pages.

25. As the only provider of content, our financial stake in the site would be implicit and obvious, contradicting the Declaration of  Cynthia Corso in the opposing

papers.

## TODARO'S OR PLAINTIFF BAD FAITH CONDUCT

26. Todaro is listed as the CEO of Plaintiff since its incorporation in 2000.

27. **EXHIBIT  9** attached hereto is a true and correct copy of Plaintiff's registration document

28. As set forth in my supporting declaration, Ex. 10,  "Statements on Brands and Trademarks"  Todaro repeatedly affirmed DAM's rights to both the trademarks word marks 'Raw F**k Club"  and "RFC."  Specifically, on March 7, 2018, I stated "I don't think you should have ownership of the RFC name or brand" to which Todaro agreed "I don't either."

29. That same day Todaro stated "I consider RFC to be a Joint Venture."

30. The only other possibility would be If Todaro made such statements to me he knew to be untrue, in order to secure my willingness to sign the JV Agreement declaring the marks to be owned by the JV–at least until termination of the agreement which occurred this past December 2024.

31. If Todaro made these comments with intent to deceive me then the JV Agreement should be considered a fraud and unenforceable, and I ask the Court to consider whatever punitive actions it sees fit.

32. Alternatively, if Todaro's statements to me were truthful, then the court should consider the bad faith and deception of the claims made by Plaintiff in the complaint, and I ask the court to dismiss the charges against me and my

company and to issue any declaratory judgments and / or punitive measures it sees fit.

**PLAINTIFF ADMITS VIDEOS AND INTELLECTUAL PROPERTY NOT BELONGING TO INDEPENDENT PRODUCERS, I.E. THE RFC BRANDED CONTENT  WERE LICENSED FROM VIDEOAPP CONSISTENT WITH THE JOINT VENTURE AGREEMENT**

33. **EXHIBIT 10** attached hereto is a true and correct copy of the Terms of Service page located on the RawF---Club.com website as it existed on January 12, 2022 which is publicly available on the WaybackMachine web service that catalogs the internet in historical context.

34. Such Term of Service state that the site is was held out as "*owned and operated by PPVNetworks*" at "*228 Park Avenue South, Suite 40543, New York, NY 10003.*"

35. It also stated "*We, our licensors, studio partners and independent producers, own all right, title, and interest, including all intellectual property rights, in and to the Site, the content on the site and the Service.*"

36. Later it states, "*This Agreement is governed by the laws of [] Nevis*" and "*You irrevocably consent to the exclusive jurisdiction of the courts located in Nevis.*"

37. As is evident from the JVA and the various communications, VideoApp is a Nevis company.

38. However, later, sometime before March 7, 2023, some of this information was changed on the TOS pages.

39. **EXHIBIT  11** attached hereto is a true and correct copy the Terms of Service page located on the RawF---Club.com website as it existed on March 7, 2023,

which is publicly available on the WaybackMachine web service that catalogs the internet in historical context.

40. By not later than March 8, 2023, the Terms of Service stated "*this site is owned and operated by SVOTHI Inc. DBA PPVNetworks, 228 Park Avenue South, Suite 40543, New York, NY 10003.*"

41. It also stated "*We, our licensors, studio partners and independent producers, own all right, title, and interest, including all intellectual property rights, in and to the Site, the content on the site and the Service.*"

42. And it still stated, "*This Agreement is governed by the laws of [] Nevis*" and "*You irrevocably consent to the exclusive jurisdiction of the courts located in Nevis.*"

43. However, newly language included, "***Content on this site may be licensed from VideoApp Inc, who in turn has ownership and/or agreements with the respective producers.***"

44. Today, however the Terms of Service do not talk about VideoApp Inc. and they state that all actions are subject to New York laws and are to be brought in New York.

45. The contents of the 2022 and 2023 Terms of Service support that the pages were always prior to 2022 owned and operated by VideoApp which is consistent with the terms of the JVA. Even though VideoApp Inc. is not named specifically, the choice of laws and jurisdiction in Nevis support that the owner operator was VideoApp

46. This is also supported by the change to the Terms of Service in 2023 that, even

though Plaintiff was stated as owning and operating, it was stated that content on the site was "*licensed from VideoApp Inc.*" which had "ownership" of such content.

