**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SVOTHI INC.,

               Plaintiff,

      v.

DARK ALLEY MEDIA, LLC and
ROBERT FELT,

               Defendants.

Civil Action No. 25 CV 00333

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR STAY PENDING ARBITRATION**

**MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR STAY PENDING ARBITRATION**

TABLE OF CONTENTS

TABLE OF CONTENTS

TABLE OF AUTHORITIES

I.      INTRODUCTION ..........................................................................................................1

II.     PRELIMINARY STATEMENT......................................................................................1

III.    STATEMENT OF FACTS .............................................................................................2

IV.     ARGUMENT ................................................................................................................14

    A.      DAM DID NOT WAIVE ARBITRATION....................................................................15

    B.      SINCE SVOTHI KNOWINGLY RECEIVED DIRECT AND SUBSTANTIAL

    BENEFITS FROM THE JV AGREEMENT, IT IS REQUIRED TO ARBITRATE THE

    FEDERAL ACTION DISPUTE ..............................................................................19

    C.      ALTHOUGH SVOTHI DID NOT SIGN THE JV AGREEMENT, IT IS ALSO

    BOUND BY THE JV AGREEMENT'S ARBITRATION CLAUSE AS THE ALTER EGO OF

    VIDEOAPP..........................................................................................................22

V.      CONCLUSION..............................................................................................................24

CERTIFICATE OF COMPLIANCE..........................................................................................28

## Table of Authorities

**Statutes**

9 U.S.C. 1 ....................................................................................................................14

Section 12.3 .............................................................................................................13

Section 2 ..................................................................................................................14

**Cases**

*All. Masonry Corp. and Corning Hosp.*,
   178 AD3d 1346 (3d Dept 2019) ........................................................................1

*Brownstone Inv. Grp., L.L.C. v. Levey*,
   514 F. Supp. 2d 536 (S.D.N.Y. 2007) ..............................................................7

*Byrnes v. Castaldi*,
   72 A.D.3d 718 (2d Dep't 2010) ...............................................................16, 17

*Cotugno v. Bartkowski*,
   2012 N.Y. Slip Op. 22288, at *2, *37 (N.Y. Sup. Ct. Oct. 5, 2012) .........17

*Cotugno v. Bartkowski*,
   37 Misc. 3d 917 (N.Y. Sup. Ct. 2012) ............................................................17

Cotugno v. Bartkowski, supra ....................................................................................17

*Cusimano v. Schnurr*,
   26 N.Y.3d 391 (2015) .........................................................................................19

*De Sapio v. Kohlmeyer*,
   35 N.Y.2d 402, 362 N.Y.S.2d 843 (1974) .....................................................16

*Deloitte Noraudit A/S v. Deloitte Haskins & Sells*,
   9 F.3d 1060 (2d Cir. 1993) .........................................................19, 20, 21, 22

*Enron Power Mktg. v. Pub. Util. Dist. No. 1*
   (In re Enron Corp.), 364 B.R. 489 (Bankr. S.D.N.Y. 2007) ....................18

*Estate of Jerry Castellone v. JP Morgan Chase Bank, N.A.*,
   60 A.D.3d 621, 875 N.Y.S.2d 130 (2d Dep't 2009) .................................16

*Life Techs. Corp. v. AB Sciex Pte. Ltd.*,
   803 F. Supp. 2d 270 (S.D.N.Y. 2011) ...............................................20, 21, 22

*Matter of Belzberg v. Verus Invs. Holdings Inc.*,
   21 N.Y.3d 626 & n.3 (2013) .......................................................................19, 20

*Matter of NBC Universal Media, L.L.C. v. Strauser*,
   190 A.D.3d 461 (1st Dep't 2021) ....................................................................19

*Matter of Sbarro Holding, Inc.*,
  91 A.D.2d 613 (2d Dep't 1982) ............................................................23

*McDonald v. McBain*,
  99 A.D.3d 436 (1st Dep't 2012) ...........................................................24

*Metro. Transp. Auth. v. HRH Const. Interiors, Inc.*,
  859 N.Y.S.2d 896 (2008) .....................................................................24

*Moton v. Maplebear Inc., No. 15 Civ. 8879*
  (CM), 2016 U.S. Dist. LEXIS 17643 (S.D.N.Y. Feb. 9, 2016) ..................7

*Sherrill v. Grayco Builders, Inc.*,
  64 N.Y.2d 261 (1985) ..........................................................................18

*Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.*,
  198 F.3d 88 (2d Cir. 1999) ..................................................................20

*Stark*,
  9 N.Y.3d at 66, 845 N.Y.S.2d at 221-22 .........................................15, 16

*Tap Holdings, L.L.C. v. Orix Fin. Corp.*,
  109 A.D.3d 167 (1st Dep't 2013) .........................................................23

*Thomson-CSF, S.A. v. Am. Arb. Ass'n*,
  64 F.3d 773 (2d Cir. 1995) ..................................................................19

*TNS Holdings Inc. v. MKI Sec. Corp.*,
  92 N.Y.2d 335 (1998) ..........................................................................22

*TNS Holdings*,
  680 N.Y.S. .........................................................................................23

*TNS Holdings*,
  680 N.Y.S. 892 (?YEAR?) .............................................................22, 23

*W. RAC Contr. Corp. v. Huntington Vil. Hotel Partners, L.L.C.*,
  75 Misc. 3d 805 (N.Y. Sup. Ct. 2022) ..................................................16

**Other**

Rules 26 and 21 ......................................................................................7

## I.  INTRODUCTION

Defendants, Dark Alley Media, LLC ("DAM") and Robert Felt, submit this Memorandum of Law in support of its motion to stay this matter pending arbitration between DAM and Svothi, Inc. ("Svothi") under the Joint Venture Agreement ("JV Agreement")[1] between DAM and Videoapp Inc. ("VideoApp").  Submitted herewith are the Declaration of Ravi Ivan Sharma ("Sharma Decl.") and the Declaration of Robert Felt ("Felt Decl.").

