# Shareholder's Agreement
## Dark Alley Media, LLC

This Agreement is made on March 25, 2005, between Robert Felt (hereinafter called "Partner 1"), Maciek Dziekiewicz (hereinafter called "Partner 2") and Timothy Boyle (hereinafter called "Partner 3").

WHEREAS, Maciek Dziekiewicz is the owner of 66 shares of the common stock of Dark Alley Media, a limited-liability company in the State of New York; and

WHEREAS, Robert Felt is the owner of 66 shares of the common stock of the corporation; and

WHEREAS, Timothy Boyle is the owner of 66 shares of the common stock of the corporation; and

WHEREAS, the shares of stock owned by the parties to this Agreement constitute the entire issued capital stock of the corporation; and

WHEREAS, the parties desire to provide for the manner in which they will vote their shares of stock on certain issues that may come before the shareholders of the corporation; and

WHEREAS, the parties desire to provide for the manner in which they should vote on certain issues as the directors of the corporation; and

WHEREAS, the parties desire to provide for the purchase and sale of each other's stock in the corporation upon the happening of certain events; and

WHEREAS, the parties agree to provide for certain other procedures and events which may be covered in this Agreement;

It is therefore agreed:

**1. Control and Operations.** Each shareholder or director shall vote his shares of stock in the corporation, or vote as a member of the Board of Directors so as to provide for the following:
(a) The Board of Directors shall consist of members

(b) The following individuals shall be the officers of the corporation with the offices

1

indicated.

| Officer | Office |
|---|---|
| Robert Felt | President |
| Maciek Dziekiewicz | Vice President |
| Timothy Boyle | Treasurer |
| Timothy Boyle | Secretary |

(c) The following shall be employed by the corporation in the position provided below:

| Officer | Position |
|---|---|
| *No employees listed.* | |

(d) The salaries and the other terms, conditions and provisions of employment for each employee shall be as provided by a separate employment agreement between the employee and the corporation, provided that the salary, fringe benefits and other terms and conditions of employment of each shareholder-employee shall be approximately equal if the said shareholder-employees each devote approximately the same amount of time to employment with the corporation.

(e) Each shareholder or director shall also vote his shares of stock in the corporation or vote as a member of the Board of Directors so as to achieve the objective of the parties to this Agreement as specified herein.

2. **Termination of Rights if Shares No Longer Held**. Notwithstanding any other provision of this Agreement, if a party ceases to be a shareholder, his offices as a director and officer and his employment by the corporation and all his rights into this Agreement shall terminate effective as of the date he ceases to be a shareholder. Each party further hereby resigns from any office as an officer and as a director which he may then hold, effective immediately as of the date he ceases to be a shareholder; provided however, that this paragraph shall not effect or change the terms, conditions and provisions of any employment or consultation agreement that by its terms are to be performed upon the occurrence of the termination.

3. **Restrictions on Transfer, etc. of Stock**. The parties agree that all shares of stock of

2

the corporation hereafter issued, whether to them or others, shall be subject to this Agreement and have endorsed on the certificate the notice contained below. No additional shares shall be issued unless prior to issuance the shareholders shall agree to become bound by the terms of this Agreement as if they were original parties.

    A. The certificates for shares of stock of the corporation now held by the parties, and all other certificates for shares of stock issued after the effective date of this Agreement, shall be endorsed as follows:

"NOTICE: The sale, assignment, mortgage, hypothecation, transfer, pledge, security interest, lien, encumbrance, gifts, or other disposition of this stock is subject to an agreement between the shareholders of this corporation, dated _____, 2005."

    B. No shareholder, without the express written consent of all the other shareholders, shall sell, assign, mortgage, hypothecate, transfer, pledge, create a security interest in, lien, encumber, give, or otherwise dispose of any of his shares of stock in the corporation, now owned or hereafter acquired, during the term of this Agreement, in any manner other than as permitted in this Agreement.

