1:25-cv-00333 (ALC)

**Request for Leave to Supplement the Record**

Request for Leave to Supplement the Record

Given the sudden nature of the proposed settlement and the fact that I only recently became aware of its details, I respectfully request leave of the Court to file supplemental exhibits and documentation within the next five (5) business days. These materials include key communications and agreements that bear directly on the issues before the Court.

Importantly, I was kept entirely out of the loop by our attorney, who has not communicated with me since filing a motion on June 23, 2025. I only learned of the current posture of the case this past Friday, July 18, 2025, and am acting with urgency to respond in good faith.

As a self-represented litigant proceeding in forma pauperis, I respectfully ask the Court's understanding to ensure a full and fair presentation of evidence.

Respectfully submitted,
Mark Edisad

(Signature)

# TABLE OF CONTENTS

**Motion to Restore Case and Object to Proposed Settlement**
**Marc Edisad, Pro Se**
<u>**Case No. 1:25-cv-00333 (ALC)**</u>

· **Request for Leave to Supplement the Record**

**MAIN FILING**

1.    **Request for Leave to Supplement**
2.    **Declaration of Marc Edisad**
3.    **Certificate of Service**
4.    **Request to Proceed In Forma Pauperis (IFP)**

**EXHIBITS**

- **Exhibit A** – Dark Alley Media LLC Shareholders Agreement (2004, Executed by Three Original Shareholders)
- **Exhibit B** – Addendum to Shareholders Agreement (Unsigned (sign copy to exists and will be provided)

- **Exhibit C** – Name Change Certificate Consular

- **Exhibit D** – February 19, 2025 Hearing Transcript Excerpt

- **Exhibit E** – Email from Robert Felt, dated February 27, 2025, forwarded to Marc Edisad on March 4, outlining strategic legal considerations

- **Exhibit F** – Recent Text Message Correspondence between Marc Edisad and Robert Felt (June–July 2025)

Page 1 of 2

- **Exhibit G, Part 1 –** Emergency Discovery Request (Evidence of Inflated Membership and Cash Flow Figures)

- **Exhibit G, Part 2 –** Analogy Illustrating Irreparable Brand Damage and Asset Misevaluation

- **Exhibit G, Part 3 –** Selected Email Correspondence from Robert Felt to Marc Edisad (2025)

- **Exhibit H1 –** Evidence of 55,000 Member Claim–Financial Dispute Context. Recorded in email from opposing counsel as attached.

- **Exhibit H2 –** Supplemental Message from Robert Felt (March 4, 2025).

- **Exhibit I –** Joint Venture Agreement (2019)

- **Exhibit J –** Draft Complaint by Chase Lawyers against Robert Felt and Damien Todaro (Unfiled, Incomplete)

---

# 1. Request for Leave to Supplement

## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1:25-CV-00333(ALC)

Case No. ~~1:25-cv-06188~~

**Marc Edisad,**
Defendant.
v.
**Svothi Inc.,**
Plaintiff.

## REQUEST FOR LEAVE TO SUPPLEMENT

Marc Edisad, Defendant, hereby requests the Court's permission to supplement the record with additional documents that have come to light after the filing of the original papers. These documents are critical to clarifying and supporting the arguments made in this case. This request is made in good faith and to ensure that all necessary evidence is presented to the Court.

The undersigned respectfully requests leave to file the supplemental documents as part of the ongoing case.

Dated this 22nd day of July, 2025.

Respectfully submitted.

**Marc Edisad**, Defendant

# 2. Declaration of Marc Edisad

## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

Case No. ~~1:25-cv-00188~~ 1:25-cv-00333

## DECLARATION OF MARC EDISAD

I, Marc Edisad, declare under penalty of perjury under the laws of the United States of America that the following statements are true and correct:

1. I am the Defendant in this case, and the facts stated herein are based on my personal knowledge and experience.

2. I was not consulted on June 23, 2025, regarding any motions filed with the Court by my previous attorney. I learned about the motion and the proposed settlement only through a separate discovery on Friday, July 18, 2025. I believe that this lack of consultation violates my rights and has resulted in significant harm to my position in this case.

3. Furthermore, the settlement negotiations were conducted without my participation or approval, and I was not informed of the decisions being made in my absence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 22nd day of July, 2025.

**Marc Edisad**
Defendant

# 4. Request to Proceed and Inform APALPARIS

## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

Case No. ~~1:23-cv-06108~~ *1:25-cv-00333 (ALC)*

## REQUEST TO PROCEED AND INFORM APALPARIS

Marc Edisad, Defendant, respectfully requests the Court's permission to proceed with the case and notify all parties involved of the next steps. This request is made to ensure that all documents and filings are made timely, and all parties are adequately informed of the proceedings as required under the law.

Furthermore, I request that the Court allow the necessary notifications and communications with APALPARIS to proceed without delay.

Dated this 22nd day of July, 2025.

Respectfully submitted,
**Marc Edisad**, Defendant

**EXHIBIT A**

**Dark Alley Media LLC Shareholders' Agreement (2004, Executed by Three Original Shareholders)**

**Executed by:**
- **Maciek Dziekiewicz (now Marc Edisad)**
- **Robert Felt**
- **Timothy Boyle**

## *Shareholder's Agreement*
### *Dark Alley Media, LLC*

This Agreement is made on March 25, 2005, between Robert Felt (hereinafter called "Partner 1"), Maciek Dziekiewicz (hereinafter called "Partner 2") and Timothy Boyle (hereinafter called "Partner 3").

**WHEREAS,** Maciek Dziekiewicz is the owner of 66 shares of the common stock of Dark Alley Media, a limited-liability company in the State of New York; and

**WHEREAS,** Robert Felt is the owner of 66 shares of the common stock of the corporation; and

**WHEREAS,** Timothy Boyle is the owner of 66 shares of the common stock of the corporation; and

**WHEREAS,** the shares of stock owned by the parties to this Agreement constitute the entire issued capital stock of the corporation; and

**WHEREAS,** the parties desire to provide for the manner in which they will vote their shares of stock on certain issues that may come before the shareholders of the corporation; and

**WHEREAS,** the parties desire to provide for the manner in which they should vote on certain issues as the directors of the corporation; and

**WHEREAS,** the parties desire to provide for the purchase and sale of each other's stock in the corporation upon the happening of certain events; and

**WHEREAS,** the parties agree to provide for certain other procedures and events which may be covered in this Agreement;

It is therefore agreed:

1. **Control and Operations**.  Each shareholder or director shall vote his shares of stock in the corporation, or vote as a member of the Board of Directors so as to provide for the following:

(a) The Board of Directors shall consist of members

(b) The following individuals shall be the officers of the corporation with the offices

indicated.

| Officer | Office |
|---------|--------|
| Robert Felt | President |
| Maciek Dziekiewicz | Vice President |
| Timothy Boyle | Treasurer |
| Timothy Boyle | Secretary |

(c) The following shall be employed by the corporation in the position provided below:

| Officer | Position |
|---------|----------|

*No employees listed.*

(d) The salaries and the other terms, conditions and provisions of employment for each employee shall be as provided by a separate employment agreement between the employee and the corporation, provided that the salary, fringe benefits and other terms and conditions of employment of each shareholder-employee shall be approximately equal if the said shareholder-employees each devote approximately the same amount of time to employment with the corporation.

(e) Each shareholder or director shall also vote his shares of stock in the corporation or vote as a member of the Board of Directors so as to achieve the objective of the parties to this Agreement as specified herein.

2. **Termination of Rights if Shares No Longer Held**. Notwithstanding any other provision of this Agreement, if a party ceases to be a shareholder, his offices as a director and officer and his employment by the corporation and all his rights into this Agreement shall terminate effective as of the date he ceases to be a shareholder. Each party further hereby resigns from any office as an officer and as a director which he may then hold, effective immediately as of the date he ceases to be a shareholder; provided however, that this paragraph shall not effect or change the terms, conditions and provisions of any employment or consultation agreement that by its terms are to be performed upon the occurrence of the termination.

3. **Restrictions on Transfer, etc. of Stock**. The parties agree that all shares of stock of

2

the corporation hereafter issued, whether to them or others, shall be subject to this Agreement and have endorsed on the certificate the notice contained below.  No additional shares shall be issued unless prior to issuance the shareholders shall agree to become bound by the terms of this Agreement as if they were original parties.

A.  The certificates for shares of stock of the corporation now held by the parties, and all other certificates for shares of stock issued after the effective date of this Agreement, shall be endorsed as follows:

**"NOTICE:  The sale, assignment, mortgage, hypothecation, transfer, pledge, security interest, lien, encumbrance, gifts, or other disposition of this stock is subject to an agreement between the shareholders of this corporation, dated _____, 2005."**

B.  No shareholder, without the express written consent of all the other shareholders, shall sell, assign, mortgage, hypothecate, transfer, pledge, create a security interest in, lien, encumber, give, or otherwise dispose of any of his shares of stock in the corporation, now owned or hereafter acquired, during the term of this Agreement, in any manner other than as permitted in this Agreement.

C.  No sale, assignment, mortgage, hypothecation, transfer, pledge, security interest in, lien, encumbrance, gift or otherwise disposition or any of the shares of this corporation by any shareholder in violation of the provisions of this Agreement shall be valid; and no shareholders shall vote to transfer any shares on the books of the corporation, nor shall any shareholder-officer take any action to transfer any shares on the books of the corporation if he determines that the shares were transferred in violation of this Agreement; nor shall any shares be entitled to vote, nor shall any dividends be paid on any shares, during the period of any violation of this Agreement. The above disqualification shall be an addition to and not in lieu of any other remedies, legal or equitable, to enforce these provisions.  Further, the parties expressly waive any voting, dividends or appraisal rights to which they would otherwise be entitled, except as provided in this Agreement.

D.  Nothing contained in this Agreement shall be construed to limit or render ineffective

any other provisions of this Agreement, or of the Certificate of Incorporation, or of the Bylaws of this corporation, consented to by all the parties, further restricting or conditioning the transfer of shares of this corporation, or providing penalties or disqualifications for violations of those restrictions or conditions.

**4. Voluntary Dissolution of the Corporation.**

A. Right to Maintain Website DNS and Telephone Number. In the event of a voluntary dissolution of the corporation, any Partner wishing to retain the corporation's principal listed telephone number(s) or website (internet ".com") DNS(s) as his telephone number(s) and DNS(s), shall pay an amount, as valued in a procedure as outlined in subparagraph D, below, to the other shareholders.

B. Compensation of Partners For Value of Office Fixtures and Improvements. In the event of voluntary dissolution of the corporation, and if a Partner exercises the option to retain the office address, or an entity designated shall receive cash sufficient to reflect the decrease in his share of the physical assets of the corporation, pursuant to the formula established in subparagraph D, below.

C. Customers and Files. In the event of dissolution, all Partners shall be entitled to retain customers of Dark Alley Media equally.

D. Dissolution: Valuation. In the event of voluntary dissolution of the corporation, the assets of the corporation, consisting of the lease and the improvements of the leasehold, the furniture, fixtures, machinery, equipment and accounts receivable of the corporation shall be valued by agreement between the shareholders. In the event the shareholders can not come to an agreement as to the value of these assets, a professional appraiser or a CPA shall be chosen, by lot if necessary, to determine their fair market value. Each shareholder or an entity designated by any of them shall be entitled to receive a percentage of the said assets equal to the ratio of the shares of stock owned to the total shares outstanding, or, in the event the parties determine to divide the assets on an unequal basis, the shareholder or entity receiving less than his or her percentage of the value of the assets shall receive an amount of cash sufficient to equalize the share of the

4

distribution of the corporation's assets with the percentage of stock owned by him or her. On the date of dissolution, a separate bank account shall be established and all accounts receivable shall be paid out of this special account, and any joint debts or former corporate debts, the bills for which come after the date of dissolution, shall also be paid out of his account. Each shareholder or designated entity shall be entitled to his or her percentage of the accounts receivable collected, minus the disbursements from the special account as described above, without regard to which shareholder generated the particular receivable collected. Upon a dissolution of the corporation, no value shall be given to "good will".