47. This is a direct admission by Plaintiff. that the content of the site that was not mere independent producer content, ie. the RawF---Club content that was owned at that time by the JV was always owned by the JV and licensed to the site and then to Plaintiff via the operation of the JV and the JVA.

48. There is no dispute that the JVA is terminated and that valuable JV Marks as per the terms of the JVA goes back to DAM. A therefore the license of the JV Marks to Plaintiff has been null and void since at December 4, 2024 when DAM terminated the JV for VideoApp's non payment.

49. Since VideoApp had no right to the JV Marks following December 4, 2024, neither has Plaintiff.

**TODARO'S INTERCHANGEABLE USE OF PLAINTIFF AND VIDEOAPP AND COMMINGLING OF FUNDS**

50. The fact is that it was not until in 2023 that Svothi was even listed as the owner operator of the RawF***Club.com website.

51. Prior to that it was PPVNetworks which I understood at all times to be VideoApp. The JVA identifies VideoApp as PPVNetworks and the operations of the JV between Damian and myself including the website featuring DAM's RawF***Club marked videos that formed the cornerstone of the JV were not questioned by me a to which of his numerous (apparently) companies he

operated to carry out Vide

52. **EXHIBIT 12** attached hereto is a true and correct copy of a 2019 email thread between Damian Todaro, Cynthia Corso and me. Such email shows that Damian held himself out as Video App, Inc. but was discussing with us both that payments I owed the Joint Venture to reimburse it for payments Damian made to independent contractors was to go into a Svothi (Plaintiff) account. I wanted to be sure that the account was correct since it appeared to be the same Plaintiff account I made payments to on account of the Eric Videos DVD deal between my company Dark Alley Distribution and VideoApp

53. Such Eric Videos deal resulted in a lawsuit against my company and VideoApp, Inc that was defended on behalf of both of us by the Mullin P.C. firm.

54. Todaro confirms that money DAM owes to VideoApp under the JVA is to be paid into a Plaintiff bank account.

55. At the end such conversation, Damian states that he considers his five companies and 12 bank accounts as one company.

56. **EXHIBIT 13** attached hereto is a true and correct copy of a 2020 skype communication between Todaro and me (reads from bottom to top) where he discusses *"[I']m closing down videoapp[,] not because of [E]ric [Video], but because [N]evis is changing all their rules for corps … they now need financials and [N]evis tax returns etc … and more due diligence."*

57. He also stated as of his money in Belize, *"half is still there … the rest I took out because cash flow was meh."*

58. During that conversation he stated he has *"3 US corps already."*

59. **EXHIBIT 14** attached hereto is a true and correct copy of a Skype conversation I had with Todaro in regard to the lawsuit against us by Eric Videos.

60. In that conversation Todaro discusses that although "*we're set up in [N]evis to protect ourselves from this sh_t, and [I']m still paying lawyers, I could just drop the case.. and let [E]ric try to collect from Nevis.*"

61. **EXHIBIT 15** attached hereto is a true and correct copy of a skype text between Todaro and me (read from bottom to top) in which he discusses that his Belize bank is giving hin problems wanting "proof of good standing for SVOTHI and VIDEOAPP".

62. **EXHIBIT 16** attached hereto is a true and correct copy of an email between Todaro and me where he forwards me an email he finds interesting from his videoapp.net email address which he received to his svothi.com email address.

63. **EXHIBIT 17** attached hereto is a true and correct copy of an email from Cynthia Corso with Todaro and me on cc regarding payment to an independent producer who was owed money from the JV activities on RawF---Club.com that shows that such payment was coming from Plaintiff.

64. **EXHIBIT 18** attached hereto is a true and correct copy of an email between Cynthia Corso, Todaro, and me.

65. In that conversation Damian, using emails with a Video App, Inc. signature block, directs Cynthia to finalize the VideoApp and Dark Alley Distribution deal for Eric Videos DVD distribution. And she directs me to pay money due VideoApp in regard to that deal to, on information and belief, a Plaintiff bank

account.

66. **EXHIBIT 19** attached hereto is a true and correct copy of an email from Todaro where he presents the agreement to be signed between Video App, Inc., my company, and Eric Videos for DVD distribution ("Eric Video Distribution Deal").