## II.  PRELIMINARY STATEMENT

Having admittedly exploited DAM's trademarks for decades, VideoApp and Svothi now seek to avoid mandatory arbitration under VideoApp's joint venture agreement with DAM. VideoApp claims waiver via its pending Article 75 petition to stay arbitration in New York County Supreme Court (Mullen Declaration in Opposition to Order to Show Cause Exhibit D (Decl. of Mullen - Exhibit D).  In such Art. 75 proceeding VideoApp attempted to gratuitously object *on Svothi's behalf* that Svothi was not a named party to the underlying joint venture agreement. Additionally, Svothi, via various filings herein has argued essentially the same thing on behalf of VideoApp, in an attempt to obviate any concern that VideoApp is nonetheless the alter ego, nominee, or agent of Svothi's in its dealings with DAM and under the JV Agreement).

These arguments are clearly flawed in a number of respects.  Although Svothi is not a signatory to the Joint Venture Agreement that controls in this case, "[t]he intent to arbitrate may be imputed on a nonsignatory where, for example, . . . the nonsignatory has been directly benefitted by the agreement containing the arbitration clause . . .." *Matter of Arbitration between All. Masonry Corp. and Corning Hosp.*, 178 AD3d 1346 (3d Dept 2019). A nonsignatory is also bound by the

---

[1]  A copy of the Joint Venture Agreement is filed herein as Exhibit 11 (Document 12) to the Declaration of Robert Felt In Support of Order To Show Cause Dated February 5, 2025.

arbitration agreement when, like Svothi, it is the alter ego of the signing party.

Here, DAM not only establishes that Svothi directly benefited from the same contract that explicitly controls VideoApp's exploitation of the subject trademarks, but Svothi is the alter ego and instrument of fraud against DAM, such that it would an egregious wrong and inequitable for Svothi to avoid arbitration. On either basis Svothi is bound by the arbitration clause.

As for waiver, Svothi/VideoApp's waiver arguments fail. DAM has done nothing which can properly be construed as a waiver of its arbitration rights.

In the Art. 75 matter, DAM has maintained a cross-motion against VideoApp, and also motion for leave to file a third-party petition to compel arbitration against Svothi as a third-party respondent.  DAM's motion to compel Svothi herein to arbitrate must be granted for the same reasons as in such motion which are set forth below.

## III.    STATEMENT OF FACTS[2]

**The Joint Venture Agreement and Arbitration Clause**

Robert Felt is founder, managing member and owner of 50% of Dark Alley Media, LLC ("DAM"), a New York-based limited liability company engaged in the production and distribution of adult entertainment.  Felt Decl. ¶2.  After DAM and VideoApp joined together and operated as a joint venture for approximately 10 years, they entered into a written joint venture agreement between DAM and VideoApp (defined as "PPVNetworks" therein), executed as of January 1, 2019, by Damian Todaro[3] and Robert Felt.   According to its terms, the JV Agreement

---

[2] The Court is also respectfully referred to the Declarations of Ravi Ivan Sharma and Robert Felt sworn to on April 21, 2025, and the exhibit and references therein for a fuller recitation of the facts of this matter.

[3] Mr. Todaro is the owner, operator and CEO of both Svothi and VideoApp as per Declaration of Robert Felt In Support of Order To Show Cause dated February 5, 2025 (Decl. of Felt In Supp. Order to Show Cause) Paragraph 31.

*memorialized* the parties' joint venture (or "JV") under which they operated a website (or "Site") bearing the "RFC Marks" (which DAM established prior thereto) for the purpose of streaming "pay-per-view" videos produced by DAM which VideoApp would operate and administer for the profit of the JV. Sharma Decl., ¶¶ 6, 7; Felt Decl. ¶¶ 5,6.

The JV Agreement explicitly declares the RFC Marks "are owned by the JV" and sets forth the disposition of the rights to the Marks upon termination under various scenarios. The JV Agreement also contains a mandatory arbitration clause, which requires disputes arising from or relating thereto to be resolved by arbitration in New York City, as follows:

9.7 Any and all disputes arising from or relating to this Agreement shall be submitted to full and final resolution by binding arbitration, to be conducted in New York, New York. Arbitrator will be mutually selected by Key Members from both parties, and a lawyer with 10+ years' experience with entertainment law. Judgment on the arbitration award may be entered in any court of competent jurisdiction [hereinafter, "**the arbitration clause**"]; . . .

The foregoing terms of the arbitration clause could not be any clearer, explicit, or unambiguous. They were not hidden in the contract and were not inconspicuous. Moreover, the arbitration agreement stated clearly what the effect of the arbitration clause was: to wit, "full and final resolution by binding arbitration." Sharma Decl., ¶¶ 8, 9.

On January 13, 2025, Svothi filed this action against DAM and Robert Felt. In the complaint, Svothi asserts Lanham Act claims against Defendants DAM and Robert Felt over certain common-law trademarks (the "RFC Marks") that Svothi alleges it owns based on its claim that it has operated adult websites under such marks since 2010. *These are the same Marks covered by the JV Agreement.* Sharma Decl., ¶ 13. DAM's use of RFC as a brand mark on their products began in 2007 and continues through today across multiple platforms, including digital and hard goods, online retail sales, and wholesale. Felt Decl. ¶ 14.

Three days after Svothi filed the complaint herein, on January 16, 2025 DAM's attorney

submitted on its behalf a JAMS Demand for Arbitration, *Dark Alley Media, LLC vs. VideoApp Inc. #5425003243*, demanding payment of at least $147,000 withheld by VideoApp since at least August 2024, and a determination that the Marks and other assets are to be transferred to DAM on account of VideoApp's uncured breach of the Joint Venture. Sharma Decl., ¶10.

DAM initiated the JAMS arbitration after over five months of acrimony ending in December 2024 between Mr. Todaro and Mr. Felt on behalf of VideoApp and DAM, respectively, over non-payment of DAM by VideoApp (and Svothi), and at least four letters between Svothi's counsel, Mr. Mullen, and DAM's counsel, consisting of competing notifications, demands, and declarations of termination of the JV under the terms of the JV Agreement. Sharma Decl., ¶ 11.

Despite the existence of the valid arbitration clause in the JV Agreement, on February 5, 2025, VideoApp filed the present Article 75 proceeding, seeking to permanently stay arbitration. Sharma Decl., ¶ 12.