    C. No sale, assignment, mortgage, hypothecation, transfer, pledge, security interest in, lien, encumbrance, gift or otherwise disposition or any of the shares of this corporation by any shareholder in violation of the provisions of this Agreement shall be valid; and no shareholders shall vote to transfer any shares on the books of the corporation, nor shall any shareholder-officer take any action to transfer any shares on the books of the corporation if he determines that the shares were transferred in violation of this Agreement; nor shall any shares be entitled to vote, nor shall any dividends be paid on any shares, during the period of any violation of this Agreement. The above disqualification shall be an addition to and not in lieu of any other remedies, legal or equitable, to enforce these provisions. Further, the parties expressly waive any voting, dividends or appraisal rights to which they would otherwise be entitled, except as provided in this Agreement.

    D. Nothing contained in this Agreement shall be construed to limit or render ineffective

any other provisions of this Agreement, or of the Certificate of Incorporation, or of the Bylaws of this corporation, consented to by all the parties, further restricting or conditioning the transfer of shares of this corporation, or providing penalties or disqualifications for violations of those restrictions or conditions.

4. **Voluntary Dissolution of the Corporation**.

A. Right to Maintain Website DNS and Telephone Number. In the event of a voluntary dissolution of the corporation, any Partner wishing to retain the corporation's principal listed telephone number(s) or website (internet ".com") DNS(s) as his telephone number(s) and DNS(s), shall pay an amount, as valued in a procedure as outlined in subparagraph D, below, to the other shareholders.

B. Compensation of Partners For Value of Office Fixtures and Improvements. In the event of voluntary dissolution of the corporation, and if a Partner exercises the option to retain the office address, or an entity designated shall receive cash sufficient to reflect the decrease in his share of the physical assets of the corporation, pursuant to the formula established in subparagraph D, below.

C. Customers and Files. In the event of dissolution, all Partners shall be entitled to retain customers of Dark Alley Media equally.

D. Dissolution: Valuation. In the event of voluntary dissolution of the corporation, the assets of the corporation, consisting of the lease and the improvements of the leasehold, the furniture, fixtures, machinery, equipment and accounts receivable of the corporation shall be valued by agreement between the shareholders. In the event the shareholders can not come to an agreement as to the value of these assets, a professional appraiser or a CPA shall be chosen, by lot if necessary, to determine their fair market value. Each shareholder or an entity designated by any of them shall be entitled to receive a percentage of the said assets equal to the ratio of the shares of stock owned to the total shares outstanding, or, in the event the parties determine to divide the assets on an unequal basis, the shareholder or entity receiving less than his or her percentage of the value of the assets shall receive an amount of cash sufficient to equalize the share of the

distribution of the corporation's assets with the percentage of stock owned by him or her. On the date of dissolution, a separate bank account shall be established and all accounts receivable shall be paid out of this special account, and any joint debts or former corporate debts, the bills for which come after the date of dissolution, shall also be paid out of his account. Each shareholder or designated entity shall be entitled to his or her percentage of the accounts receivable collected, minus the disbursements from the special account as described above, without regard to which shareholder generated the particular receivable collected. Upon a dissolution of the corporation, no value shall be given to "good will".

5. **Voluntary Withdrawal of a Shareholder**. In the event of a voluntary withdrawal by a shareholder, the withdrawing shareholder shall give written notice of his intentions to the corporation. The corporation shall have the right of first refusal to purchase the withdrawing party's shares of stock in the corporation. The remaining shareholders may also elect to treat the withdrawal of the other stockholder as a voluntary dissolution of the corporation and proceed according to the appropriate provisions of this Agreement.

(a) Price of Shares. The price of the shares in the event of a purchase upon the withdrawal of a shareholder shall be fifty (50%) percent of the value of the shareholder's stock in the corporation as calculated pursuant to the "Valuation" section of this Agreement, below.

(b) Customers. All customers shall remain the customer of the corporation, unless the remaining shareholders elect to treat the withdrawal as a dissolution. The withdrawing shareholder may publish an announcement of his new office location, if any, in the newspaper, but may not directly solicit the corporation's customers to become his customers. Solicitation of the corporation's patients shall entitle the remaining shareholder to stop payment on the Promissory Note described below.

(c) Terms of Payment. The price of the withdrawing stockholder's share shall be paid to him in one hundred twenty (120) equal monthly installments, with interest at ten (10%) percent, over a period of ten years, with the first installment being due thirty days following his actual withdrawal from the corporation.