　　　　5. **Voluntary Withdrawal of a Shareholder**.  In the event of a voluntary withdrawal by a shareholder, the withdrawing shareholder shall give written notice of his intentions to the corporation. The corporation shall have the right of first refusal to purchase the withdrawing party's shares of stock in the corporation. The remaining shareholders may also elect to treat the withdrawal of the other stockholder as a voluntary dissolution of the corporation and proceed according to the appropriate provisions of this Agreement.

　　　　(a) Price of Shares.   The price of the shares in the event of a purchase upon the withdrawal of a shareholder shall be fifty (50%) percent of the value of the shareholder's stock in the corporation as calculated pursuant to the "Valuation" section of this Agreement, below.

　　　　(b) Customers.  All customers shall remain the customer of the corporation, unless the remaining shareholders elect to treat the withdrawal as a dissolution.  The withdrawing shareholder may publish an announcement of his new office location, if any, in the newspaper, but may not directly solicit the corporation's customers to become his customers.  Solicitation of the corporation's patients shall entitle the remaining shareholder to stop payment on the Promissory Note described below.

　　　　(c) Terms of Payment.  The price of the withdrawing stockholder's share shall be paid to him in one hundred twenty (120) equal monthly installments, with interest at ten (10%) percent, over a period of ten years, with the first installment being due thirty days following his actual withdrawal from the corporation.

　　　　(d) Security for Payment.  The purchasing entity shall give a Promissory Note for the full amount due to under this Agreement, with interest at ten (10%) percent, payable in monthly installments over a period of ten years, and shall pledge the stock transferred to it by the withdrawing shareholder as collateral for the repayment of said Note.

　　　　6. **Compulsory Withdrawal of a Shareholder**.

5

A.    Recognizing that the business of the corporation requires a harmonious and satisfactory personal and professional relationship between the shareholders, the parties agree that the following grounds shall each constitute a sufficient reason the compulsory withdrawal of a shareholder:

If any shareholder: (1) engages in personal misconduct or a breach of this Agreement that makes his continued presence as a shareholder in the corporation personally or professionally obnoxious or detrimental to the other shareholders or the corporation; (2) is expelled, suspended or otherwise disciplined by a final action of any professional industry organization, on serious grounds, other than for non-payment of dues or other similar grounds, whereas such action is detrimental to the other shareholders or corporation; (3) resigns from any professional organization under threat of disciplinary action, on serious grounds other than for non-payment of dues or similar grounds, whereas such action is detrimental to the other shareholders or corporation ; (4) is convicted of a felony, or of a crime or offense of a serious nature, whereas such action is detrimental to the other shareholders or corporation; or (5) becomes insolvent, makes an assignment for the benefit of creditors, is declared bankrupt, or his assets are administered in any type of creditors' proceedings.

B.    Compulsory withdrawal may be treated as "voluntary" by the non-withdrawing shareholder.

7.    **Total and Permanent Disability of a Shareholder**.    If a shareholder becomes permanently disabled from performing his duties for the corporation to the same extent, and in the same manner he performed those duties prior to his disability, and such disability lasts for more than 180 consecutive calendar days, the disabled shareholder may, be sending written notice to the corporation, require the corporation to purchase his shares of stock in the corporation as provided below.    If a shareholder is permanently disabled from performing his duties for the corporation in the same manner and to the same extent as he performed them prior to his disability for a period of one calendar year or more, then the corporation may require the disabled shareholder to sell to the corporation his shares in the corporation after given written notice of its election, as provided below.

(a) Price of Shares.    The price of the shares in the event of a disability purchase as described herein shall be seventy-five (75%) percent of the value of the shareholder's stock in the corporation, as calculated pursuant to the "Valuation" section of this Agreement, below.

6

(b) <u>Terms of Payment</u>.  The corporation shall pay the selling shareholder the price for his shares as determined according to the preceding paragraph, in the following manner: twenty (20%) percent of the purchase price shall be paid in cash within thirty days of the date the written notice was sent; the remaining eighty (80%) percent of the purchase price shall be paid over a period of five years, in sixty (60) equal monthly installments, with interest at ten (10%) percent.

(c) <u>Security for Payment</u>.  The corporation shall sign a Note for the eighty (80%) percent of the purchase price to be paid in installments, and shall pledge the stock received from the selling partner as collateral for the payments required under the Note, but shall not be required to pledge his own original stock in the corporation.

(d) <u>Disability Insurance</u>.  The payments required under this Agreement shall be in addition to any payments received by the disabled shareholder on account of any policy of disability insurance.  In the event the corporation or the remaining shareholder has purchased "Disability Buy-Out Insurance" specifically to fund this or some other disability purchase agreement, the proceeds of that insurance may be used to fund the purchase of the disabled shareholder's stock. If more than twenty (20%) percent of the purchase price of the disabled shareholder's stock is received in the form of such disability buy-out insurance payments, then the minimum down payment on the purchase price required by this Agreement shall be the actual amount of insurance proceeds received by the purchasing shareholder or the corporation, payable when received, and the Note and repayment terms shall be adjusted accordingly.

**8.  Death of a Shareholder**.  If a shareholder dies, the corporation shall purchase his stock from his estate within thirty days of the date of his death, as provided below.

(a) <u>Price of Shares</u>.  The purchase price shall be one hundred (100%) percent of the value of the shareholder's stock, as determined according to the "Valuation" section of this Agreement, below.

(b) <u>Terms of Payment</u>.

1.<u>Down payment</u>.  Within thirty days of the date of the shareholder's death, the corporation shall pay over to the personal representative of the deceased shareholder twenty (20%) percent of the purchase price as established by this Agreement, or the full amount of any life insurance proceeds received by the corporation or the purchasing shareholder on account of the deceased shareholder's death, whichever amount is larger.

2.The balance of the purchase price shall be payable in sixty (60) equal monthly installments of principal and interest, with interest at the rate of ten (10%) percent, with the first installment coming due thirty days after the shareholder's death.

7

(c) <u>Security for Payment</u>.  The corporation shall sign a Note payable to the estate of the deceased shareholder in the full amount of the purchase price, less the amount of the down payment.  The obligations shall bear interest at the rate of ten (10%) percent.  The corporation shall pledge the shares purchased from the deceased shareholder's estate as collateral for the repayment of this obligation.

9. **<u>Retirement of a Shareholder</u>**.  Any shareholder shall be eligible to retire under the provisions of this Agreement after reaching the age of sixty-five (65), or after the completion of the twenty-fifth (25) year of employment at the corporation.  The corporation shall be obligated to purchase the retiring shareholder's shares as provided below.

(a) <u>Price of Shares</u>.  Purchase price in the event of retirement shall be one hundred (100%) percent of the value of the shareholder's stock as calculated according to the "Valuation" section of this Agreement, below.

(b) <u>Terms of Payment</u>.  There shall be no down payment in the event of the retirement of a shareholder.  The purchase price shall be paid to the retiring shareholder, his heirs and assigns, over a period of seven (7) years, in eighty-four (84) equal monthly installments of principal and interest.  Interest shall be payable at ten (10%) percent per year.  The first such installment shall be due thirty days after the date the retiring shareholder advised the remaining shareholder of his retirement.

(c) <u>Security for Payment</u>.  The corporation shall sign a Note for the full purchase price of the shares, payable over seven years.  The obligation shall bear interest at ten (10%) percent.  As collateral, the corporation shall pledge the shares of stock purchased from the retiring shareholder.

(d) <u>Restrictive Covenants</u>.  The retiring shareholder shall sign a restrictive covenant, in which he agrees not to acquire any ownership interest in the business in the adult entertainment industry, other than as a consultant, or in any capacity which could not reasonably be construed as being in competition with the non-retiring shareholder in New York for seven years following his retirement.  The restrictive covenant will provide that the corporation shall not be obligated to make any payments called for by this Agreement if the restrictive covenant is violated by the retiring shareholder.

(e) <u>Employment of Retiring Shareholder as a Consultant</u>.  If a shareholder has attained that age of sixty-five (65), or has completed their twenty-fifth (25) year of employment at the corporation, and is therefore entitled to retirement under the provisions of this Agreement, he may elect to remain employed by the corporation as a "consultant" and the corporation agrees to execute an appropriate contract, providing that the retiring shareholder shall be employed as a consultant, at an annual compensation agreed upon between the parties, not to exceed fifty (50%) percent of the annual salary paid to the retiring shareholder in the last full calendar year of his employment by the corporation.  A consultant shall devote to the business of the corporation

approximately fifty (50%) percent of the time he devoted when he was a full-time employee of the corporation. In the event the retiring shareholder elects to remain a consultant to the corporation, the corporation shall pay interest only, at the rate of ten (10%) percent per year, on the purchase price of the retiring shareholder's stock, so long as the retiring shareholder remains employed by the corporation as a consultant. Once the retiring shareholder ceases to be employed by the corporation as a consultant, then the purchase price for his shares shall be paid as provided above, in eighty-four (84) equal monthly installments, beginning one month from the date of his termination of employment with the corporation. In any event the retiring shareholder must transfer his stock to the corporation upon the termination of this full-time employment by the corporation and before being employed by the corporation as a consultant.

10. **Valuation of Stock**. The value of the stock in the corporation shall be composed of the following components: (1) all tangible assets of the corporation of any kind, and; (2) accounts receivable. The value of each component shall be established, as of the date any party gives the required notice that the corporation or other party is required to purchase or sell his shares according to the terms of this Agreement.

(a) <u>Tangible Assets</u>. The parties shall agree upon a valuation of the tangible assets of the corporation. If the parties can not agree on such valuation, they shall select a professional appraiser or accountant (CPA) to establish the current market value of the tangible assets, which shall be the value used for the purposes of this Agreement.

(b) <u>Accounts Receivable</u>. The value of the accounts receivable shall be computed to include only those accounts receivable less than six months old, as of the valuation date established above. The value of the accounts receivable shall be adjusted in a case where the receivable is expected to be paid by insurance or other third-party payments, to the expected amount of such insurance or other third-party payment.

11. **Coordination of Provisions**. If a shareholder has elected to voluntarily withdraw or retire from the corporation and triggered the voluntary withdraw provisions of this Agreement or in the event of a mandatory withdrawal, the subsequent disability or death of that shareholder shall have no effect upon the price and manner of payment for his shares, whether or not transfer of the stock and execution of required documents has been completed. Likewise, if a shareholder becomes disabled and triggers the disability provisions of this Agreement, his subsequent death shall effect no change upon the price and manner of payment. However, if a shareholder is totally and permanently disabled as provided by this Agreement, and if any party would have been entitled to elect a "disability purchase" under the terms of this Agreement, but the shareholder dies

9

before either party makes such an election, then the "death purchase" provisions of this Agreement shall control. In any event, the giving of the required notice shall be conclusive proof that the appropriate purchase had begun.

12. **Transfer of Stock**. Upon receipt by a withdrawing, disabled, or retiring shareholder or a deceased shareholder's estate of the purchase price, or the down payment of first installment thereon as provided in this Agreement, the former shareholder or his legal representative shall endorse or deliver the shares of stock sold to the corporation, and the remaining shareholder shall execute and deliver the required Note and collateral.