67. **EXHIBIT 20** attached hereto is a true and correct copy of an email from Todaro to Mullen P.C. with Cynthia and me on cc directing her to make a payment to the firm. This was regarding the lawsuit by Eric Videos resulting from the Eric Video Distribution Deal.

**THE ERIC VIDEO LAWSUIT**

68. **EXHIBIT 21** attached hereto is a true and correct copy of an email to me informing me that my company Dark Alley Distribution was being sued with VideoApp by the owner of Eric Videos based on breach of contract by VideoApp

69. Such lawsuit in the SDNY in 2020 alleged that VideoApp continued to distribute the property and trademarks of Eric Video under the Lanham Act after termination of the agreement. Which is near identical to DAM's claims in this case against Plaintiff.

70. **EXHIBIT 22** attached hereto is a true and correct copy of a July 28, 2020 email to me and Todaro from the Mullen P.C. firm by Wesley Mullen who represented us in defense of the Eric Video lawsuit.

71. **EXHIBIT 23** attached hereto is a true and correct copy of an August 20, 2020

email to me and Todaro from the Mullen P.C. firm by Wesley Mullen addressed to "*Dear Clients*".

72. **EXHIBIT 24** attached hereto is a true and correct copy of an email from me to the Mullen P.C. firm and Wesley Mullen with Todaro on cc where I present to him a certificate of destruction of DVD when VideoApp settled the Eric Video lawsuit.

73. **EXHIBIT 25** attached hereto is a true and correct copy of a Skype text from 2019 between Todaro and me.

**CYNTHIA CORSO'S DECLARATION THAT DAM HAD NO MANAGERIAL OR FINANCIAL STATE IN THE SITE AND NOTHING MORE THAN A CONTENT PROVIDE IS NOT TRUE**

74. Beginning October 2019 with the launch of the new platform known as "RFC Channels" DAM was no longer the only provider of content to the site. New providers, performers who filmed their own amateur or "fan" content, were brought on. These performers became performer-producers, and due to their lack of affiliation with professional studios were deemed "Independent Producers."

75. To incentivize adaptation of the new platform by these Independent Producers, Todaro and I agreed to implement a $500 referral fee program. Per the JV Agreement, payments to Independent Producers were considered a shared cost, crucial to determine the net-revenues, which under the terms of the JVA were to be split 50/50 between VideoApp and DAM.

76. In 2019, no automated mechanism existed to tally the costs associated with Independent Producer Payouts, including the $500 referral bonus, of which DAM was to pay one half.

77. Such required Damian Todaro, with the assistance of Cynthia Corso, to manually tally these amounts. In May of 2019, after several months of failing to finish a manual tally, Damian presented me with a spreadsheet indicating that just under $34,000 had been disbursed to independent producers, meaning that I owed VideoApp around $17,000 dollars under the JV Agreement. These facts are supported by Skype messages between myself and Damian Todaro.

78. **EXHIBIT 26** attached hereto is a true and correct copy of Skype Messages relating to Independent Producer payments

79. These messages demonstrate my financial stake in the website as well as my managerial duties, and align with a Joint Venture structure.. They show myself and Todaro operating on the same managerial level when it comes to shared expenses. Todaro admits he must seek my approval on certain decisions, even defers to my wishes. This directly contradicts the Declaration of Cynthia Corso, who characterized Dark Alley as a "content provider."

80. Further evidence of how Producer Revenues were considered shared expenses and Cynthia's role in invoice and collections can be found in email correspondence between myself , Cynthia Corso, and Damian Todaro. Including "Payment" where I alert Cynthia that I sent a payment of $7,923.52 to their account. "The magic number is" where Damian gives a figure of  stating it is

high "because we had like new producers."

81. **EXHIBIT 27** attached hereto is a true and correct copy of an email from Todaro (using his VideoApp signature block) to me in which he admits there are problems with emails at addressed to ppvnetworks and "Plaintiff". This email is evidence that I was involved in the day-to-day intricacies of operating th RawF---Club website operated by the JV.

82. **EXHIBIT (28)** attached hereto is a true and correct copy of an email sent to me. These statements are directly opposed to the statements made by Cynthia Corso in her affidavit opposing the order to show cause, in which she claims Dark Alley never had ownership or control of RawF**kClub.com or the brands.