By letter dated January 31, 2025, DAM's attorney requested a *pre-motion* conference on its behalf herein to discuss an anticipated motion seeking to (i) stay this matter pending arbitration, and (ii) possibly implead VideoApp. VideoApp in fact has not been joined into this matter, and DAM has no intention of doing so unless for some reason it is blocked from doing so via VideoApp's Article 75 proceeding pending in New York Supreme Court (Mullen Declaration in Opposition to Order to Show Cause Exhibit D Decl of Mullen - Exhibit D); which DAM is both vigorously defending and has cross-moved to compel the arbitration of the JV Agreement by VideoApp. Sharma Decl., ¶ 15.   As further detailed below and in the accompanying Declaration of Robert Felt, VideoApp is a company dominated by Svothi and by Svothi's principal, Damian Todaro. Sharma Decl., ¶ 14.

DAM requested the pre-motion conference as a *precautionary* measure to avoid any

possible waiver of its arbitration rights. This and all other actions DAM took were done to preserve and protect DAM's right to arbitration under the JV Agreement without compromising their defense. Sharma Decl., ¶ 16.

This Court held the requested hearing conference on February 19, 2025. At the hearing, VideoApp/Svothi's counsel demonstrated that Svothi's objection to application of the arbitration clause against Svothi is, at best, disingenuous. Svothi's counsel conceded that Svothi had no position on whether VideoApp's entry into the joint venture agreement was valid or invalid, Sharma Decl., ¶ 17.

## **No Waiver of Arbitration**

In VideoApp's Memorandum of Law in Support of Petition to Stay Arbitration ("MOL") (Mullen Declaration in Opposition to Order to Show Cause Exhibit D [Decl. of Mullen - Exhibit D](#)), VideoApp makes the following waiver and arguments against DAM which mirror the same assertions Svothi has made in this action:

> Dark Alley waived any right it might have had to arbitration by waging a highly public, multi-forum litigation campaign against VideoApp in the state and federal courts. Like its JAMS Demand, Dark Alley's state and federal claims all seek damages under the Joint Venture Agreement. The federal ones seek rescission of the Joint Venture Agreement. Dark Alley's arbitration must be stayed because "[b]y commencing an action at law involving arbitrable issues, [Dark Alley] waived whatever right [it] had to arbitration."1 In contrast to its confidential arbitration papers, Dark Alley does not confine its public pleadings to dry contractual matters. Instead it gratuitously alleges fraud, illegal drug use, conspiracy, underage sexual misconduct, and animal abuse — not only against VideoApp, but also against its owner and his family members. On social media, Dark Alley's principal Mr. Robert Felt — a popular performer known professionally as Owen Hawk — flogs Dark Alley's litigation maneuvers, and their scandalous allegations, to eager fans of his adult film persona.

MOL, at 4-5.

This waiver claim is soundly refuted by the facts and law. First, as noted above, on January

5

13, 2025, Svothi filed this action asserting claims against the JV Marks[4] that are also subject to mandatory arbitration under the JV Agreement's arbitration clause. In this action, DAM not only indicated via footnote 1 on page 1 of its Answer and Amended answer that it would seek arbitration notwithstanding asserting its defenses and preserving its claims against Svothi, but also pled arbitration as affirmative defense in their Answer to the Complaint, **to preserve DAM's right to arbitration**. Sharma Decl., ¶¶ 19, 20.

Critically DAM filed its Answer and Amended Answer purely to assert its Counterclaims against Svothi and *protect* the substantial goodwill that DAM has developed over approximately 17 years in its distinctive word mark and logo alleged in the Complaint and Counterclaim herein as the RFC Marks. Accordingly, DAM's Answer herein did not waive DAM's right to arbitrate under the JV Agreement.

Moreover, whatever actions DAM took against the Complaint herein, they were, ***according to VideoApp's position in the Art. 75 matter, only against Svothi***. That is, VideoApp there insisted that Svothi is not its alter ego or otherwise liable for VideoApp's conduct. ***If that were so***, then DAM's defense of this matter *cannot* logically be deemed a waiver of DAM's arbitration rights against **VideoApp**.

VideoApp (in the Article 75 proceeding) and Svothi (in its Opposition to the Order to Show Cause in this matter) also contend that DAM waived arbitration because it filed a New York State Supreme Court action against VideoApp, and "publicized" the litigation. Each waiver claim by both co-joined entities is a specious as the other. DAM's state court complaint addresses tortious interference arising from conduct that occurred **after** the termination of the JV Agreement and defamation which, in any event, **is not related to the JV Agreement**. None of the claims alleged

---

[4] The JV Marks do not include "Dark Alley Media."

in the state action are related to the ownership of Marks or the business relationship covered by the JV Agreement. Sharma Decl., ¶22.  Courts have consistently held that litigation involving non-arbitrable claims or different cases does not constitute a waiver of arbitration.

Svothi and VideoApp also contend that Dark Alley's public promotion of its own image in social media and in the press somehow waives Dark Alley's right to arbitration.  As discussed below, the "publication" waiver is factually and legally unfounded. Additionally, Rules 26 and 21 of JAMS Comprehensive Arbitration Rules and JAMS Streamlined Arbitration Rules respectively, state, "JAMS and the Arbitrator shall maintain the confidential nature of the Arbitration proceeding and the Award, including the Hearing…." and "The Arbitrator may issue orders to protect the confidentiality of proprietary information, trade secrets or other sensitive information." There are **no** confidentiality agreements or orders prohibiting Mr. Felt from speaking about the facts of the case. Public statements about ongoing litigation or arbitration are not inherently inconsistent with arbitration.  *See Moton v. Maplebear Inc.*, No. 15 Civ. 8879 (CM), 2016 U.S. Dist. LEXIS 17643, at *25 (S.D.N.Y. Feb. 9, 2016). Neither is there any evidence of prejudice to VideoApp or Svothi.  *Brownstone Inv. Grp., L.L.C. v. Levey*, 514 F. Supp. 2d 536 (S.D.N.Y. 2007).

## Alter Ego and Estoppel Theories Require
## Svothi to Arbitrate Under JV Agreement

Although Svothi did not sign the Agreement, DAM's evidence establishes two clear grounds for requiring Svothi to submit to arbitration, alter ego and estoppel. ***Svothi***, here, nor VideoApp in the state court litigation, has not disputed that they are closely related to each other— because they cannot.  Svothi's claims in this matter rest solely on its alleged use of these same trademarks beginning in 2010. This is extremely significant since (i) the JV Agreement explicitly governs the ownership and use of these trademarks, and (ii) Svothi has an incestuous and domineering relationship with VideoApp.  Felt Decl. ¶¶ 57, 58. As further discussed below, these

7

facts and circumstances strongly support the determination that Svothi, although a nonsignatory to the JV Agreement, is nevertheless bound by its arbitration clause as the alter ego or agent of VideoApp, or because Svothi substantially and directly benefited from the JV Agreement.