(d) Security for Payment. The purchasing entity shall give a Promissory Note for the full amount due to under this Agreement, with interest at ten (10%) percent, payable in monthly installments over a period of ten years, and shall pledge the stock transferred to it by the withdrawing shareholder as collateral for the repayment of said Note.

6. **Compulsory Withdrawal of a Shareholder**.

A. Recognizing that the business of the corporation requires a harmonious and satisfactory personal and professional relationship between the shareholders, the parties agree that the following grounds shall each constitute a sufficient reason the compulsory withdrawal of a shareholder:

If any shareholder: (1) engages in personal misconduct or a breach of this Agreement that makes his continued presence as a shareholder in the corporation personally or professionally obnoxious or detrimental to the other shareholders or the corporation; (2) is expelled, suspended or otherwise disciplined by a final action of any professional industry organization, on serious grounds, other than for non-payment of dues or other similar grounds, whereas such action is detrimental to the other shareholders or corporation; (3) resigns from any professional organization under threat of disciplinary action, on serious grounds other than for non-payment of dues or similar grounds, whereas such action is detrimental to the other shareholders or corporation ; (4) is convicted of a felony, or of a crime or offense of a serious nature, whereas such action is detrimental to the other shareholders or corporation; or (5) becomes insolvent, makes an assignment for the benefit of creditors, is declared bankrupt, or his assets are administered in any type of creditors' proceedings.

B. Compulsory withdrawal may be treated as "voluntary" by the non-withdrawing shareholder.

7. **Total and Permanent Disability of a Shareholder**. If a shareholder becomes permanently disabled from performing his duties for the corporation to the same extent, and in the same manner he performed those duties prior to his disability, and such disability lasts for more than 180 consecutive calendar days, the disabled shareholder may, be sending written notice to the corporation, require the corporation to purchase his shares of stock in the corporation as provided below. If a shareholder is permanently disabled from performing his duties for the corporation in the same manner and to the same extent as he performed them prior to his disability for a period of one calendar year or more, then the corporation may require the disabled shareholder to sell to the corporation his shares in the corporation after given written notice of its election, as provided below.

(a) <u>Price of Shares</u>. The price of the shares in the event of a disability purchase as described herein shall be seventy-five (75%) percent of the value of the shareholder's stock in the corporation, as calculated pursuant to the "Valuation" section of this Agreement, below.

6

(b) <u>Terms of Payment</u>. The corporation shall pay the selling shareholder the price for his shares as determined according to the preceding paragraph, in the following manner: twenty (20%) percent of the purchase price shall be paid in cash within thirty days of the date the written notice was sent; the remaining eighty (80%) percent of the purchase price shall be paid over a period of five years, in sixty (60) equal monthly installments, with interest at ten (10%) percent.

(c) <u>Security for Payment</u>. The corporation shall sign a Note for the eighty (80%) percent of the purchase price to be paid in installments, and shall pledge the stock received from the selling partner as collateral for the payments required under the Note, but shall not be required to pledge his own original stock in the corporation.

(d) <u>Disability Insurance</u>. The payments required under this Agreement shall be in addition to any payments received by the disabled shareholder on account of any policy of disability insurance. In the event the corporation or the remaining shareholder has purchased "Disability Buy-Out Insurance" specifically to fund this or some other disability purchase agreement, the proceeds of that insurance may be used to fund the purchase of the disabled shareholder's stock. If more than twenty (20%) percent of the purchase price of the disabled shareholder's stock is received in the form of such disability buy-out insurance payments, then the minimum down payment on the purchase price required by this Agreement shall be the actual amount of insurance proceeds received by the purchasing shareholder or the corporation, payable when received, and the Note and repayment terms shall be adjusted accordingly.

8. **Death of a Shareholder**. If a shareholder dies, the corporation shall purchase his stock from his estate within thirty days of the date of his death, as provided below.

(a) <u>Price of Shares</u>. The purchase price shall be one hundred (100%) percent of the value of the shareholder's stock, as determined according to the "Valuation" section of this Agreement, below.

(b) <u>Terms of Payment</u>.