13. **Termination**. This Agreement shall terminate upon occurrence of the following events:

(a) The voluntary agreement in writing of all the parties.

(b)     Bankruptcy, insolvency or receivership of any party or the appointment of a receiver of the assets of any party prior to the purchase of any stock under the terms of this Agreement.

(c)     Dissolution and liquidation of the corporation prior to the purchase of any stock under this Agreement.

14. **Dissolution**. Each party agrees to vote all his shares of stock for dissolution of the corporation, upon the demand of any party, upon occurrence of any of the following events:

(a) The decision of an arbitrator, or arbitrators, designated to resolve any dispute between the parties, that the corporation be resolved.

(b) Upon the written request for dissolution of this corporation delivered to the other parties, by parties who are the holders of fifty (50%) percent or more of the total numbers of shares of stock of the corporation.

(c) The death of any shareholder if for any reason the shares of the deceased shareholder are not purchased by the other shareholders as provided in paragraph #7 above.

15. **Disputes and Arbitration**. Any dispute or controversy arising under this Agreement shall be determined and settled by arbitration under the Rules of the American Arbitration Association. The arbitration award shall be final and binding, and judgment on the award may be entered by any Court having competent jurisdiction.

16. **Amendment**. No modification, amendment, addition to, or termination of this

10

Agreement, nor waiver of any of its provisions shall be valid or enforceable unless in writing and signed by all the parties.

17. **Binding Agreement**. This Agreement shall be binding on the parties, their distributees, their legal representatives, successors and assigns.

18. **Notices**. All notices under this Agreement shall be in writing, and shall be served by personal service, or be certified mail, return receipt requested. Notice by mail shall be addressed to each party at the address set forth below his signature in this Agreement. Any party may notify the other parties of a different address to which notices shall be sent.

19. **Governing Law**. This Agreement shall be governed by the laws of the State of New York.

20. **Execution in Counterparts**. This Agreement may be executed in any number of counterparts deemed for all purposes to be one Agreement. To the same effect as if it were the original, anyone may rely on a copy certified by a Notary Public or other authorized person to be a true copy of the Agreement and of any writings endorsed on or attached to the Agreement. Anyone may rely upon any Statement of Facts certified by a party to this Agreement.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement on <u>April 16</u>, 2005.

Robert Felt: _____     SSN: <u>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</u>

Maciek Dziekiewicz: _____     SSN: <u>122-92-7/4</u>

Timothy Boyle: _____     SSN: <u>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</u>

Witness: _____     Print Name: _____

11

# EXHIBIT B

## Addendum to Shareholders Agreement

This exhibit contains the Addendum to the Shareholders Agreement between **Mark Edisad, Robert Felt**, and mentioning at the onset **Timothy Boyle** as one of the three initial owners during the first year after company was founded.

The addendum outlines modifications or additions made to the original agreement, reflecting changes in ownership structure, terms, and conditions as agreed upon by the parties involved. Please note that this document is unsigned but remains relevant to the case for understanding the business relationship and shareholder terms.

## ADDENDUM TO SHARE HOLDERS AGREEMENT

## DARK ALLEY MEDIA, LLC

### January 1st, 2016

-- Timothy Boyle is no longer an owner of Dark Alley Media, having sold his shares back to the company in 2006.

-- Maciej Dziekiewizc is now know as Marc Edisad, having legally changed his name.

-- Ownership of the company is as follows:

      50% Ownership for Mr. Robert Felt

      50% Ownership for Mr. Marc Edisad

Addendums to specific paragraphs:

### 1b Control and Operations

| OFFICER | OFFICE |
| --- | --- |
| Robert Felt | President |
| Marc Edisad | Vice-President |
| Robert Felt | Treasurer |
| Marc Edisad | Secretary |

### 8 Death of a Shareholder

If a shareholder dies, 50% of their ownership will automatically transfer to the other partner, giving that partner controlling interested in the company. The deceased partner may will the other 50% of their ownership to any person of their choosing, however in the absence of any specific will, this agreement will constitute agreement to transfer 100% of the ownership of the company to the other shareholder.

The company and its surviving shareholder and under no obligation to purchase any stock willed to the deceased shareholders heirs or his estate.


SIGNED AND AGREED


ROBERT FELT


_____     DATE _____


MARC EDISAD


_____     DATE _____

# EXHIBIT C

## Name Change Documentation – Consulate of Poland in Milan

This exhibit contains the official document reflecting the legal change of name from **Maciek Dziekiewicz** to **Mark Edisad**, issued by the Consulate of the Republic of Poland in Milan in 2012. This name change is relevant to the court's understanding of the identity of the party in this matter.

Rif.   133/52/157/2013                                    Milano, li 02.08.2013

### CERTIFICATO CONSOLARE

Il consolato Onorario della Repubblica di Polonia
ATTESTA CHE

Il cittadino polacco
Cognome:   EDISAD
Cognome precedente: DZIEMIEWICZ
Cognome da nubile: EDISAD
Nome: MARC
Nome precedente: MACIEJ Pietro
Nato a WARSZAWA (POLONIA)   il 14.04.1964
titolare del consolato, in possesso di un certificato o un possesso della decisione
dell'ufficiale dello stato civile di Varsavia del 04.04.2012 sul cambiamento del
cognome e nome

Cognome: DZIEMIEWICZ
Nome: MACIEJ Pietro
Nato a WARSZAWA (POLONIA)   il 14.04.1964
titolare del suo passaporto del suo stato civile del 14.04.1964.

si intende la stessa persona fisica e caratterizzata anagrafica secondo
l'ordinamento dello stato civile con seguenti

Cognome: **EDISAD**
Cognome precedente: DZIEMIEWICZ
Cognome da nubile: EDISAD
Nome: **MARC**
Nomi precedenti MACIEJ Pietro
Nato a WARSZAWA (POLONIA)   il 14.04.1964

Si rilascia su richiesta dell'interessata per alcun consentito dalla legge

# EXHIBIT D

**February 19, 2025**
**Excerpt from Hearing Transcript before Judge Andrew L. Carter, Jr.**
**United States District Court, Southern District of New York**
**Case No.: 1:25-cv-00333**
**Nature of Suit: 840 – Property Rights (Trademark)**

This excerpt reflects critical comments made by the Court during a hearing concerning the alleged settlement and the ownership and operation of the disputed intellectual property. The statements included here support the assertion that no final, lawful settlement was entered into and that unresolved ownership and fiduciary matters remain central to this case.

*The full transcript is available upon request.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SVOTHI INC.,

                    Plaintiff,

          v.

DARK ALLEY MEDIA, LLC and
ROBERT FELT,

                    Defendants.

Civil Action No. 25 CV 00333

**ANSWER WITH**
**COUNTERCLAIMS**

**ANSWER OF DEFENDANTS DARK ALLEY MEDIA, LLC AND ROBERT FELT TO PLAINTIFF'S COMPLAINT WITH AFFIRMATIVE DEFENSES AND COUNTERCLAIM WITH JURY DEMAND**

Defendants Dark Alley Media, LLC ("DAM") and Robert Felt, by their attorneys, Ravi Ivan Sharma, P.C., as and for their Answer to the Complaint of Plaintiff, Affirmative Defenses,[1] and Counterclaims against SVOTHI, INC., respectfully allege as follows:

1.     This is an action for trademark infringement.

          **ANSWER:**     **Defendants admit that Plaintiff has made the**

---

[1] **Matter subject to Arbitration**: Defendants assert that this matter must be stayed pending arbitration involving the parties, have plead such as an affirmative defense to the Complaint to preserve their right to arbitration, and intend to move the court for a stay for such purpose. Defendants are filing this Answer, notwithstanding that this matter should be stayed pending arbitration, to assert their Counterclaims against Plaintiff and to protect the substantial goodwill that Dark Alley Media, LLC has developed over approximately 17 years in its distinctive word mark and logo alleged in the Complaint and the Counterclaim as the RFC Marks. Accordingly, this Answer does not wave Defendant's right to move the Court to stay this matter pending arbitration.

allegation of Paragraph 1 of the Complaint regarding the reason it claims to have filed its Complaint but deny Plaintiff's claims have merit and denies the allegations in Paragraph 1 of the Complaint.

2.    For more than two decades, Plaintiff SVOTHI, Inc. ("SVOTHI") has been a

leader in the adult online content industry, operating a digital platform for the delivery of premium adult content. SVOTHI runs adult websites and other technology channels under the common-law marks "RFC"; "RFC.com"; and **RFC** (together, the "RFC Marks").

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of the first sentence of paragraph 2 of the Complaint. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations that Plaintiff "runs" anything of the second sentence of paragraph 2 of the Complaint. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of the second sentence of the Complaint because it is indecipherable in regard to the meaning and its use of word "use" and the meaning and its use of the words "under." Defendants deny any implication of the allegations of the second sentence of paragraph 2 of the**

Complaint that Plaintiff has any cognizable rights to the RFC Marks referenced.

3.    SVOTHI has invested millions of dollars and decades of effort to ensure that consumers associate the RFC Marks with SVOTHI and its premium adult content.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 3 of the Complaint.**

4.    Defendants Dark Alley Media, LLC ("Dark Alley") and its principal Mr.Robert Felt, an adult content creator professionally known as Owen Hawk ("Mr. Felt" and, together with Dark Alley, "Defendants"), have affixed exact reproductions of the RFC Marks to Defendants' own websites and video content. Defendants' conduct deliberately trades on Plaintiff's RFC Marks and goodwill, and is intended to deceive consumers into believing that SVOTHI is the source of, or associated, with Defendants' content and businesses.

**ANSWER: Defendants admit the allegations of the first sentence of paragraph 4 of the Complaint. Defendants deny the allegations of the second sentence of paragraph 4 of the Complaint.**

5.    Defendants' conduct is causing irreparable harm to SVOTHI in violation of the Lanham Act and state law. Plaintiff seeks injunctive relief against Defendants' ongoing, unauthorized conduct; damages; attorney's fees; and other appropriate relief described below.

**ANSWER: Defendants deny the allegations of the first sentence of paragraph 5 of the Complaint. Defendants deny that Plaintiff is entitled to the judgment and relief prayed for in the allegations of the second sentence of paragraph 5 and denies the remainder of the allegations of the second sentence of paragraph 5 of the complaint.**

## PARTIES

6.    Plaintiff SVOTHI, Inc. is a corporation organized under the laws of the State of New York.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 6 of the Complaint.**

7.    Defendant Dark Alley Media, LLC is a limited liability company organized under the laws of the State of New York.

**ANSWER: Defendants admit the allegations of paragraph 4 of the Complaint.**

8.    Defendant Mr. Robert Felt is a natural person who resides in this District.

**ANSWER: Defendants admit the allegations of paragraph 8 of the Complaint.**

9.    Upon information and belief, Defendant Mr. Robert Felt is the sole member and manager of Defendant Dark Alley Media, LLC.

**ANSWER: Defendants deny the allegations of paragraph 9 of the Complaint.**

10.    Defendants conduct substantial business in New York State and within this District, including the unauthorized and infringing conduct complained of herein. Defendant Dark Alley Media, LLC maintains its headquarters and principal office in the County of New York and manages the owenhawk.com website from within this District. Defendant Mr. Felt operates and directs the operations of Dark Alley Media, LLC and the owenhawk.com website from the company's headquarters, and frequently within the State of New York and this District to, among other things, manage and operate Defendant Dark Alley Media, LLC's digital properties and to produce video content for distribution, including through Dark Alley Media, LLC's digital properties and the owenhawk.com website. Moreover, Defendant Mr. Felt operates his X (formerly Twitter) account @owenhawkxxx within the State of New York and publishes its content to users within the State of New York.