**CONFUSION OF THE PUBLIC AS IRREPARABLE INJURY IF THE MARKS ARE KEPT WITH PLAINTIFFS**

83. **EXHIBIT 29** attached hereto is a true and correct copy of an email from this February, 2025 from a fan of RawF---Club which expresses his confusion at not seeing RawF---Club content on the website and was wondering where to find it. He expressed that he was looking forward to the new location for the content.

84. sdf

85. sd

**WHAT IS THE HEADING FOR ALL OF BELOW**

86. Even after Dark Alley Media ceased being the sole content producer to the site, we maintained out special status, with a channel "RAW F**k CLUB" dedicated to our content. The Raw F**k Club channels was billed as "exclusive originals", given prominent placement on the front page, and our new releases featured on

the main banner at the top of the front page. The 3rd mark, the biohazard RFC, , was utilized as the Avatar for the Raw F**k Club channel, and on Dark Alley Media submitted video files, both previews and full-length scenes as a "watermark", always displayed in the lower right hand corner of the screen.  On knowledge and belief, It was used nowhere else on the site.

*Use and placement of Biohazard "watermark" 2019 -present*

87. Outside of the site, the Biohazard mark continued to be used by Dark Alley Media on all the all DVD- box covers (for digital and hardgood distribution), as a watermark on the DVD video files, and on the warning screen for all DVD video files.



*Example of DVD Warning screen 2010 - present*



*Use and placement of Biohazard mark on DVD Box Covers 2010 - Present*

88. The graphical RFC mark, claimed as a trademark by SVOTHI, was utilized in the main header of the site. Prior to October 2019, this mark was not displayed outside of the website, either in conjunction with any Dark Alley business activity or otherwise.



*RFC Graphical Mark on RawF**k Club site, 2019 - present*

89. The RFC-graphical mark was derived from the Biohazard mark and deliberately designed to be a more generic version of the Biohazard mark. This made sense

as the site needed to appeal to a wider range of users and producers who would upload a greater variety of content.

90. This raises the question of whether it possesses the requisite distinctiveness for trademark protection. A design must be inherently distinctive or have acquired secondary meaning through continuous commercial use to qualify for federal trademark protection. SVOTHI has failed to produce any evidence that the RFC graphical mark meets these standards.

91. Furthermore, given that Dark Alley's Biohazard mark was the dominant identifier of the brand from 2010 onward, any acquired distinctiveness would be attributable to Dark Alley's use, which included all modes of content distribution, and is certain to have reached more customers than SVOTHI's could have reached through membership sites alone.

92. The introduction of the RFC graphical mark in 2019, after years of established brand recognition under Dark Alley's Biohazard mark, suggests that it was a secondary adaptation rather than an original identifier of the brand. Thus, SVOTHI cannot establish first use without relying on Dark Alley's long-standing branding and goodwill.

93. Dark Alley Media's extensive use of the biohazard mark in commerce, across multiple platforms and distribution channels from 2019 - 2025, was not challenged by SVOTHI until this complaint. If the SVOTHI considered the JVA to be a valid contract, and not a "contract-based theory" this use would raise no

questions as the JVA explicitly allowed for Dark Alley to do just as it did. This remains another unanswered question complicating SVOTHIs claims.

94. Even in the complaint, SVOTHI makes no claim of own ownership of the Biohazard mark used on the owenhawk.com site. Instead it uses its claim to the RFC and RFC.com wordmarks and the Graphical RFC mark to claim market confusion. However the following facts beguile SVOTHI in this matter. 1. The OwenHawk.com site does not engage in commerce, and to denote this the site has a banner proclaiming it is a non-functional "Dummy Site".



95. Counsel for SVOTHI, in calling for "sales reports" in his complaint, is either mistaken or deliberately misleading the court into assuming owenhawk.com was engaged in commerce. While true a court could find owenhawk.com had an "effect on the marketplace" this was not the only "error" in the complaint, which also stated that the mark had been "affixed to video files". This is demonstrably false.

96. Failing to claim ownership of the biohazard mark raises an even bigger, and perhaps fatal problem for SVOTHI. Their graphical mark was not created until 2018 and not used in commerce until 2019. In order to establish first use from

2010, they need not show an unbroken chain of custody from 2010 - 2025 without the Biohazard mark. This means that ever SVOTHI never owned the Biohazard mark -- countermanding Declarations by Ms.Corso that SVOTHI always controlled the brands and marks -- or SVOTHI abandoned the Biohazard mark in November 2024 when it either terminated the JV Agreement via its Alter Ego, Videoapp, or revoked Dark Alley's posting permissions, under a the terms of contractual agreement governing Dark Alley's posting permissions they have so far failed to mention.