The accompanying declaration of Robert Felt documents that Svothi pervasively dominates VideoApp, and that the two entities have, *inter alia*, a shared address, shared attorney, shared ownership, shared resources, shared conduct, shared hiding of funds, same d/b/a (PPVNetworks), similar websites evidencing the same control and function, and Svothi was the source and payor on checks to DAM pursuant to profit shares due DAM from the proceeds of the exploitation of DAM's videos on the websites under the JV Agreement. Mr. Felt further avers that Svothi has directly benefited from the JV Agreement by reason of its use of DAM's JV Marks. Felt Decl. ¶¶ 8, 55, 56, 57, 66, and 67.

The 2022 Terms of Service for the RawF---Club states that the Site was held out as "owned and operated by PPVNetworks" at "228 Park Avenue South, Suite 40543, New York, NY 10003." The 2022 Terms of Service also stated "We, our licensors, studio partners and independent producers, own all right, title, and interest, including all intellectual property rights, in and to the Site, the content on the site and the Service."  Felt Decl. ¶¶ 283-1.

Later the 2022 Terms of Service states, "This Agreement is governed by the laws of [] Nevis" and "You irrevocably consent to the exclusive jurisdiction of the courts located in Nevis." As is evident from the JV Agreement and the parties' various communications, VideoApp is a Nevis company and, thus the 2022 Terms of Service referenced VideoApp. However, sometime before March 7, 2023, **critical information was changed on the Terms of Service pages**. Felt Decl. ¶¶ 31-33.

Not later than March 8, 2023, the Terms of Service ("2023 Terms of Service") stated: "**this**

site is owned and operated by Svothi Inc. DBA PPVNetworks, 228 Park Avenue South, Suite

40543, New York, NY 10003."  Moreover, currently, and since March 8, 2023, the Terms of

Service do not mention VideoApp at all, and they also state that all actions are subject to New

York laws and are to be brought in New York. Felt Decl. ¶¶ 34, 35. The contents of the 2022 and

2023 Terms of Service indicate that the pages were always prior to 2022 owned and operated **by**

**VideoApp** which is consistent with the JV Agreement.  **However, that all changed in 2023 when**

**the 2023 Terms of Service stated Svothi was the owner and operator, and the content on the**

**site was "licensed from VideoApp Inc." which had "ownership" of such content**. This is a

direct admission by Svothi that the content of the Site that was not mere independent producer

content, *i.e.*, the RawF---Club content that was owned at that time by the JV was always owned

by the JV and licensed to the site and then to Svothi **via the operation of the joint venture and**

**the JV Agreement**. Felt Decl. ¶¶ 32-37

### Todaro's Interchangeable Use Of Svothi And VideoaApp And Commingling Of Funds

Again, it was not until 2023 that Svothi was listed as the owner operator of the

RawF***Club.com website. Prior to that time the owner operation was listed as PPVNetworks,

which is the d/b/a of **both VideoApp and Svothi**. Felt Decl. ¶¶ 30-37.

Documentation from 2020 and 2019 shows that Todaro was simultaneously holding

himself out as Svothi and VideoApp, both financially and otherwise. In an email to DAM during

that period, Todaro actually **admitted to Robert Felt that Todao "considered his five**

**companies and 12 bank accounts to be one company and that the only one that deal[s] with**

**"you" (meaning DAM) is SVOTHI.**  Felt Decl. ¶¶ 41-45.

The bottom line is that the Svothi bank accounts and funds were used interchangeably with

those of VideoApp.  Further, this disregard of the corporate form was used by VideoApp to evade

9

government regulations and debt collection. For example, in one 2020 Skype communication, Todaro also admitted, "[I']m closing down videoapp[,] not because of [E]ric [Video]**, but because [N]evis is changing all their rules for corps … they now need financials and [N]evis tax returns etc … and more due diligence**." In another conversation, Todaro also stated to Felt in reference to a lawsuit brought against VideoApp that although "we're set up in [N]evis to protect ourselves from this sh_t, and [I']m still paying lawyers, I could just drop the case. and let [E]ric try to collect from Nevis" (*i.e.* collect from VideoApp). Felt Decl. ¶¶ 40-53 Other documents during the same period indicate that Todaro was using the two companies interchangeably as most convenient to avoid financial pressures and banking requirements. Felt Decl. ¶¶ 50-53

It is also noteworthy that in the Complaint herein, Svothi alleges it has operated the Site for over a decade. Thus, by its own admission Svothi even now is profiting directly from the goodwill, branding, and reputation that DAM built over nearly two decades in the joint venture, while simultaneously attempting to prevent DAM from using its own long-held marks. The JV (as memorialized in the JV Agreement) established Svothi's relationship with DAM and the content DAM, and that in fact, Svothi was at least co-operating the Site and in any event was collecting income from the Site. Felt Decl. ¶¶ 54.

Moreover, payments to Dark Alley Media pursuant to the JV came from **Svoth**i throughout this relationship, and establishes that somehow, whether directly collecting the same from customers of the Site or siphoning the money through VideoApp, that Svothi was directly involved in and benefited from the financial operations of the JV and the JV Agreement. Felt Decl. ¶¶ 55.

**Affiliation Between Svothi and VideoApp**

Svothi is the agent and alter ego of VideoApp, as evidenced by, *inter alia*, their shared address, shared attorney (Mullen), shared ownership (Todaro), shared resources, shared conduct,

hiding of funds, Svothi's pervasive domination of VideoApp, use of the same d/b/a (PPVNetworks), similar website evidencing the same control and function, and the fact that Svothi was the source and payor on checks to DAM pursuant to profit shares due DAM from the proceeds of the exploitation of DAM's videos on the websites under the JV Agreement. Despite this domination, Svothi shrouded its involvement from DAM, and was not a named party to the JV Agreement. Felt Decl. ¶ 57.

This pervasive overlap in corporate structure and representation demonstrates a lack of separation between the two entities, indicating that they operate as a single economic unit. Felt Decl. ¶¶58, 60. Svothi also issued payments to DAM *under the JV Agreement*, despite not being a signatory to the agreement. These payments were made pursuant to profit shares due to DAM from the proceeds of the exploitation of DAM's videos on the websites operated under the JV Agreement. Felt Decl. ¶ 57.