1.<u>Down payment</u>. Within thirty days of the date of the shareholder's death, the corporation shall pay over to the personal representative of the deceased shareholder twenty (20%) percent of the purchase price as established by this Agreement, or the full amount of any life insurance proceeds received by the corporation or the purchasing shareholder on account of the deceased shareholder's death, whichever amount is larger.

2.The balance of the purchase price shall be payable in sixty (60) equal monthly installments of principal and interest, with interest at the rate of ten (10%) percent, with the first installment coming due thirty days after the shareholder's death.

(c) <u>Security for Payment</u>. The corporation shall sign a Note payable to the estate of the deceased shareholder in the full amount of the purchase price, less the amount of the down payment. The obligations shall bear interest at the rate of ten (10%) percent. The corporation shall pledge the shares purchased from the deceased shareholder's estate as collateral for the repayment of this obligation.

9. **Retirement of a Shareholder**. Any shareholder shall be eligible to retire under the provisions of this Agreement after reaching the age of sixty-five (65), or after the completion of the twenty-fifth (25) year of employment at the corporation. The corporation shall be obligated to purchase the retiring shareholder's shares as provided below.

(a) <u>Price of Shares</u>. Purchase price in the event of retirement shall be one hundred (100%) percent of the value of the shareholder's stock as calculated according to the "Valuation" section of this Agreement, below.

(b) <u>Terms of Payment</u>. There shall be no down payment in the event of the retirement of a shareholder. The purchase price shall be paid to the retiring shareholder, his heirs and assigns, over a period of seven (7) years, in eighty-four (84) equal monthly installments of principal and interest. Interest shall be payable at ten (10%) percent per year. The first such installment shall be due thirty days after the date the retiring shareholder advised the remaining shareholder of his retirement.

(c) <u>Security for Payment</u>. The corporation shall sign a Note for the full purchase price of the shares, payable over seven years. The obligation shall bear interest at ten (10%) percent. As collateral, the corporation shall pledge the shares of stock purchased from the retiring shareholder.

(d) <u>Restrictive Covenants</u>. The retiring shareholder shall sign a restrictive covenant, in which he agrees not to acquire any ownership interest in the business in the adult entertainment industry, other than as a consultant, or in any capacity which could not reasonably be construed as being in competition with the non-retiring shareholder in New York for seven years following his retirement. The restrictive covenant will provide that the corporation shall not be obligated to make any payments called for by this Agreement if the restrictive covenant is violated by the retiring shareholder.

(e) <u>Employment of Retiring Shareholder as a Consultant</u>. If a shareholder has attained that age of sixty-five (65), or has completed their twenty-fifth (25) year of employment at the corporation, and is therefore entitled to retirement under the provisions of this Agreement, he may elect to remain employed by the corporation as a "consultant" and the corporation agrees to execute an appropriate contract, providing that the retiring shareholder shall be employed as a consultant, at an annual compensation agreed upon between the parties, not to exceed fifty (50%) percent of the annual salary paid to the retiring shareholder in the last full calendar year of his employment by the corporation. A consultant shall devote to the business of the corporation

8

approximately fifty (50%) percent of the time he devoted when he was a full-time employee of the corporation. In the event the retiring shareholder elects to remain a consultant to the corporation, the corporation shall pay interest only, at the rate of ten (10%) percent per year, on the purchase price of the retiring shareholder's stock, so long as the retiring shareholder remains employed by the corporation as a consultant. Once the retiring shareholder ceases to be employed by the corporation as a consultant, then the purchase price for his shares shall be paid as provided above, in eighty-four (84) equal monthly installments, beginning one month from the date of his termination of employment with the corporation. In any event the retiring shareholder must transfer his stock to the corporation upon the termination of this full-time employment by the corporation and before being employed by the corporation as a consultant.

10. **Valuation of Stock**. The value of the stock in the corporation shall be composed of the following components: (1) all tangible assets of the corporation of any kind, and; (2) accounts receivable. The value of each component shall be established, as of the date any party gives the required notice that the corporation or other party is required to purchase or sell his shares according to the terms of this Agreement.