**ANSWER: Defendants admit the allegations of the first part of the first sentence of paragraph 10 of the Complaint. Defendants deny the allegations of the second part of the first sentence of paragraph 10 of the Complaint. Defendants admit the allegations of the first part of the second sentence of paragraph 10 of the Complaint. Defendants deny the allegations of the second part of the second sentence of paragraph 10 of the**

# Exhibit E

**This email from Robert Felt, dated February 27, 2025, and forwarded to Marc Edisad on March 4, 2025, outlines strategic legal considerations surrounding the joint venture, proposed settlement terms, and Marc Edisad's potential pro se representation.**

**It demonstrates Mr. Felt's awareness of both the JV structure and the broader legal landscape. Text in Italic is from Ravi Sharma.**

*On Feb 27, 2025, at 8:01 AM, Robert Felt <robert@darkalleymail.com> wrote:*

*Hi Ravi,*

*Thank you for sending the motions from Wesley and clarifying the deadlines. In typical fashion I see they are attempting to recast themselves as the victim, misrepresenting the "trifecta of hell" which the rest of the quote made clear was about how I was living in hell, not bringing hell upon them. As we have some time to respond to that, and it is in our interest to contact effort and cost, I think we need to table it until March 6th.*

*Regarding a response to the settlement offer, would I be correct to assume you have not relayed anything to them in reply?*

None.

*If so, that would be good as I think my previous messages should be disregarded and I need to change my mode of operation to reflect a more efficient approach and not overwhelm you with huge emails arising from the fact that I am overwhelmed myself.*

I will not read them so as to not spend time.

*I am aware of the delay in the last bill. I was assured it would come by today, but even saying that I worry about losing credibility if it does not. I do acknowledge that I am aware tat in the worst case outcomes it may require a handoff of DAMs representation failing a settlement agreement, or sufficient progress too one, as those Marc 24 deadlines approach.*

*To mitigate this, I've begun reaching out to a couple of contingency-based lawyers asking them to review my defamation claims.*

I think you may have found that contingency for defamation claims is not a thing — if you find, then go for it. The best you may find is someone to paralegal your writer work if you act pro-se. But that is very rough going.

*Perhaps that could be taken off our plate, reducing costs and functioning as leverage for us in this case. Also, going forward I will limit my emails avoiding exploring all possible legal theories, and instead focus on more immediate issues.*

*I think there's still enough hope for a settlement given the March 6th deadline and the possibility of bringing in the magistrate that it's premature to discuss potential handoffs of that case, so In service of efficiency, I'm going to focus the rest of this email on what I think is the next and most immediate thing to address, which is our reply to their settlement offer. Please reply inline as that method seems more effective and efficient.*

*1.I want to respond to their settlement offer with a strategic escalation that rejects their framework for settlement and forces them to take positions as defense to ours. The reply must clear that I will not sign any settlement where we do not retain rights to our wordmarks for "Raw Fuck Club" (which SVOTHI did not claim) and the right to continue branding our adult conent as we have since 2007. I want to be clear we view "Raw Fuck Club" and "RFC" as our common-law wordmark, but we are open to them having "RFC" and agreeing to guideless for use, discussed more.*

What about RFC Channels?

*2. To show we are not capitulating, we must request clarification from Mullen in regards to crucial information to evaluate the strength of their claim to this mark:*

*2a What is VideoApps position on the statement by Mrs Corso that "SVOTHI has owned and operated the Website continuously since in or about February 2010". If that statement is true, what is VideoApps position in regards to their right to enter into the JV agreement.*

I can see that Damian/videoapp inc. and soothes position will be that svothi used the marks on its sites since 2010 and that at best the JV owned the marks during the life of the JV and that following such, based VideoApp's interpretation of the termination of the JV that the marks reverted to Svothi.

I believe one of our best counterarguments to that was that VideoAPp is the nominee or agent of Svothi, that Svothi was always (and is) the real

party in interest in the JVA and that the issue of where/who the marks devolve to is who rightfully terminated the JV

The reality is that we are now in federal court and it is more costly to try to fight out of it (answer the article 78 with a cross motion to a) dismiss their petition and a cross motion to compel arbitration before JAMS — while arbitration is potentially faster, remember we have to at minimum pay 1/2 of the hourly fees of the arbitrator which can be high so potentially add $400/hour (1/2 of $800) for every moment the arbitrator Spends — the judge doesnt' cost, but the cost of trial is the fact there is a jury and that makes everything take a lot longer and causes more need for more prep time. But in federal court we can seek mediation as the case moves forward and we get some discovery. If it shows that they may lose, then we may have a chance for a not horrible setltlement.

I wonder if a good settlement proposal is to suggest a division of the marks along the lines of what you have recently proposed to me.


*2b In the termination letter he authored on Oct 25th, if the statement "Accordingly, and pursuant to Section 12.3 of the Agreement, you are hereby notified that : (a) PPVN has exercised its contractual right of election to continue to use the Content , Domains and RFC Brands for the continued operation of Sites;" if in this context "PPVN" is meant to meant VideoApp DBA PPVN" (as defined in the letter) what is your other client, SVOTHIs position on why VideoApps continued use of the brands was not infringing on SVOTHIs in light of Mrs Corso's declaration that SVOTHI operated the site independent from VideoApp?*

To the extent that they may take the position that the agreement was either sanctioned by, or not objected to by, SVothi, or that Svothi licensed the marks to the JV, then such may not be inconsistent with Svothi's claim to ownership

To me, what is going on here is that just like you say you had the marks first and apparently believed that your joint venture since 2010 (as stated in the 2019 JV agreement language essentially) was with Damian, Svothi is taking th position that it always rand the internet pages and backbone and

party in interest in the JVA and that the issue of where/who the marks devolve to is who rightfully terminated the JV

The reality is that we are now in federal court and it is more costly to try to fight out of it (answer the article 78 with a cross motion to a) dismiss their petition and a cross motion to compel arbitration before JAMS — while arbitration is potentially faster, remember we have have to at minimum pay 1/2 of the hourly fees of the arbitrator which can be high so potentially add $400/hour (1/2 of $800) for every moment the arbitrator Spends — the judge doesnt' cost, but the cost of trial is the fact there is a jury and that makes everything take a lot longer and causes more need for more prep time. But in federal court we can seek mediation as the case moves forward and we get some discovery. If it shows that they may lose, then we may have a chance for a not horrible setItlement.

I wonder if a good settlement proposal is to suggest a division of the marks along the lines of what you have recently proposed to me.

*2b In the termination letter he authored on Oct 25th, if the statement "Accordingly, and pursuant to Section 12.3 of the Agreement, you are hereby notified that : (a) PPVN has exercised its contractual right of election to continue to use the Content , Domains and RFC Brands for the continued operation of Sites;" if in this context "PPVN" is meant to meant VideoApp DBA PPVN" (as defined in the letter) what is your other client, SVOTHIs position on why VideoApps continued use of the brands was not infringing on SVOTHIs in light of Mrs Corso's declaration that SVOTHI operated the site independent from VideoApp?*

To the extent that they may take the position that the agreement was either sanctioned by, or not objected to by, SVothi, or that Svothi licensed the marks to the JV, then such may not be inconsistent with Svothi's claim to ownership

To me, what is going on here is that just like you say you had the marks first and apparently believed that your joint venture since 2010 (as stated in the 2019 JV agreement language essentially) was with Damian, Svothi is taking th position that it always rand the internet pages and backbone and

that it gained ownership when it started using such with, if not your written consent, your oral consent or your knowledge that it was doing so' and that the JVA did to recite who was given what marks to the JV, and that in actuality it was Svothi giving the marks to the JVA via it permitting VideoApp to do so. Two things in regard to this: 1. The interesting terms found by David two weeks ago saying VideoApp is licking content to the pages is interesting —however, I think their counter to that will be "when the JVA was alive, such was true. But now it's not." 2. A the end of the day, if Svothi agrees that it is bound by the JVA or a jury rules that it is, then if the termination by you wins (over the termination by VideoAPp) then you may win the day — and if the jury believes that Damian played fast an loose with svothi and videoapp so as to potentially allow a piercing of the veil of both to him, then to the extent that neither svothi or videoapp could pay you money, that he could be liable. I think however that whatever the result with Video App is with regard to alter ego, currently I do not see alter ego facts to to pierce svothi. It looks to me that he used svothi for all purposes and operated it full on. VideoApp' alter ego was probably svothi, not Damian.

*2b. VideoApps rights and responsibilities under the JV included all aspects of site maintenance  other than At any time after signing of the JV, were SVOTHI ever engaged in operation of the rawfuckclub.com at the same time? and if so how was this structured such that VideoApp did not have an obligation under the JV to disclose this.*

They will say that you knew about svothi all the time since it was stated the websites and you got paid since day 1 by svothi.

— this however supports our argument that the JVA is really between DAM and Svothi.

*3. We also request clarification necessary for settlement talks arising from deficiencies in their complaint. SVOTHI claims to have established common-law rights to RFC marks "no later than 2010 through its public marketing and sale of adult video content and other digital media under and in connection with the RFC Marks." Specifically, is it SVOTHIs position*

that it gained ownership when it started using such with, if not your written consent, your oral consent or your knowledge that it was doing so' and that the JVA did to recite who was given what marks to the JV, and that in actuality it was Svothi giving the marks to the JVA via it permitting VideoApp to do so. Two things in regard to this: 1. The interesting terms found by David two weeks ago saying VideoApp is licking content to the pages is interesting —however, I think their counter to that will be "when the JVA was alive, such was true. But now it's not." 2. A the end of the day, if Svothi agrees that it is bound by the JVA or a jury rules that it is, then if the termination by you wins (over the termination by VideoAPp) then you may win the day — and if the jury believes that Damian played fast an loose with svothi and videoapp so as to potentially allow a piercing of the veil of both to him, then to the extent that neither svothi or videoapp could pay you money, that he could be liable. I think however that whatever the result with Video App is with regard to alter ego, currently I do not see alter ego facts to to pierce svothi. It looks to me that he used svothi for all purposes and operated it full on. VideoApp' alter ego was probably svothi, not Damian.

*2b. VideoApps rights and responsibilities under the JV included all aspects of site maintenance  other than At any time after signing of the JV, were SVOTHI ever engaged in operation of the rawfuckclub.com at the same time? and if so how was this structured such that VideoApp did not have an obligation under the JV to disclose this.*

They will say that you knew about svothi all the time since it was stated the websites and you got paid since day 1 by svothi.

— this however supports our argument that the JVA is really between DAM and Svothi.

*3. We also request clarification necessary for settlement talks arising from deficiencies in their complaint. SVOTHI claims to have established common-law rights to RFC marks "no later than 2010 through its public marketing and sale of adult video content and other digital media under and in connection with the RFC Marks." Specifically, is it SVOTHIs position*

*that they were also first to engage in public marketing and sale of adult video content in connection to the marks? and is it SVOTHIs position that their use of the marks through marketing and sales was continuous?*

This bears further research but what I am gathering from this argument is that the subsequent use by Svothi since 2010 with your and DAM's acquiescence (i.e. not a written license agreement which might have preserved DAMs rights), that Svothi obtained the marks.

Our argument is that frankly DAM and Damian were partners, joint ventures, etc, and that your partnership utilized Svothi to do its bidding and that in 2019 you and he memorialized the partnership but called it a joint venture and he chose Videoapp to stand in place of him, i.e. like DAM did of you. — but again, assuming we prevail on this point (or they concede it) the outcome of such is that it matters how the termination of the JVA is decided — if DAM wins, then DAM gets the marks. If DAM doesn't win then it doesn't matter whether it's Svothi, videoapp or Damian.