97. SVOTHI's reliance on the wordmark "RFC" to establish first use is flawed. The domain RFC.com has never been owned by SVOTHI, nor has it ever been available for commercial use by them. In 2022, when I inquired about purchasing RFC.com through a GoDaddy domain broker, I was informed that the domain was held by a large corporation that seldom sells its domains, instead keeping them for internal projects or as company assets. The broker stated that the owner would only entertain six-figure offers and was not interested in selling under any other terms.

98. **EXHIBIT 30** attached hereto is a true and correct copy of "Email with Domain broker for RFC.com

99. This information raises serious doubts about SVOTHI's ability to establish first use for "RFC" dating back to 2010. If the RFC.com domain was held as a corporate asset and unavailable for purchase or commercial use, then SVOTHI's claim of exclusive, uninterrupted use of "RFC" as a brand identifier is dubious at

best. SVOTHI has not demonstrated how it could have developed consumer recognition of "RFC" while the most obvious and direct domain—RFC.com—was never under its control.

100.   To claim trademark rights, a party must establish that the mark has been distinctively associated with their goods or services in commerce. Yet, if a major corporation held RFC.com and did not use it in relation to SVOTHI's business, SVOTHI cannot credibly claim to have developed brand distinctiveness under "RFC" in a way that excludes all other commercial users. Without control over the domain or evidence of significant brand presence, SVOTHI's attempt to claim first use based on "RFC" alone is unsupported.

101.   SVOTHI's own statements in the opposition papers contradict their claim to exclusive, continuous ownership of the RFC brand. In one breath, they insist that they "always controlled" RawF**kClub.com, yet in another, they claim they had to "take control" of it in November 2024. These two statements cannot both be true. If they were required to "take control," then they necessarily did not have control before that point—meaning another party, namely Dark Alley Media, did.

102.   This admission alone is fatal to SVOTHI's claim of first use and continuous control. Their attempt to rewrite history should not be permitted to stand. The evidence is clear: DAM created the RFC brand, developed its market presence, and used it in commerce long before SVOTHI's involvement.

103.   **EXHIBIT 31** attached hereto is a true and correct copy of "working on

ideas" email.

104.   Such email negates Plaintiff's  argument that DAM is unfit to manage RFC
due to compliance failures is equally flawed. Their own principal, Damian
Todaro, openly admitted to compliance failures in August 2024, stating he was
"struggling" to maintain proper records and had not sought legal advice despite
overseeing "thousands of models." If DAM's alleged failures disqualify us from
managing RFC, then SVOTHI's failures do the same for them. Full quote:

"*Maintaining IDs and consent is one of the areas I am struggling with the
most because there are literally hundreds of producers and thousands of
models. I have e-signed releases for the producers, obviously, but for the
models, I only have e-signed attestations of compliance with our
requirements.*"
– August 13, 2024, 7:02 PM

"*I need to get legal advice to the question of whether I need to have all of the
IDs and releases on file, OR, if I can rely on the producers to maintain the
records, so long as they contractually agreed that they have said documents.
I'll start with Wes tomorrow.*"
– August 13, 2024, 8:44 PM

105.   More importantly, SVOTHI was fully aware of DAM's financial stake in
RawF\*\*kClub.com. Their attempt to portray DAM as merely a content provider
is contradicted by the historical evidence—including emails with their own

accountant, Cynthia Corso, who actively calculated revenue splits between DAM and PPV Networks. If DAM were merely a vendor, there would have been no need to calculate and reconcile revenue shares.

106.    SVOTHI's attorney, Wesley Mullen, has further undermined their case by shifting positions on the JVA. He refers to it as a "contract-based theory" in their filings, yet in his own October 25, 2024 letter, he invoked the JVA's terms when attempting to terminate DAM's role in RFC. Even if one were to overlook the cynical nature of these inconsistencies, the existence of bad faith practice on the part of Mullen, and / or his employer is undeniable and proves that DAM was unfairly treated in at least once occurrence, as the JVA cannot be a valid enforceable contract in October and a mere theory only months later.