Svothi and VideoApp also both operated under the very same d/b/a, "PPVNetworks" at 228 Park Avenue South, Unit 40543, New York, NY 10003. Felt Decl. ¶¶ 57, 60, 61. Svothi and VideoApp utilize similar websites, also with the same addresses, 228 Park Avenue South, Unit 40543, New York, NY 10003, that evidence the same control and function. Felt Decl. ¶61.

Svothi's involvement in the joint venture, including (a) issuing payments to DAM and, (b) in this action asserting ownership of the JV Marks, demonstrates its lack of independence from VideoApp, Inc. Svothi and VideoApp, Inc. have failed to maintain separate corporate identities, instead commingling their operations and resources to the detriment of DAM. Felt Decl. ¶¶ 62, 63. Svothi's actions, including its attempt to circumvent the arbitration process and assert independent ownership of the JV Marks, further demonstrate Svothi's bad faith and alter ego relationship with VideoApp, Inc. Felt Decl. ¶¶ 62-65.

11

Because of Svothi's fraud/bad faith/deceit, the failure to find Svothi bound by the JV Agreement and its arbitration clause would be egregious and inequitable to DAM.   Due to the existence of the JV Agreement, both VideoApp and Svothi have used and continue to use DAM's JV Marks that fall within the JV Agreement. **Svothi has directly and substantially benefited from the JV Agreement by reason of such use.** Felt Decl. ¶¶ 63-66. Due to the JV Agreement, Svothi has also used and continues to use DAM's JV Marks to sell competing goods to many of the same consumers served by DAM. **Svothi has directly and substantially benefited from the JV Agreement because of such sales.** Felt Decl. ¶ 65-70. As previously stated, the JV Agreement memorializes the JV. None of the Dark Alley Media content would have existed on the Site without the JV and DAM's continuous involvement in the JV. DAM's involvement with the Site and Robert Felt's involvement with the Site on behalf of Dark Alley Media would not have existed without the JV as memorialized in the JV Agreement. Felt Decl. ¶ 65-70.

**Svothi's Claims Regarding Its Ownership Of The Mark Are Contradicted By Its Counsel's Statements and Letters and By Corso's Declaration.**

During the February 19, 2025, hearing, the Court questioned Svothi's counsel, Mr. Mullen, about VideoApp's rights to use the RFC Marks. Mr. Mullen expressed uncertainty, stating, "I don't know that VideoApp has a right to use the mark" (Feb. 19, 2025 Hearing Tr., p. 14, l.5-10, Sharma Dec. Ex.4).

This statement is contradicted by Mr. Mullen's earlier written communications to DAM. In his October 25, 2024 letter to DAM, Mullen stated *"PPVN has exercised its contractual right of election to continue to use the Content, Domains, and RFC Brands for continued operation of Sites. This election is made pursuant to Section 12.3 of the Joint Venture Agreement between*

*VideoApp, Inc. and Dark Alley Media, LLC."* (Decl. of Felt In Support Of Order to Show Cause, Ex. 19 (SDNY ECF 20).

Mullen's October 25, 2024, letter also indicated VideoApp's intention to continue selling DAM's titles, contingent on DAM agreeing to new terms and was reiterated in Mullen's November 12, 2024: ""*As I noted … if DAM desires … DAM Content [to] remain available on any Sites, you should let me know …. Failing such election, all pre-termination DAM Content will be removed from the Sites…."* (Decl. of Ravi Ivan Sharma In Support Of Order to Show Cause, Ex. 5 (SDNY ECF 27).

Contrary to these communications, SVOTHI in both the complaint and via the Corso Declaration claims it owned and controlled Website since February 2010: "[Svothi's] *properties include… rawfuckclub.com… [and it] has owned and operated the Website continuously since in or about February 2010."* (Corso Decl., SDNY ECF 25 ¶¶3–4).

Also contrary to Mullen's letter's positions that DAM was terminated was due to DAM's refusal to enter a new agreement is Corso's assertion that Svothi terminated DAM's due to policy violations: (Corso Decl. in Opposition to Order to Show Cause, SDNY ECF 25 ¶10).

Both business owned and controlled by Damian Todaro literally are claiming simultaneous termination of DAM but for different reasons. VideoApp in reliance on the JV Agreement but ignoring that Svothi exists, and Svothi as though there is no JV Agreement. However, it was not until this action did Svothi ever speak of termination of DAM – only VideoApp ever did.

Which is more evidence that the only entity doing Svothi's bidding, assuming for purposes of argument that Svothi's allegations of ownership of the marks is true (which is disputed) was VideoApp as Svothi's nominee and/or agent via the JV Agreement.

**Svothi's Bad Faith/Fraudulent Conduct
In Procuring Agreement/Bringing Action**

Todaro has been listed as the CEO of Svothi since its incorporation in 2000. Todaro has repeatedly affirmed DAM's rights to both the trademarks word marks 'Raw F**k Club" and "RFC." Specifically, on March 7, 2018, Robert Felt stated to Todaro, "I don't think you should have ownership of the RFC name or brand" to which Todaro responded, "I don't either." That same day Todaro stated to Robert Felt, "I consider RFC to be a Joint Venture." Felt Decl. ¶¶ 21-26.

Accordingly, Svothi either lied then when Todaro made these statements to Felt knowing them to be untrue, to secure Felt/DAM's willingness to sign the JV Agreement declaring the marks were to be owned by the JV–at least until termination of the agreement, or Svothi is lying now in its Federal Action. Either way, Svothi has lied to DAM and caused egregious injuries to DAM. Felt Decl. ¶¶ 21-26.

The actions of Svothi, including fraudulent conduct described herein, have caused severe financial and reputational harm to DAM, threatening its very survival. Felt Decl. ¶ 70.

## IV.  ARGUMENT

The Federal Arbitration Act (FAA), codified at 9 U.S.C. 1 et seq., establishes a strong federal policy favoring arbitration agreements. Section 2 of the FAA provides that written arbitration agreements in contracts involving commerce are valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract , Doctor's Assocs. v. Hamilton, 150 F.3d 157 ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co., 307 F.3d 24. This provision ensures that arbitration agreements are placed on equal footing with other contracts and are enforceable unless invalidated by generally applicable contract defenses such as fraud, duress, or unconscionability.