(a) <u>Tangible Assets</u>. The parties shall agree upon a valuation of the tangible assets of the corporation. If the parties can not agree on such valuation, they shall select a professional appraiser or accountant (CPA) to establish the current market value of the tangible assets, which shall be the value used for the purposes of this Agreement.

(b) <u>Accounts Receivable</u>. The value of the accounts receivable shall be computed to include only those accounts receivable less than six months old, as of the valuation date established above. The value of the accounts receivable shall be adjusted in a case where the receivable is expected to be paid by insurance or other third-party payments, to the expected amount of such insurance or other third-party payment.

11. **Coordination of Provisions**. If a shareholder has elected to voluntarily withdraw or retire from the corporation and triggered the voluntary withdraw provisions of this Agreement or in the event of a mandatory withdrawal, the subsequent disability or death of that shareholder shall have no effect upon the price and manner of payment for his shares, whether or not transfer of the stock and execution of required documents has been completed. Likewise, if a shareholder becomes disabled and triggers the disability provisions of this Agreement, his subsequent death shall effect no change upon the price and manner of payment. However, if a shareholder is totally and permanently disabled as provided by this Agreement, and if any party would have been entitled to elect a "disability purchase" under the terms of this Agreement, but the shareholder dies

before either party makes such an election, then the "death purchase" provisions of this Agreement shall control. In any event, the giving of the required notice shall be conclusive proof that the appropriate purchase had begun.

12. **Transfer of Stock**. Upon receipt by a withdrawing, disabled, or retiring shareholder or a deceased shareholder's estate of the purchase price, or the down payment of first installment thereon as provided in this Agreement, the former shareholder or his legal representative shall endorse or deliver the shares of stock sold to the corporation, and the remaining shareholder shall execute and deliver the required Note and collateral.

13. **Termination**. This Agreement shall terminate upon occurrence of the following events:

(a) The voluntary agreement in writing of all the parties.

(b) Bankruptcy, insolvency or receivership of any party or the appointment of a receiver of the assets of any party prior to the purchase of any stock under the terms of this Agreement.

(c) Dissolution and liquidation of the corporation prior to the purchase of any stock under this Agreement.

14. **Dissolution**. Each party agrees to vote all his shares of stock for dissolution of the corporation, upon the demand of any party, upon occurrence of any of the following events:

(a) The decision of an arbitrator, or arbitrators, designated to resolve any dispute between the parties, that the corporation be resolved.

(b) Upon the written request for dissolution of this corporation delivered to the other parties, by parties who are the holders of fifty (50%) percent or more of the total numbers of shares of stock of the corporation.

(c) The death of any shareholder if for any reason the shares of the deceased shareholder are not purchased by the other shareholders as provided in paragraph #7 above.

15. **Disputes and Arbitration**. Any dispute or controversy arising under this Agreement shall be determined and settled by arbitration under the Rules of the American Arbitration Association. The arbitration award shall be final and binding, and judgment on the award may be entered by any Court having competent jurisdiction.

16. **Amendment**. No modification, amendment, addition to, or termination of this

Agreement, nor waiver of any of its provisions shall be valid or enforceable unless in writing and signed by all the parties.

17. **Binding Agreement**. This Agreement shall be binding on the parties, their distributees, their legal representatives, successors and assigns.

18. **Notices**. All notices under this Agreement shall be in writing, and shall be served by personal service, or be certified mail, return receipt requested. Notice by mail shall be addressed to each party at the address set forth below his signature in this Agreement. Any party may notify the other parties of a different address to which notices shall be sent.

19. **Governing Law**. This Agreement shall be governed by the laws of the State of New York.

20. **Execution in Counterparts**. This Agreement may be executed in any number of counterparts deemed for all purposes to be one Agreement. To the same effect as if it were the original, anyone may rely on a copy certified by a Notary Public or other authorized person to be a true copy of the Agreement and of any writings endorsed on or attached to the Agreement. Anyone may rely upon any Statement of Facts certified by a party to this Agreement.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement on April 16, 2005.

Robert Felt: _[signature]_   SSN: 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

Maciek Dziekiewicz: _[signature]_   SSN: 122-92-7/46

Timothy Boyle: _[signature]_   SSN: 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

Witness: _____   Print Name: _____