But the real need here is for us to prevail first on the fact that svothi and.or videoapp and/or Damian are subject to the JVA based on the all the fact. Then you need to win the JVA termination situation.

*3b. To not seem overreaching I will limit it to those clarifications. If they Refuse to articulate a position here. I think it will enable us to present to the judge that this refusal to articulate essential elements of their argument is functioning to preclude settlement.*

The judge will do nothing but tell us to engage in discovery.

*4. Regardless of their response, I want to indicate in this reply that I propose a settlement along lines described below. While they appear to be pursuing the total obliteration of DAM, I view the furtherance of this conflict could create a situation of Mutually Assured Destruction. I cannot agree to any settlement that would not allow DAM to have business continuity. When faced with the choice between certain death, as would be their terms, the rational and logical choice is to keep fighting. The risk of continued litigation skews against them. They may have masterfully*

*laid a trap where my only hope of survival is to ensure they are trapped along with me.*

Not sure how to respond to this.

*5. Discovery threatens to expose their alter-ego, inconsistencies, perjurious statements by Cytnhia regarding membership numbers,*

Correct.

*puts Mullen in danger of possible ethical charges if he finds himself unable to reconcile his shifting positions on the facts.*

Maybe.

*That is a lot to risk on flimsy Lanham Act claims that were intended to lay a trap. They have again created this choice for me where they feel I will seek to end the pain and preserve something as opposed to choosing risk and uncertainty, without understanding that even those most ridiculous outcomes where I am defending myself pro se*

You can defend yourself pro-se but your ability to defend on behalf of DAM or sue on behalf of DAM is not allowed. If you went pro-se, they would get a default judgment against DAM and you personally, as not a party to the JVA, have no standing in regard to the JVA —and 9.6 and 9.8 of the JVA prohiibits DAM from assigning tis rights under the JVA to anyone absent written approval by VideoApp inc.

*are more appealing to me than taking a deal like the one offered as I have more to gain from the attention that would come from that "insanity" than I have to gain by accepting 15,000 finding myself in another case with Marc*

*6. They have not considered the optics of SVOTHI, an entity entirely unknown to the industry waging a battle over intellectual property content creators with 2 decades of ties and associations with the brand while simultaneously pursuing a business model that requires content creators to trust them with their intellectual property. In the event I lose everything my story will be the only thing of value off of which to build any hope of a future for myself, and I will approach this with the intent to create the best*

*story possible. This settlement is their last chance for any agreement containing a gag order.*

Perhaps.

*7. That might not need to be said, however I want to tell them that I view coexistence as possible and that cooperation is their best chance at survival. I want to offer a framework for settlement along the lines whereby the JV is dissolved by mutuality, with agreements over use the marks along these lines:*

*a. SVOTHI will operate "RFC" as a tech platform, keep 100% of profits and be free of financial and fiduciary duties to DAM. They may produce content, label and brand it as "RFC Channels". and may use terminology such as "Exclusive to RFC Channels" to further creation of a distinct brand identity.*

*b. DAM will remain the only source for "Raw Fuck Club" branded content, and may continue using our distinctive Biohazard logo affixed to video files. I will agree to certain limitations on our use of the logo, such as how it may or may not be affixed to websites.*

*c. Both parties will agree to mediation to solve issues of market confusion that may result from independent operation post JV, prior to initiation of legal action.*

*II. Use of RawFuckClub.com Domain*

*a. Our position on the domain is clear, we feel it was owned by us, transferred to the JV, and now should be transferred back to us. The Dark Alley Domain must be returned.*

*b. Their position is RFC domain unclear however they seem intent to use it. But, I have questions if this is in fact their real goal. They removed all the DAM content, did not declare Raw Fuck Club as their mark, and have been heavily marking things as RFC Channels. It's possible they may prefer to sever all ties with the domain, or at least that they may foresee a future where they do.*

*c. I want to offer use of the domain to them without asking for a continued royalty. Instead tie their use of it to a combination of financial and material assistance sufficient to guarantee Dark Alleys business continuity, without giving them a number out of hand, we would invite them to accept of reject this framework indicating that the more JV assets they agree to shared us of, twitter, customer base, the less financial assistance.*

*d. Alternatively, they could skip all that and buy the domain for payment of 150K, our full demand.*

*e. Introducing AEBN loss or the Defamation into this equation threatens to complicate the process, as they feel confident on the merits, I suggest allowing it to play out and see if they push for it to be included.*

End of email

# EXHIBIT F

## Recent Text Message Correspondence Between Mark Edisad and Robert Felt (June–July 2025)

This exhibit includes text message exchanges between business partners Mark Edisad and Robert Felt. The purpose is to demonstrate:

1. That Mark attempted to clarify with Rob whether a motion to settle had been submitted without their knowledge;

2. That Rob acknowledged the general structure of the deal (200K total, 100K upfront in July);

3. That Rob seemed unaware of the court's order of discontinuance and termination dated June 23;

4. That Rob stated neither he nor Mark had access to PACER and that they had not reviewed filings;

5. That despite these admissions, Rob stated, "We were defendants, so I think it's good," implying passive acceptance of the case closure.

These messages support the broader argument that the settlement was conducted without proper consultation or explicit approval from both business partners, potentially violating principles of equal ownership and fair legal process.

**The following screenshots are offered in support:**

- Screenshot 1: Discussion of Ravi's filing on June 20 and termination order on June 23.

- Screenshot 2: Mark asking who submitted the joint letter; Rob suggests "probably Ravi and Mullen."

- Screenshot 3: Rob says the deal isn't final until payment and describes the 200K/100K structure.

- Screenshot 4: Rob states he hasn't looked at the court order and reiterates that the case was "put on pause for settlement talks."

08:58

Rob

Yes if our google Svothi and Dark Alley it's the only hit - Pacer

I haven't looked at it.

It was put on pause for settlement talks.

08:58

Rob

We were talking back and forth for a while

Cool !

I wasn't expecting that tbh

Well, we were defendants so I think it's good

08:58

Rob

It's not done until he pays
– nothing signed — they
just need to do some
procedural thing so that
the cases stop

No  I've never had one

I mean the structure of the
deal is known

200k

100 in front in July

08:58

Rob

Probably ravi and Mullen

No lol

It's not done until he pays
– nothing signed — they
just need to do some
procedural thing so that
the cases stop

happening!
Eoin

# EXHIBIT G – Part 1

## EMERGENCY MOTION FOR LIMITED DISCOVERY REGARDING SVOTHI'S CLAIMED MEMBERSHIP AND REVENUES

Plaintiff respectfully requests the Court's immediate intervention through a narrowly tailored order permitting limited discovery into SVOTHI Inc.'s financial representations. The reason for this emergency request is simple and time-sensitive: the settlement process cannot be meaningfully or ethically conducted without clarity on the very asset being bargained over — namely, the value of the RAWFUCKCLUB trademark, domain, and X.com (Formerly Twitter) customer base.

Opposing counsel has repeatedly represented that SVOTHI possesses "55,000 members" and has enjoyed continuous revenues from this base. This number appears both unsubstantiated and materially inconsistent with Plaintiff's own records from the period when he managed the business.

Indeed, SVOTHI has not produced:

- Any membership logs or billing reports to support the claim of 55,000 members;

- Any bank records or financial statements showing revenue flow attributable to this base;

- Any tax records or licensing agreements indicating the operation of a business of such scale;

- Any usage statistics, affiliate contracts, or marketing records evidencing the maintenance of a 55,000-member adult site.

This lack of transparency, coupled with exaggerated representations in pre-settlement talks, raises urgent concern that the Court and the Plaintiff are being misled about the true scale and value of the asset.

Plaintiff therefore seeks limited emergency discovery on the following:

1. **All revenue statements** from January 1, 2015 through present for SVOTHI Inc. or any affiliated entity operating under the name RawFuckClub, RFC, VideoApp LLC, or PPVNetworks.

2. **All documents showing current or past membership counts**, including logs, CRM data, billing rosters, or other customer databases.

3. **Tax filings and bank statements** reflecting revenues or cash flow associated with the RawFuckClub website or related trademarks/domains.

4. **Any agreements between SVOTHI Inc. and billing processors** (e.g., CCBill, SegPay, Epoch, Netbilling, or others) used during the relevant period.

5. **Affiliate and advertising contracts** that would confirm user activity or audience size, if 55,000 members were indeed being serviced.

Without this information, Plaintiff cannot assess the proposed settlement. Nor can the Court ensure that any deal made is fair, lawful, or founded on accurate disclosures. Moreover, Plaintiff asserts that the RawFuckClub.com domain is the principal asset in this case — and that all valuation hinges on verifiable traffic, billing, and usage data. Defendant's refusal to provide these details, while pressing for settlement, is tantamount to negotiating in bad faith.

Plaintiff respectfully requests that the Court grant this narrowly scoped discovery motion on an expedited basis.

# EXHIBIT G – Part 2

## ANALOGY ILLUSTRATING IRREPARABLE BRAND DAMAGE AND ASSET MISEVALUATION

To further illustrate the core issue at hand, Plaintiff submits the following analogy:

Imagine that a small company owns a valuable domain — **NikeShoes.com** — and builds an independent business around reviewing and selling sneakers. Over time, the domain gains substantial traction and reputation among collectors, resellers, and streetwear enthusiasts. But one day, the domain is transferred to a third party, who changes its contents entirely: instead of premium shoes, it now hosts knock-off flip-flops, counterfeit products, or worse — irrelevant or offensive material.

The value of **NikeShoes.com** as a brand asset isn't based merely on a logo or a registration with the USPTO — it's based on public recognition, digital presence, brand consistency, search engine history, link networks, and consumer trust. These are elements that take years to cultivate and minutes to destroy. And once destroyed, they are exceedingly difficult to reconstruct.

This is precisely what has happened to **RawFuckClub.com**, a domain Plaintiff helped develop into a distinctive adult brand with loyal members, unique content, and consistent market identity. The domain was suddenly repurposed — first stripped, then converted into something unrecognizable, misleading, or inactive — effectively wiping out years of value.

Any proposed settlement or valuation must reflect not just ownership rights on paper, but the **real-world impact of this digital erasure**. Without control of the RawFuckClub.com domain, Plaintiff cannot rebuild the business. And without urgent discovery into how SVOTHI has handled and monetized the domain, Plaintiff and the Court are being asked to accept a fiction in place of a financial and brand reality.

Just as **NikeShoes.com** would be worth nothing after a domain hijacking and brand betrayal, so too is **RawFuckClub.com** now — unless control is restored.

# EXHIBIT G - *PART 3*

## Selected Email Correspondence from Robert Felt to Mark Edisad (2025)

These excerpts illustrate business partner Robert Felt's acknowledgment of exclusion from the business, control issues over domains, and disputes with Damian. Each quote below was written by Robert Felt unless otherwise noted.

1. *"I was given endless assurances leading up to the signing of the JV that the domains and trademarks were mine..."*
   → This statement was written by Robert Felt and reflects his belief that ownership of the RFC trademarks and domains was to be secured under the joint venture agreement.

2. *"So I decided to test this out a little bit, and I've told Ravi that I am not interested in any settlements that allow PPV to maintain ownership..."*
   → Robert describes his refusal to settle unless ownership returns to the joint venture partners, not to PPV Networks or Damien.