107.    These contradictions, inconsistencies, and self-serving misrepresentations make clear that SVOTHI is not asserting legitimate trademark rights, but attempting to seize control of a brand they did not create. Their lawsuit is designed not to protect intellectual property, but to rewrite the history of RFC and permanently erase DAM's role.

108.    SVOTHI is now profiting solely from the goodwill, branding, and reputation that DAM built over nearly two decades, while simultaneously attempting to prevent DAM from using its own long-held marks. This, combined with their decision to file this lawsuit—knowing that DAM lacks the financial resources to sustain extended litigation—has inflicted severe economic harm. The loss of our

primary revenue stream and the legal costs associated with defending against this bad-faith action place DAM in imminent financial peril.

109.    The financial harm to DAM cannot be overstated. At the start of 2024, DAM was earning an average of **$37,000 per month** from its share of revenue generated by RawF\*\*kClub.com. Other income sources accounted for approximately $6,000 per month, meaning that the loss of revenue from RFC represents an existential threat to DAM's ability to continue operations. Since August 2024, SVOTHI has operated the site without compensating DAM, despite DAM's long standing financial stake and continuous role in its development and branding.

110.    **EXHIBIT 32** attached hereto is a true and correct copy of "DAM Bank Statements 2024"

111.    This harm is not theoretical. As demonstrated by customer outreach, the public associates RFC with DAM and me personally**.** A longtime subscriber wrote:

> "Been wondering what the hell was going on with RFC and you.
> Been a member of RFC for a bit. Went looking for a few fav videos
> with you, Tyler Roberts (RIP), Damagedbttm, and Archer Croft.
> Nada. Then noticed pretty much every video with you disappeared.
> So…just googled, 'what's going on with Owen Hawk and Raw F\*\*k
> Club?'. BAM! Here I am. Please keep me up to date with things."

112.    **EXHIBIT 33** attached hereto is a true and correct copy of "Customer email"

113.    This message exemplifies the marketplace confusion that SVOTHI's actions have created. They have effectively erased my legacy, DAM's content, and our reputation from the site we helped build. SVOTHI is not merely continuing operations; they are attempting to rewrite history while reaping the benefits of a brand and platform that they did not establish.

114.    The confusion caused by SVOTHI's misappropriation is entirely avoidable. We are not asking the court to shut down SVOTHI's business or prevent them from operating. Rather, we seek an injunction requiring them to cease using the marks and branding that have long been associated with DAM and to migrate their current business to their own distinct brand, **RFC Channels**, which better reflects their present operations.

115.    Injunctive relief is necessary to prevent further irreparable harm to DAM. We are not asking the court to shut down SVOTHI's operations—**o**nly to require them to move their business to their own brand, RFC Channels, rather than unlawfully profiting from DAM's legacy.

116.    There is no undue hardship for SVOTHI in complying with this request. They already own the domain RFCChannels.com, among others, and possess the know-how to transfer their site off of our domain. They can continue on as platform for independent content producers rather than squat on the exclusive home of DAM's productions. A transition to RFC Channels would allow them to

continue operations without profiting off the goodwill and brand equity built by DAM.

117.    SVOTHI's use of the marks divorced from DAM, the originators of the marks, has already inflicted irreparable harm by severing DAM's revenue stream, causing marketplace confusion, and misleading customers into believing that Dark Alley Media's content has simply vanished. Meanwhile, SVOTHI has no legitimate interest in continuing to use marks they did not create, control, or commercially exploit prior to their association with DAM.

118.    The court should not permit SVOTHI to rewrite history to suit its litigation strategy. The evidence overwhelmingly demonstrates that DAM was the first and continuous user of the Raw F**k Club brand, that I personally held the **rawF**kclub.com** domain for over a decade, and that SVOTHI's claims to first use are based on unsubstantiated attestation rather than documentation.

**CONCLUSION**

119.    I respectfully request that the court consider these facts when evaluating the merits of the applications in this matter and order appropriate action to ensure fairness, accountability, and proper use of the legal process, including but not limited to, enjoining Counterclaim Defendant from any use of the marks and for all the other relief requested in the Counterclaim and our motion for injunctive relief.

[Signature Page to Follow]

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, NY

February 14, 2025

*Robert Felt*
Robert Felt (Feb 14, 2025 23:14 EST)

_____

Robert Felt