14

The FAA preempts state laws that specifically target arbitration agreements or impose unique limitations on their enforceability Hayes v. County Bank, 26 A.D.3d 465. For example, courts may not invalidate arbitration agreements based on state laws that apply solely to arbitration provisions, as this would contravene the FAAs goals and policies Doctor's Assocs. v. Casarotto, 517 U.S. 681 Hayes v. County Bank, 26 A.D.3d 465. In New York, the FAA applies to arbitration agreements that affect interstate commerce, and courts have consistently upheld the enforceability of such agreements under federal law.

New York courts have also recognized the FAAs authority and the federal policy favoring arbitration. For instance, in *Highland HC, LLC v. Scott*, the court applied the FAA to compel arbitration in a dispute involving interstate commerce, affirming the presumption of arbitrability when an enforceable arbitration agreement is ambiguous about its scope Emily Wu v. Uber Techs., Inc., 2022 N.Y. Misc. LEXIS 29944. Similarly, in *Maynard v. Smith*, the court reiterated that arbitration agreements are governed by general contract principles, allowing parties to resist enforcement only on grounds applicable to all contracts, such as fraud or unconscionability.

## A. DAM DID NOT WAIVE ARBITRATION

The New York Court of Appeals has "repeatedly recognized New York's 'long and strong public policy favoring arbitration.'" *Stark*, 9 N.Y.3d at 66, 845 N.Y.S.2d at 221-22 (quoting *Smith Barney Shearson Inc. v. Sacharow*, 91 N.Y.2d 39, 49 (1997)).   Indeed, "this State favors and encourages arbitration as a means of conserving the time and resources of the courts and the contracting parties. Therefore, New York courts interfere as little as possible with the freedom of consenting parties to submit disputes to arbitration," *Smith Barney Shearson* at 49-50 (citations and internal quotation marks omitted).

15

To find a waiver of arbitration, a defendant must have acted inconsistently with the intention to arbitrate, such as by participating in the discovery process without asserting the right to arbitration. *See Stark v. Molod Spitz DeSantis & Stark, P.C.*, 9 NY3d 59, 66, 845 NYS2d 217 (2007); *Estate of Jerry Castellone v. JP Morgan Chase Bank, N.A.*, 60 A.D.3d 621, 623, 875 N.Y.S.2d 130, 132 (2d Dep't 2009) (although defendants served a deposition notice they never sought to take depositions).

As stated by the Court of Appeals, "[t]he crucial question, of course, is what degree of participation by the defendant in the action will create a waiver of a right to stay the action. **In the absence of unreasonable delay, so long as the defendant's actions are consistent with an assertion of the right to arbitrate, there is no waiver**." *De Sapio v. Kohlmeyer*, 35 N.Y.2d 402, 405, 362 N.Y.S.2d 843, 846 (1974) (emphasis added).

In *W. RAC Contr. Corp. v. Huntington Vil. Hotel Partners, L.L.C.*, 75 Misc. 3d 805 (N.Y. Sup. Ct. 2022), the court held that a party did not waive its right to arbitration by commencing an action to foreclose a mechanic's lien. The court emphasized that such an action was in the nature of preserving the status quo pending arbitration and did not vitiate the parties' agreement to arbitrate contractual disputes. The decision highlighted that arbitration is strongly favored in New York, and actions consistent with preserving rights under the agreement do not constitute a waiver.

In *Byrnes v. Castaldi*, 72 A.D.3d 718 (2d Dep't 2010), the appellate court found that the builders did not waive their right to arbitration despite serving discovery demands and delaying their motion to compel arbitration by four months. The court reasoned that the builders' answer included an affirmative defense asserting arbitration, and their limited engagement in discovery did not amount to inconsistent conduct that would waive arbitration. The court further noted that the plaintiffs failed to demonstrate any prejudice resulting from the delay or conduct of the

builders.

In accordance with these standards, there clearly was no waiver of arbitration by DAM in this case.  Sharma Decl. ¶¶ 12, 15, 16, To the contrary, DAM's counsel was proactive and careful to preserve DAM's arbitration rights, and did nothing that can be found, imputed or implied as a waiver against DAM or Mr. Felt. *Id.*

Also, in a case "[w]hen claims are entirely separate, though arising from a common agreement, no waiver of arbitration may be implied from the fact that resort has been made to the courts on other claims. Moreover, when an urgent need to preserve the status quo requires some immediate action that cannot await the appointment of an arbitrator, waiver will not occur when the plaintiff moves in court for protective relief in order to preserve the status quo while at the same time exercising his right under the contract to demand arbitration."  *Cotugno v. Bartkowski*, 2012 N.Y. Slip Op. 22288, at *2, *37 (N.Y. Sup. Ct. Oct. 5, 2012).

That was precisely the case here, first when DAM filed its Answer in this case to assert its **right to arbitration** and Counterclaims against Svothi to **protect** DAM's substantial goodwill; and then when DAM filed the state court action "arising from conduct that occurred **after** the termination of the JV Agreements and which, in any event, **[was] not related to the JV Agreement**." Sharma Decl., ¶¶ 15, 16, 18. *See Cotugno v. Bartkowski*, *supra, Cotugno v. Bartkowski*, 37 Misc. 3d 917, 919 (N.Y. Sup. Ct. 2012).

Thus, there is no waiver where, as with respect to DAM's state court case,

the **two suits involve different issues**. Nor can waiver of the right to arbitrate certain claims be inferred based upon the explicit waiver of other claims. In addition, the "litigation of non-arbitrable claims does not waive a party's right to arbitrate other arbitrable claims." Thus, it is the "prior litigation of the same legal and factual issues" as the party subsequently seeks to arbitrate that results in the waiver of the right to arbitrate.

17

*Enron Power Mktg. v. Pub. Util. Dist. No. 1 (In re Enron Corp.),* 364 B.R. 489, 512 (Bankr. S.D.N.Y. 2007), *citing and quoting Doctor's Assocs. v. Distajo*, 107 F.3d 126, 132 n.11, 133 (2d Cir. 1997) (emphasis added).