3. *"Damian then obtained the 2 Factor ID from David under threat... and David was told 'not to tell Rob or Ravi about this.'"*
   → "David" refers to David Eck, who was in charge of our communications platform (formerly Twitter/X) and our direct connection to subscribers. Once Damien gained access to the 2FA code, David and our team were locked out. This meant we lost all ability to message our members, notify them about product status, or access accounts. To this day, we remain completely cut off.

4. *"I am ready to essentially drop my objections to you returning as an active member should you wish to..."*
   → Robert indicates his willingness to allow Mark Edisad to return to an active role in the company.

5.  *"Well, I know that I didn't engage in any embezzling or self-dealing..."*
    → Robert appears to be defending himself from potential accusations or distancing himself from Damien's actions.

6.  *"I would like to have some sort of agreement upon what we're going to do with that [legal expense] debt..."*
    → This relates to internal disagreements about legal expenses and financial obligations under the joint venture.

7.  *"Knowing that I can have my rent and my health insurance largely, if not completely taken care of, it makes it a lot easier for me..."*
    → Robert discusses potential personal financial security, indicating influence or dependence on one of the parties in the dispute.

## Additional Context (Not in Emails):

- Robert handed over control of the **RawFuckClub.com** domain to Damian upon signing the Joint Venture.

- Mark Edisad (the undersigned) held the registrar login for **DarkAlley.com**, which was stored in his private email account. Damien **illegally accessed** this email account without consent and removed Mark as the administrative contact.

- Damian then **transferred the domain** from UniRegistry in the U.S. to a registrar in Amsterdam, moving it outside of U.S. jurisdiction.

- This happened even though Marc had already **paid for the domain until 2026**. UniRegistry confirmed this payment and the original ownership.

- After taking control of **DarkAlley.com**, Damian cancelled over **250 original films** produced over 20 years, effectively taking the entire site offline and cutting off the company's history and audience.

# EXHIBIT H**1**

**Evidence of 55000 Member Claim - Financial Dispute Context.
Recorded in Email from Opposing Counsel as attached.
Subject: Clarification of Positions for Potential Settlement
Discussions**

Ms.Corso's is Svothi's accountant, who was present during the telephone hearing. According to my business partner who was allowed to listen in, in her declaration opposing our injunction, she asserted that SVOTHI's platform had 55,000 members.

At a $30-35 per member price point, this suggests a revenue stream exceeding $1.650,000.00 to 1,925,000.00 per month; (with median value of 1,787,500.00).
If this claim is accurate, it directly impacts the valuation of the trademarks at issue.

If it is inaccurate, then Svothi's accountant have submitted a misleading financial statement to the court under the penalty of perjury.

In order to assess any potential settlement, we require immediate verification of actual membership numbers and revenue…cont. on the second page.

[Document Screenshot with Email Heading: 'Updated Settlement Inquiry Including the $55,000 Membership Claim'
(As high as possible-resolution screenshot of the actual message is included following this summary on the following page page.)

Caption

# EXHIBIT H2
# Supplemental Message from Rob Felt (March 4, 2025)

This page was put together without any omissions from the text message that took place between
Marc Edisad and Robert Felt on 03/04/25. The screenshot is too small to read; original included.

Marc Edisad:
• Counter with a demand that forces them to reveal intent?
I would counter with the request to the court that they show what they are really making
because we can't have a mediation if we don't know the size of the lake. 55000 subscribers -
judge needs to be aware what that is in real money monthly.
If they don't open the books they behave fraudulently.
How do you know that Damian wasn't cheating you with Cynthia already in the past?

Robert Felt:
• I always assumed he would skim a little off the top, but I didn't think it would be significant
or worth doing a accounting for, but yeah, there's no way that site has that many members
not possible.
That's 1.65 million or something a month.
And she's the only employee in the finance department OK

# EXHIBIT I

## Joint Venture Agreement (2019)

Between Dark Alley Media, LLC and VideoApp, LLC
(Both entities ultimately owned and operated by Svothi, Inc., the parent company
managing revenues, accounting, and merchant processing for the past 20 years.
PPV Networks is also a d/b/a used interchangeably under this umbrella.
All are represented by the same counsel, Mr. Mullen.)



# Joint Venture Agreement

This joint venture agreement commencing on January 1, 2019, between

VideoApp Inc, 228 Park Avenue, Unit 40543, New York, NY 10003, a Nevis corporation, hereinafter referred to as "PPVNetworks" and;

Dark Alley Media, LLC, 4005 NE 6th Ave, Oakland Park, FL 33334, a New York corporation, hereinafter referred to as "DAM;"

WHEREAS PPVNetworks brings technology, a robust and proprietary channels-based video delivery platform, operations (content management, customer service, billing, accounting, affiliate management), industry experience, industry connections;

WHEREAS DAM brings adult video production, 2257 management, industry experience, performer connections;

WHEREAS PPVNetworks and DAM wish to memorialize their joint venture operating an adult video website using the brand built by PPVNetworks and DAM together over the past 10 years and to confirm that the Domains, including but not limited to RAWFUCKCLUB.COM and the brand, Raw Fuck Club" and "RFC" are owned by the JV;

NOW THEREFORE PPVNetworks and DAM hereby declare this joint venture ("the JV") with the purpose of the operation of the adult video website under the Domains and the brands "RFC" and "Raw Fuck Club.".

## 1. DEFINITIONS

1.1 "Affiliate" means a company, or person, who promotes Sites and gets compensated either by revenue-share or pay-per-signup, a flat fee per conversion. Affiliate payouts are determined and negotiated by PPVNetworks with the goal of maximizing long-term Profit of the Sites,

1.2 "Agreement" means this agreement and any future amendments added in writing;



2

1.3 "Brands" and "RFC Brands" means the brands, trademarks and copyrights associated with the names "RFC", "Raw Fuck Club," "RFC Channels" and all versions of the logos associated with these names;

1.4 "Chargeback" means a free assessed by a merchant bank for transactions that are fraudulent or disputed by customers;

1.5 "Confidential Information" means any proprietary data or information acquired by the parties about the other party;

1.6 "Scenes" or "Content" mean the original video content created for Sites by DAM which includes metadata (descriptions, titles, list of performers, etc.) on a continuous basis. Scenes are 15 to 30 minutes in length, featuring two or more performers, and anal sex.

1.7 "Conversion" is a new member as determined by member joining with a uniquely new username;

1.8 "Domain Names" or "Domains" are the internet addresses of the Sites and are listed in Appendix B;

1.9 "Expenses" means shared advertising fees (to be agreed upon as they arise), merchant processing fees, independent producer revenue sharing and affiliate payouts;

1.10 "Force Majeure" means (a) acts of God; (b) flood, fire, earthquake, or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (d) government order or law; (e) actions, embargoes, or blockades in effect on or after the date of this Agreement; (f) action by any governmental authority; (g) national or regional emergency; (h) strikes, labor stoppages or slowdowns, or other industrial disturbances; (i) shortage of adequate power or transportation facilities; and (j) other similar events beyond the reasonable control of the party impacted by the Force Majeure Event;

1.11 "Key Members" are individuals considered to be essential to the performance of this joint venture. List in Appendix A;

1.12 "License" described in Section 3;

1.13 "Profits" means Gross Revenues (receipts) less Expenses;

1.14 "Sites" are membership websites operated by PPVNetworks using proprietary technology owned by PPVNetworks, using Domain Names owned by the joint venture, to monetize Content produced by DAM and other producers.

3 

## 2. INTELLECTUAL PROPERTY

The parties acknowledge and agree the JV is the owner of the Domains, listed in Appendix B, and Brands throughout the world. Any goodwill derived from the use bt and licensee of the Domains and the Brands shall inure to the benefit of the JV. If any license acquires any rights in the Domains and the Brands, by operation of law, or otherwise, such rights shall be deemed and are hereby irrevocably assigned to the JV without further action by any of the parties;

2.2 The JV has the right to monetize and promote Content licensed by DAM, as RFC original content, as listed in Appendix D and described in Section 3;

2.3 The JV has the right to use proprietary channels-based video delivery platform developed by PPVNetworks, customized and branded for RFC as Sites;

2.4 Both parties agree that they shall not, during the Term or thereafter, directly or indirectly:

    I.do, omit to do, or permit to be done. any act which will or may dilute the Domains and the Brands or tarnish or bring into disrepute the reputation of or goodwill associated with the Domains and the Brands, or the other party, or which will or may invalidate or jeopardize any registration or registrability of the Domains and the Brands; or

    II.apply for, or obtain, or assist any person in applying for or obtaining any registration or any trademark, service mark, trader name or other [indicia] confusingly similar to the Domains and the Brands in any country.

2.5 To protect the intellectual property of the JV, both parties should respectively apply for or obtain registrations of the Brands with USPTO within the appropriate applicable International Classification of Classes of Goods and Services.

2.6 Trademarks may be registered by either party, for purposes of protecting the rights of the joint venture;

2.7 PPVNetworks should obtain registrations for Brands including but not necessarily limited to the following ID's per USPTO Nice database:

038-434



Video broadcasting and transmission services via the Internet, featuring films and movies

038-384
Video broadcasting services over the Internet or other communications network featuring the uploaded, posted and tagged videos of others

2.8 DAM should obtain registrations for Brands including but not necessarily limited to the following ID's per USPTO Nice database:

041-897
Film and video production

2.9 Although the Domains shall be registered and managed by PPVNetworks during the Term hereof, the Domains (in addition to the Brands) shall be solely owned by the JV;

2.10 PPVNetworks acknowledges and is familiar with the high standards, quality, style and image of DAM, and PPVNetworks shall, at all times, conduct its business and use the Domains and Brands in a manner consistent with these standards, quality, style and image;

2.11 PPVNetworks shall comply with the specifications, standards and directions relating to the Domains and Brands, including their design, manufacture, promotion, distribution and sale;

2.12 In exercising its rights under this Agreement, PPVNetworks shall comply with and shall ensure that the products solds or otherwise supplied by PPVNetworks comply with all applicable laws. PPVNetworks shall promptly provide DAM with copies of all communications, relating to Domains and Brands, with any governmental, regulatory or industry authority;

2.13    PPVNetworks shall immediately notify DAM in writing giving reasonable detail if any of the following matters come to its attention:

  I. any actual, suspected or threatened infringement of the Domains and Brands;
  II. any actual, suspected or threatened claim that the Domains and Brands is invalid;
  III. any actual, suspected or threatened opposition to the Domains and Brands;
  IV. any actual, suspected or threatened claim that use of the Domains and Brands infringes the rights of any third party;
  V. any person applies for, or is granted, a registered trademark by reason of which that person may be, or has been, granted rights which conflict with any of the rights granted to PPVNetworks under this Agreement; or

5

VI. any other actual, suspected or threatened claim to which the Domains and Brands may be subject.

2.14 The JV allows DAM use of RFC Brands for commercialization of merchandise, such as clothing and sex toys;

2.15 The joint venture allows DAM use of RFC Brands for commercialization of physical DVDs and online adult streaming services listed in Appendix C, using Content created for Sites, repackaged into DVD with Dark Alley and RFC co-branding;

2.16 No rights are granted now, or upon termination of the contract, for either party to utilize the RFC Brands outside of those defined herein.