While Svothi and VideoApp have cited numerous waiver cases, none of them even remotely fit the facts of the present case, where DAM has never failed to protect its right to arbitration, unreasonably delayed in pursuing arbitration, or litigated arbitrable claims. In sum, there are simply no grounds for finding DAM waived its right to arbitrate.

This includes the novel argument that DAM waived arbitration by "publicizing its litigation" against VideoApp. Mr. Felt's social media press postings are not remotely analogous to a cases like *Sherrill v. Grayco Builders, Inc.*, 64 N.Y.2d 261 (1985) upon which it has relied in the New York action, where a party moved to compel arbitration after conducting party depositions that he may have been precluded from taking in an arbitration. *Id.* at 271. Contrary to VideoApp's tortured argument, DAM did not "draw on the judicial process for a particular advantage, such as pretrial disclosure not generally available in arbitration.". *Id.* at 273-74.

A determination that a party has waived the right to arbitrate requires a finding that the party engaged in litigation to such an extent as to "manifest [ ] a preference 'clearly inconsistent with [its] later claim that the parties were obligated to settle their differences by arbitration' . . . and thereby elected to litigate rather than arbitrate." *Id.* at 272 (quoting *Zimmerman v. Cohen*, 236 N.Y. 15, 19 (1923)).

In determining whether there has been a waiver of arbitration, courts consider the amount of litigation that has occurred, the length of time between the start of litigation and the arbitration request, and whether prejudice has been established. *Cusimano v. Schnurr*, 26 N.Y.3d 391, 400 (2015). Prejudice is the "critical" consideration. *See Matter of NBC Universal Media, L.L.C. v.*

*Strauser*, 190 A.D.3d 461 (1st Dep't 2021) (finding that the defendant had not waived its right to pursue arbitration after 26 months between the start of litigation and the demand for arbitration where the action had not been substantially litigated at that point, and the plaintiff could not demonstrate prejudice as a result).

In this case, none of the elements constituting a waiver of arbitration are present. Perhaps most critically, absolutely no prejudice to VideoApp or Svothi can be shown -- and of course there can be none where this case should by rights be arbitrated. Likewise, neither Svothi nor VideoApp can show any "advantage" that DAM has secured for itself to date.

## B. SINCE SVOTHI KNOWINGLY RECEIVED DIRECT AND SUBSTANTIAL BENEFITS FROM THE JV AGREEMENT, IT IS REQUIRED TO ARBITRATE THE CLAIMS IN THIS ACTION

New York and federal courts have "recognized a number of theories under which nonsignatories may be bound to the arbitration agreements of others," including "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) ; *see also Matter of Belzberg v. Verus Invs. Holdings Inc.*, 21 N.Y.3d 626, 630 & n.3 (2013). Such theories "arise out of common law principles of contract and agency law." *Thomson-CSF*, 64 F.3d at 776.  Under the estoppel theory, New York courts have ordered third party, non-signatories to arbitrate when the third parties have "knowingly accepted the benefits of the [a]greement" containing the arbitration clause. *Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, 9 F.3d 1060, 1064 (2d Cir. 1993); *see also Matter of Belzberg*, 21 N.Y.3d at 631 ("Under the direct benefits theory of estoppel, a nonsignatory may be compelled to arbitrate where the nonsignatory 'knowingly exploits' the benefits of an agreement containing an arbitration clause, and receives benefits flowing directly from the agreement."); *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97-98 (2d Cir. 1999) ("We have held that the non- signatory may be compelled to arbitrate when it has

derived other benefits under the agreement containing the arbitration clause."); *Life Techs. Corp. v. AB Sciex Pte. Ltd.*, 803 F. Supp. 2d 270, 271-72 (S.D.N.Y. 2011) ("AB Sciex is estopped from avoiding arbitration . . . because it knowingly exploited the direct benefits of the Purchase Agreement by obtaining and using the licenses provided by the License Agreement.").

A non-signatory may be compelled to participate in an arbitration if, like Svothi here it received a "direct" as opposed to an "indirect" benefit from the contract containing the arbitration clause. *See Matter of Belzberg*, 21 N.Y.3d at 630-31, 633-34; *Life Techs. Corp.*, 803 F. Supp. 2d at 273-76. Benefits are "direct" "when arising specifically from the unsigned contract containing the arbitration clause" and, as here, when "specifically contemplated by the relevant parties." *Id.* at 276; *see also Matter of Belzberg*, 21 N.Y.3d at 633 (a benefit is "direct" when it "can be traced directly to the agreement containing the arbitration clause"). In contrast, "[a] benefit is indirect where the nonsignatory exploits the contractual relation of the parties, but not the agreement itself." *Id.* at 631.

In *Deloitte Noraudit*, for example, the Second Circuit held that a party was bound to an arbitration provision of an agreement it did not sign because it had "knowingly accepted the benefits of the [a]greement" containing the arbitration clause and the benefits were derived from the agreement in question. *Deloitte Noraudit A/S*, 9 F.3d at 1064. In that case, Deloitte and its affiliates (including Noraudit) had formed, through a memorandum agreement, an international association. *Id.* at 1061. In a separate litigation, Deloitte and its affiliates had signed a settlement agreement that permitted the affiliates to use the name "Deloitte." *Id.* Noraudit received a copy of the settlement agreement and did not object to it at the time. *See Id.* When Noraudit later brought a lawsuit against Deloitte in federal court, Deloitte moved to compel arbitration based on the arbitration clause in the settlement agreement. *Id.* at 1061-62. The Second Circuit rejected

Noraudit's argument that it was not bound by the arbitration provision because it was neither a party nor a signatory to the agreement. *Id.* at 1063-64 ("[W]e have held that 'a party may be bound by an agreement to arbitrate even in the absence of a signature.'" (citation omitted)). The court held that Noraudit was estopped from denying its obligation to arbitrate under the settlement agreement because it "failed to object to the [settlement a]greement when it received it and offers no persuasive reason for its inaction" and "knowingly accepted the benefits of the [a]greement through its continuing use of the name 'Deloitte.'" *Id.* at 1064.