## 3. GRANT OF LICENSE

3.1 JV hereby grants to PPVNetworks, subject to the terms and conditions of this Agreement, a license to use the Domains and Brands on or in connection with the promotion, advertising, distribution Domains and Brands, including the right to use, integrate and incorporate in Sites and the rights for any affiliates of PPVNetworks to so promote;

3.2 The JV allows PPVNetworks to commercialize Content on its network of VOD and channels-based sites;

3.3 Grant of license is worldwide;

3.4 Notwithstanding termination of this Agreement, the License shall remain in effect indefinitely;

3.5 Grant of license is exclusive except as stated in 3.8 and 3.9 below;

3.6 Notwithstanding anything to the contrary in this Agreement, the parties hereto hereby grant permission to DAM to fully commercially exploit, without incurring of or payment of any royalty or licensing fee to the JV or PPVNetworks, all RFC branded content outside of the JV, in all available digital and printed forms, so long as it is packaged and presented in the format of a DVD;

3.7 Notwithstanding anything to the contrary in this Agreement, the parties hereby grant permission to DAMto fully commercially exploit, without incurring of or payment of any royalty or licensing fee to the JV or PPVNetworks, all RFC branded content that is more

than 1 year old (defined as 1 year from date of content's premiere on Sites) in all forms, DVD and scene, in all possible formats and through all possible distribution channels.

# 4. CONSIDERATION

4.1 In consideration for being a partner of joint venture discussed herein, and granting a License for use of originally produced Content to be used under the RFC Brands, Profits from Sites shall be split evenly, or 50/50 to PPVNetworks and DAM;

4.2 In consideration for granting the License. PPVNetworks shall pay DAM its published Independent Producer revenue sharing for referrals, streaming and downloads, for Content that appears in Channels or VOD on the PPVNetworks network of sites;

4.3 PPVNetworks shall provide DAM with real-time reports to check, and audit, revenues;

4.4 Disbursements will be paid monthly via ACH. Payments are made on or about the 10th of each month for the prior month's transactions;

4.5 Chargeback fee of $25 per occurrence plus prorated share of returned transaction.

# 5. DAM OBLIGATIONS

5.1 DAM shall supply and deliver to PPVNetworks Content as described in Appendix D;

5.2 DAM must continue to provide originally produced videos, including post-produced "ready to encode" video files of comparable format, length, genre, number of performers, appearance of performers, video quality (high-definition 16:9 video minimally compressed digital source), quality of sex acts (scenes must all contain anal and a cum shot from a majority of performers, and at least half of the minimum required scenes produced must include 3 or more performers);

5.3 Content shall be entirely original, directed and filmed by DAM, and not infringe upon any third party rights, title or interest. DAM indemnifies PPVNetworks from any damages suffered by it as relating to Content;

5.4 DAM shall design and deliver, using software provided by PPVNetworks, newsletters at a minimum of once per week;



5.5 DAM shall provide PPVNetworks with a legal address of Custodian of Records. DAM shall maintain records, for immediate delivery upon request, of model releases and proof of age for each performer in compliance with, and organized electronically and physically as specified by, USC 2257:

# 6. PPVNETWORKS OBLIGATIONS

6.1 PPVNetworks will operate a channels-based membership site at one or more of the aforementioned Domains. PPVNetworks will handle all aspects of Site operations, with the exception of original content production, including but not limited to hosting; software development and updates; cloud infrastructure architecture; registrar and domain management, management and protection; customer service; technical support; independent producer management; marketing operations using newsletters and twitter; cascaded payment processing; DoS/DDoS threat mitigation;

6.2 PPVNetworks will release content, including all associated marketing, on a regular basis. PPVNetworks manages the approval and scheduling of all content, however, RFC content is prioritized and released based on mutually agreed upon rules;

6.3 PPVNetworks will maintain its sites at or above industry standards for adult membership websites as it pertains to new web technologies, anti-piracy, support for new devices, industry trends, and guidelines set forth by market leaders (ie. Google, Twitter, Apple, etc.)
6.4 PPVNetworks will provide 24/7/365 operation of Sites;

6.5 PPVNetworks will provide a proprietary channels-based platform that allows for independent producers to create and manage channels of video content from which they can generate revenues conversions and production revenues;

6.6 PPVNetworks will employ digital fingerprinting technology to protect content from piracy and non-authorized distribution. Efficacy of these efforts is not guaranteed;

6.7 PPVNetworks has relationships with most tube providers and will issue DMCA takedowns for content that it finds is being exhibiting Content without permission. Efficacy of these efforts is not guaranteed;

6.8 PPVNetworks will process disbursements to DAM, studios, independent producers and affiliates in a timely manner.

6.9 PPVNetworks shall use its best efforts to promote the Domains and Brands, and;

I. provide such advertising and publicity as may reasonably be expected to bring Domains and Brands to the attention of as many purchasers and potential purchasers as possible; and

II. ensure its advertising, marketing and promotion of the Domains and Brands in no way reduces or diminishes the reputation, image and prestige of the Domains and Brands or of the products sold under or by reference to the Domains and Brands (including, without limitation, the Content):

# 7. CONFIDENTIAL INFORMATION

7.1 Each party agrees that from time to time it may be exposed to confidential information of the other party. Both parties will take appropriate steps to protect this confidential information, and neither party will disclose this confidential information to any third party or use any confidential information without prior written consent;

7.2 Except as set out in Section 6.3 below, "Confidential Information" means all non-public, confidential or proprietary information disclosed before, on or after the Effective Date, by either Party (a "Disclosing Party") to the other Party (a "Recipient") or its affiliates, or to any of such Recipient's or its affiliates' employees, officers, directors, partners, shareholders, agents, attorneys, accountants or advisors (collectively, "Representatives"), whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential," including, without limitation:

    i      all information concerning the Disclosing Party's and its affiliates', and their customers', suppliers' and other third parties' past, present and future business affairs including, without limitation, finances, customer information, supplier information, products, services, organizational structure and internal practices, forecasts, sales and other financial results, records and budgets, and business, marketing, development, sales and other commercial strategies;

    ii      the Disclosing Party's unpatented inventions, ideas, methods and discoveries, trade secrets, know-how, unpublished patent applications and other confidential intellectual property;

    iii      all designs, specifications, documentation, components, source code, object code, images, icons, audiovisual components and objects, schematics, drawings, protocols, processes, and other visual depictions, in whole or in part, of any of the foregoing;

    iv      any third-party confidential information included with, or incorporated in,



any information provided by the Disclosing Party to the Recipient or its Representatives; and

v       all notes, analyses, compilations, reports, forecasts, studies, samples, data, statistics, summaries, interpretations and other materials (the "Notes") prepared by or for the Recipient or its Representatives that contain, are based on, or otherwise reflect or are derived from, in whole or in part, any of the foregoing;

6.4 Exclusions from Confidential Information. Except as required by applicable federal, state or local law or regulation, the term "Confidential Information" as used in this Agreement shall not include information that:

i       at the time of disclosure is, or thereafter becomes, generally available to and known by the public other than as a result of, directly or indirectly, any violation of this Agreement by the Recipient or any of its Representatives;

ii       at the time of disclosure is, or thereafter becomes, available to the Recipient on a non-confidential basis from a third-party source, provided that such third party is not and was not prohibited from disclosing such Confidential Information to the Recipient by a legal, fiduciary or contractual obligation to the Disclosing Party;

iii       was known by or in the possession of the Recipient or its Representatives, as established by documentary evidence, before being disclosed by or on behalf of the Disclosing Party under this Agreement, or

iv       was or is independently developed by the Recipient, as established by documentary evidence, without reference to or use of, in whole or in part, any of the Disclosing Party's Confidential Information.

6.5 The Recipient shall:

v       protect and safeguard the confidentiality of all such Confidential Information with at least the same degree of care as the Recipient would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care;

vi       not use the Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than the Purpose or any related transactions between the Parties, or otherwise in any manner to the Disclosing Party's detriment, including without limitation, to reverse engineer, disassemble, decompile or design around the Disclosing Party's proprietary services, products and/or confidential intellectual property;



vii    not disclose any such Confidential Information to any person or entity, except to the Recipient's Representatives who: (a) need to know the Confidential Information to assist the Recipient, or act on its behalf, in relation to the Purpose or to exercise its rights under the Agreement; (b) are informed by the Recipient of the confidential nature of the Confidential Information; and (c) are subject to confidentiality duties or obligations to the Recipient that are no less restrictive than the terms and conditions of this Agreement; and

viii    be responsible for any breach of this Agreement caused by any of its Representatives.

6.6 Parties will not reveal to any third party any particulars or details of this Agreement;

6.7 Except as specified in this Agreement, each Party hereby retains its entire right, title and interest, including all intellectual property rights, in and to all of its Confidential Information Except as specified in this Agreement, disclosure of such Confidential Information hereunder shall not be construed as an assignment, grant, option, license or other transfer of any such right, title or interest whatsoever to the Recipient or any of its Representatives;

6.8 Each party's obligation with respect to confidential information shall continue for 2 years from the date of termination of this Agreement.

# 8. REPRESENTATIONS AND WARRANTIES

8.1 Both parties represent and warrant to each other that it has been duly incorporated and is validly existing as a corporation under the laws of its government jurisdiction; it has the right to enter into this Agreement and perform its obligations;

8.2 DAM represents and warrants that it is the sole owner of Content; its intellectual property rights are not contested; Content complies with all application laws, regulations, treaties and restrictions of the United States, including USC 2257; no performers under the age of 21 appear in Content; no forced sex appears in Content; no beastiality appears in Content.



11

# 9. GENERAL PROVISIONS

9.1 Neither party shall be considered to be in default pursuant to this Agreement while the fulfilment of its obligations is prevented due to Force Majeure

9.2 In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction), and the balance of this Agreement shall be interpreted as if such provisions were so excluded and shall be enforceable in accordance with its terms;

9.3 All notices, solicitations of consent or approval, and other communications hereunder shall be in writing and shall be sent by certified or registered mail, return receipt requested, or by hand delivery or overnight courier with return receipt, addressed as set forth above;

9.4 No failure or delay by any party hereto in exercising any of its rights under this Agreement shall operate as a waiver thereof or of any other right, nor shall any single or partial exercise of any such right preclude any other or further exercise thereof, or of any other right. Each waiver or consent under any provision of this Agreement shall be effective only if in writing and in the specific instance and for the specific purpose for which it was given;

9.5 No provision of this Agreement may be amended or modified except by an instrument in writing executed by both of the parties hereto. Any such written amendment or modification will be binding upon the parties and the JV;

9.6 Parties shall not assign the rights or obligations created pursuant to the terms of this Agreement without the express written consent to such effect of the other party;

9.7 Any and all disputes arising from or relating to this Agreement shall be submitted to full and final resolution by binding arbitration, to be conducted in New York, New York. Arbitrator will be mutually selected by Key Members from both parties, and a lawyer with 10+ years' experience with entertainment law. Judgment on the arbitration award may be entered in any court of competent jurisdiction;

9.8 Parties shall not assign the rights or obligations created pursuant to the terms of this Agreement without the express written consent to such effect of the other party;

12

9.9 This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement;

9.10 If either party breaches its obligations under this Agreement, the non-breaching party shall give the breaching party written notice of such breach, and the opportunity to cure such breach for a period of thirty (30) business days after delivery of the notice of breach with respect to a monetary breach, or forty-five (45) business days after delivery of the notice of breach with respect to a non-monetary breach.

## 10. EFFECTIVE DATE

10.1 This Agreement shall commence effective as of the date indicated at the beginning.

## 11. TERM

11.1 The term of this Agreement shall commence on the date hereof and shall be perpetual, subject to the provisions of this Agreement.

## 12. TERMINATION

12.1 This Agreement shall Terminate due to Breach in any of the following circumstances:

a. if a party fails to fulfill any of its obligations hereunder and does not remedy the default as per 9.10;

b. if either party (a) becomes insolvent or admits its inability to pay its debts generally as they become due; (b) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which is not fully stayed within [seven] business days or is not dismissed or vacated within 60 days after filing; (c) is dissolved or liquidated or takes any corporate action for such purpose; (d) makes a general assignment for the benefit of creditors; or (e) has a receiver, trustee, custodian or similar agent


13

appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business;

c. in the unlikely event such as death, permanent incapacitation, incarceration for 30 days or more, or any life event that causes a Key Member to be unable to perform his duties or maintain decision-making authority;

d. in the event of significant organizational changes that limit the decision-making power of a Key Member within the organization, such as a buyout, merger or large transfer of shares.