Similarly, in *Life Technologies Corporation*, the district court held that a non-signatory, AB Sciex, was estopped from avoiding arbitration where it had "knowingly accepted and exploited benefits provided for in, and contemplated by, a contract containing an arbitration provision." *Life Techs. Corp.*, 803 F. Supp. 2d at 277. There, AB Sciex's affiliate, DH Tech, entered into an agreement with Life Tech and Applied Biosystems to purchase Life Tech's mass spectrometry business (the "Purchase Agreement"). Id at 271. The Purchase Agreement contained an arbitration clause. *Id.* The Purchase Agreement also referred to "ancillary agreements" and required that the signatories, or their affiliates, execute a separate trademark license agreement. *Id.* at 271-72. Life Tech and Applied Biosystems thereafter signed a trademark license agreement with AB Sciex that permitted AB Sciex to use certain trademarks (the "License Agreement"). *Id.* at 272. AB Sciex "proceeded to use those trademarks in connection with" the License Agreement and DH Tech's mass spectrometry business. *Id.* at 276.

The district court held that AB Sciex was estopped from avoiding arbitration under the Purchase Agreement (which it did not sign) because it "knowingly exploited the benefits of the Purchase Agreement" by "executing the License Agreement, contracting for the trademarks, and using the trademarks in commerce, all with the knowledge of the Purchase Agreement." *Id.* at 279.

Here, it is beyond dispute that Svothi too "knowingly exploited a direct benefit of a separate agreement containing an arbitration clause." *Id.* at 276. Todaro, and thus Svothi, had actual knowledge of the JV Agreement and its content. The JV Agreement expressly contemplated that VideoApp would run the Site and DAM supply content, and they in fact did, but then so did Svothi, and thus Svothi substantially benefited from the Agreement - - both by Svothi's own admissions and claims, and Robert Felt's personal observations. Felt Decl. ¶¶ 64-70. Indeed, Svothi has made no admissible attempt to refute their extensive involvement with and benefit from the Site operations that existed solely because of the JV Agreement. *See Id.* Simply put, Svothi "knowingly accepted the benefits of the [JV Agreement]" by performing the contracted-for work under the Agreement. *Deloitte Noraudit A/S*, 9 F.3d at 1064. Accordingly, Svothi is clearly required to arbitrate even though it is a nonsignatory because it knowingly received direct benefits from VideoApp's JV Agreement with DAM.

## C. ALTHOUGH SVOTHI DID NOT SIGN THE JV AGREEMENT, IT IS ALSO BOUND BY THE JV AGREEMENT'S ARBITRATION CLAUSE AS THE ALTER EGO OF VIDEOAPP

DAM also presents a compelling case for finding Svothi bound by the JV Agreement's arbitration clause as the alter-ego of *TNS Holdings Inc. v. MKI Sec. Corp.*, 92 N.Y.2d 335, 680 (1998), the New York Court of Appeals was asked to decide "whether a corporation that is related to, but not itself, a party to an agreement containing an arbitration clause can be compelled to arbitrate a dispute arising from an alleged breach of that agreement." *TNS Holdings*, 680 N.Y.S. 892, 892 (?YEAR?). The Court declared that where the party signing an agreement to arbitrate is the alter ego of a non-signatory, and equity or the prevention of fraud justifies piercing the corporate veil, the non-signatory should be bound by the arbitration agreement. The court held:

> Akin to piercing the corporate veil to prevent fraud or to achieve equity this exception applies as well in determining whether a nonsignatory to an arbitration

agreement should be bound by it.

*Id.* at 893 (citations omitted).

Thus, where a party to an arbitration agreement is the alter ego of the anon-signatory to the arbitration agreement, the non-signatory will be compelled to arbitrate any dispute covered by the arbitration agreement. *See TNS Holdings*, 680 N.Y.S. at 893

DAM's supporting evidence clearly demonstrates that VideoApp is a mere alter ego of Svothi. Felt Decl., ¶¶8, 64, 46, 57. "Where one corporation merely acts as the alter ego of a second corporation, the second corporation can be compelled to participate in an arbitration proceeding although it is not a signatory of the contract containing the arbitration clause which was, however, signed by the alter ego." *Matter of Sbarro Holding, Inc.*, 91 A.D.2d 613, 614 (2d Dep't 1982). "The corporate veil will be pierced (1) to achieve equity, even absent fraud, where the officers and employees of a parent corporation exercise control over the daily operations of a subsidiary corporation and act as the true prime movers behind the subsidiary's actions . . . and/or (2) where a parent corporation conducts business through a subsidiary which exists solely to serve the parent." *Id.* (citations omitted).

In *Tap Holdings, L.L.C. v. Orix Fin. Corp.*, 109 A.D.3d 167, 175 (1st Dep't 2013), the First Department held that a plaintiff had asserted a claim for alter ego liability when the defendant lenders engineered a "scheme" for "the sole purpose of extinguishing the note holders' claims against the subordinated notes" and established a new corporation "in order to siphon off the funds" belonging to the plaintiff. The Court provided that "such liability exists when any abuse of the corporate form is exercised for the purpose of working an inequity on another." *Id.* (emphasis added). Clearly, in finding in favor of a well-advised corporation, the Court did not care whether the parties were sophisticated parties with experience in complex financial transactions.

Likewise, Svothi cannot now hide behind VideoApp, one of Todaro's shell companies, to

23

escape arbitration for its trademark violations under the JV Agreement. DAM has presented extensive evidence that Svothi pervasively dominated VideoApp and ran and financed the joint venture while VideoApp was a sham intended to hide funds and avoid government oversight. Felt Decl., ¶¶ 57-60.

The Court is well within its power to consider this alter ego liability, especially considering the clear abuse of the corporate form here. *See McDonald v. McBain*, 99 A.D.3d 436, 437 (1st Dep't 2012) (holding that a non-signatory would be bound by an arbitration provision if it were "one of defendant's wholly controlled 'shell' entities"); *see also Metro. Transp. Auth. v. HRH Const. Interiors, Inc.*, 859 N.Y.S.2d 896, 896 (2008) ("The arbitration provision in the Agreement is extremely broad, and it neither explicitly nor implicitly exempts the issue of alter ego liability from arbitration.").

## V.  CONCLUSION

Based on the foregoing, the motion to stay pending arbitration of the JV Agreement should be granted.

Dated: April 21, 2025
New York, NY

Respectfully submitted,

SHARMALAW – Ravi Ivan Sharma, P.C.


By: /s/

Ravi Ivan Sharma
26 Broadway, Suite 1108
New York, NY 10004
(212) 537-5957
ravi@sharmalaw.com

*Counsel for Respondent and Third-Party Petitioner Dark Alley Media, LLC*

24