12.2 This Agreement shall Terminate by Mutuality in any of the following circumstances:

a. upon the written consent of both parties;

b. In the event site revenues fall to below profitability for either, or both, of the parties forcing inability to meet Obligations as described in Sections 4 and 5. The specific metrics for this trigger need to be discussed further.

12.3 Upon termination of this agreement by DAM due to Breach, as described in 12.1,

a. PPVNetworks, at its discretion, may continue to utilize the RFC Brands, Content and Domains, for continued operation of Sites;

b. PPVNetworks may produce, or outsource production of, new RFC-branded Content to used on Sites;

c. In lieu of pre-termination Consideration that was granted by this Agreement, after termination PPVNetworks shall pay to the shareholders of DAM, as determined at time of breach, and pro-rated based on their percent of ownership of DAM, a revenue share for the continued commercialization of Content originally produced and supplied by DAM. This revenue share shall be consistent with the payment schedule used for all Independent Producers on Sites, or alternately as agreed to in writing by Key Members.

12.4 Upon termination of this agreement by PPVNetworks due to Breach, as described in 12.1,

a. PPVNetworks shall provide DAM with digital assets, including but not limited to metadata, source video and encoded stream files, and customer database tables;



b. DAM gains all rights to RFC Brands, Content and Domain names for monetization of Content.

12.5 Upon Termination by Mutuality, the parties agree to shut down the Sites and discontinue use of RFC Brands, Domains and Content. The parties must mutually agree in writing to a path forward for monetization of RFC Brands, Domains and Content.

## 13. BUSINESS CONTINUITY

13.1 PPVNetworks will provide DAM with all the necessary development and admin contacts, and other staff necessary for DAM to continue operations;

13.2 DAM will provide PPVNetworks contacts to all current and recent production and post-production staff, and a contact database for performers and applicants. DAM will provide PPVNetworks with a cloud storage system of 2257 records;

13.3 A designated agent will be assigned by both parties to deliver this business continuity information and data in the event of death, permanent incapacitation, incarceration of a Key Member, or either party becomes insolvent or bankrupt.

**SIGNATURE PAGE TO FOLLOW**

15

Damian Todaro
President
PPVNetworks

3/25/19
Date

Robert Felt
President
Dark Alley Media, LLC

3/25/19
Date

**APPENDIX ATTACHED**



# APPENDIX A

List of Key Members:

Damian Todaro
Robert Felt

# APPENDIX B

List of Domain Names:

RAWFUCKCLUB.COM
RFCCHANNELS.COM
RFCMEN.COM

# APPENDIX C

List of Online Streaming Services:

AEBN
Naked Sword

# APPENDIX D

Listing of Content licensed by DAM to joint venture:

- Entire library of existing Scenes, produced under the following lines: Raw Fuck Club, Dark Alley, Dark Alley XT, Fisting Underground and Darkroom
- 2 new originally produced Scenes per month

# EXHIBIT J

## Draft Complaint Prepared by Chase Lawyers (Unfiled)

This document is a partial draft complaint prepared on my behalf by **Chase Lawyers**, a law firm based in Miami and New York City, in or around **March 2025**.

It outlines factual allegations and legal claims related to **Robert Felt** and **Damian Todaro**, including issues of exclusion from company decision-making and asset control in **Dark Alley Media LLC**.

Due to financial hardship, I was unable to retain Chase Lawyers for full litigation. The draft was emailed to Robert Felt as a final attempt to prompt discussion and resolution prior to the present litigation in federal court.

This exhibit is submitted as relevant background to demonstrate the efforts made to resolve internal ownership and governance issues before becoming aware of the federal lawsuit.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- -           -            X

MARC EDISAD and DARK ALLEY MEDIA LLC, a New York limited liability company,
:
:        Index No.

     Plaintiff(s),    :

    :

                            -against-

    :

:     **VERIFIED COMPLAINT**

ROBERT FELT and VIDEOAPP, INC., a Saint Kitts and Nevis corporation d/b/a
PPVNetworks,:
:

     Defendant(s).        :

:

                         X

Plaintiffs Marc Edisad ("Edisad") and Dark Alley Media, LLC ("DAM") (collectively, the "Plaintiffs"), by their attorneys ChaseLawyers, as and for their Complaint in the above-entitled action, against Defendants Robert Felt ("Felt") and VideoApp, Inc. ("VideoApp") (collectively, the "Defendants") state on knowledge, and on information and belief as to all other matters, as follows:

# INTRODUCTION

1.      Plaintiff, Edisad and Defendant, Felt, possess equal ownership interests in and have equal rights to the management, profits and distributions of DAM.

2.      At all relevant times, Felt nevertheless exercised unilateral dominion and control over the finances, books and records of DAM and its management, distributions and allocations of profits.

3.      This action arises out of the wrongful conversion of Edisad's and Felt's business, DAM, by Felt, whom Edisad once praised as a trusted partner. The Parties established DAM, an adult-content website in 2005 and thereafter became successful business owners – unfortunately, Felt took advantage of Edisad's trust and goodwill to squeeze Edisad out and take the management, distributions and profits of their business for himself.

4.      Upon information and belief, Felt diverted [$$$$$] from DAM to his own benefit and converted cash and assets of DAM for his own use in the form of: (i) unilateral management of DAM while ignoring and blocking Edisad's efforts to participate in said management; (ii) diverting and unilaterally taking distributions to which Edisad was entitled; (iii) unauthorized and improper withdrawals of cash from the operating accounts of DAM; and (iv) making payments out of DAM revenues to third parties for Felt's personal obligations.

5.      Additionally, (without authorization from Edisad) Felt unilaterally obligated DAM under a written agreement (the "Contract") with VideoApp to permit PPVNetworks to distribute content with a percentage of the revenue earned from the distribution going to DAM. In order to effectuate the relationship, VideoApp accessed and took over control of DAM's domain, rawfuckclub.com (the "Domain"). Edisad is informed and believes that VideoApp is in

breach of the Contract for failing to make payments, failing to provide access to revenue information, and failing to provide any access to the domain for the owners. Additionally, Felt and VideoApp's owner, Damian Todaro … (civil conspiracy facts).

6.      Edisad brings this action to seek redress for his losses and to enforce his rights as an equal owner of DAM.  Absent urgent judicial redress, Defendants' actions pose irreparable harm to Plaintiffs, by depriving them of the right to participate in the ongoing affairs of DAM and threatening irreversible loss of reputation and goodwill.   Accordingly, Plaintiffs seek injunctive and other relief against Defendants, in addition to damages.

## PARTIES

7.      Plaintiff, Marc Edisad is a resident of the County of New York, State of New York.

8.      Plaintiff, Dark Alley Media, LLC is a domestic limited liability company duly formed and existing under the laws of the State of New York with its principal place of business located in New York County.

9.      Upon information and belief, Defendant, Robert Felt is an individual who resides in the State of New York.

10.     Upon information and belief, Defendant, VideoApp, Inc. is a foreign corporation formed under the laws of the Federation of Saint Kitts and Nevis and doing business in New York as PPVNetworks.

## JURISDICTION AND VENUE

11.     Jurisdiction in this action is based on New York's Civil Practice Law and Rules ("CPLR") §§ 301 and 302.  This Court has personal jurisdiction over the Defendants because of,

*inter alia,* Defendants' residency in New York, conducting business in New York, and having committed one or more tortious acts within New York.

12.     Venue for this action is proper in this Court pursuant to CPLR § 503 because Plaintiff Edisad resides in the County, and this County is the principal place of business for Plaintiff DAM.

## STATEMENT OF FACTS

13.  [Describe history of DAM, de facto expulsion of Edisad and more recent deterioration of DAM's revenues.]

### AS AND FOR A FIRST CAUSE OF ACTION – BREACH OF CONTRACT
### ROBERT FELT

14.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through [#], as if fully set forth herein.

### AS AND FOR A SECOND CAUSE OF ACTION – BREACH OF CONTRACT
### VIDEOAPP, INC.

15.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through [#], as if fully set forth herein.

### AS AND FOR A THIRD CAUSE OF ACTION – AN ACCOUNTING
### ROBERT FELT

16.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through [#], as if fully set forth herein.

### AS AND FOR A FOURTH CAUSE OF ACTION – CONVERSION
### ROBERT FELT

17.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through [#], as if fully set forth herein.

### AS AND FOR A FIFTH CAUSE OF ACTION – BREACH OF FIDUCIARY DUTY
### ROBERT FELT

18.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through [#], as if fully set forth herein.

### AS AND FOR A SIXTH CAUSE OF ACTION – AN ACCOUNTING
### VIDEOAPP, INC.

19.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through [#], as if fully set forth herein.

### AS AND FOR A SEVENTH CAUSE OF ACTION – BREACH OF DUTY OF LOYALTY
### ROBERT FELT

20.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through [#], as if fully set forth herein.

### AS AND FOR AN EIGHTH CAUSE OF ACTION – UNJUST ENRICHMENT
### ROBERT FELT

21.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through [#], as if fully set forth herein.

### AS AND FOR A NINTH CAUSE OF ACTION – EXPULSION
### ROBERT FELT

22.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through [#], as if fully set forth herein.

### AS AND FOR A NINTH CAUSE OF ACTION – CIVIL CONSPIRACY
### ROBERT FELT AND VIDEOAPP, INC.

23.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through [#], as if fully set forth herein.

**WHEREFORE**, Plaintiffs respectfully request judgment as follows:

A.    Awarding damages to Plaintiffs in an amount to be determined at trial but reasonably believed to be in excess of [$$$$];

B.    Expelling Felt from DAM;

C.    An accounting of all corporate records and bank accounts;

     C.     Enjoining Defendant Felt from: (a) making any membership distributions or allocations; (b) engaging in any activities outside of the normal course of DAM's business; and (c) granting to Plaintiffs immediate access to the books and records of DAM;

     D.     Granting to Plaintiffs a full accounting from Defendant, VideoApp, Inc. to ascertain the amount of compensatory damages due;

     E.     Enjoining Defendant, VideoApp from: (a) use of DAM content; (b) ordering the immediate return and access to the Domain.

     F.     Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated:    _____
      New York, New York          CHASE LAWYERS

                                 By: _ _ _ _ _ _ _ _
                                 Barry Oliver Chase, Esq.
                                 *Attorneys for Plaintiffs*
                                 1345 Avenue of the Americas
                                 New York, New York 10105
                                 Tel: (212) 601-2762

                                 By: _ _ _ _ _ _ _ _
                                 Anastasia Latman, Esq.
                                 *Attorneys for Plaintiffs*
                                 1345 Avenue of the Americas
                                 New York, New York 10105
                                 Tel: (212) 601-2762

STATE OF NEW YORK               )
                                 ) ss.:
COUNTY OF [COUNTY WHERE SWORN]   )

[NAME], being duly sworn, deposes and states:

I am the [plaintiff][OFFICER POSITION TITLE] of plaintiff [NAME OF PLAINTIFF COMPANY][] in this action. I have read the annexed complaint, and its factual contents are true to my personal knowledge, except as to the matters alleged on information and belief, and as to those matters, I believe them to be true.

[PLAINTIFF'S NAME AND TITLE]

Sworn to me this __ day of [MONTH], [YEAR]

Notary Public